## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SUNOCO PARTNERS MARKETING & TERMINALS L.P., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 17-1390-LPS-CJB |
| POWDER SPRINGS LOGISTICS, LLC, AND MAGELLAN MIDSTREAM PARTNERS, L.P., | ) ) ) ) ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

In this action filed by Plaintiff Sunoco Partners Marketing & Terminals L.P ("Sunoco" or "Plaintiff") against Powder Springs Logistics, LLC ("Powder Springs") and Magellan Midstream Partners, L.P. ("Magellan" and collectively with Powder Springs, "Defendants"), Sunoco alleges infringement of United States Patent Nos. 6,679,302 (the "'302 patent"), 7,032,629 (the "'629 patent"), 9,207,686 (the "'686 patent"), 9,494,948 (the "'948 patent") and 9,606,548 (the "'548 patent" and collectively with the other patents, "the asserted patents").[1] Presently before the Court is the matter of claim construction. The Court recommends that the District Court adopt the construction set forth below.

## I. BACKGROUND AND STANDARD OF REVIEW

The Court hereby incorporates by reference the summary of the background of this matter set out in its July 26, 2019 Report and Recommendation ("July 26 R&R"). (D.I. 321 at 1-

---

[1] Four of the five asserted patents (the '302 patent, '629 patent, '948 patent and '548 patent) are at issue in another litigation (the "Illinois Litigation"). *See* (D.I. 176 at 54; *Sunoco Partners Mktg. & Terminals, L.P. v. U.S. Venture*, No. 15-CV-8178 (D.I. 161) (N.D. Ill. April 10, 2017)). Sunoco also asserts United States Patent No. 7,631,671 (the "'671 patent") in the Illinois Litigation. The '686, '948 and '548 patents are all continuations of the '671 patent. (D.I. 176 at 5 n.7)

2) It additionally incorporates by reference the legal principles regarding claim construction set out in the July 26, 2019 R&R. (*Id.* at 2-5)

## II. DISCUSSION

The parties had claim construction disputes regarding five terms or sets of terms (hereinafter, "terms"). The Court has addressed four of these terms in previously-issued Report and Recommendations. (D.I. 321; D.I. 331) The Court addresses the remaining term ("gasoline"), which presented the most challenging claim construction dispute, herein.

The claim term "gasoline" appears in all asserted claims of the patents-in-suit. The use of the disputed term in claim 1 of the '302 patent and claim 1 of the '548 patent is representative. (*See* Defendants' Markman Presentation, Slides DDX-104-05) Accordingly, these claims are reproduced below, with the disputed term highlighted:

> 1. A system for blending *gasoline* and butane at a tank farm comprising:
>
> a) a tank of *gasoline*;
>
> b) a tank of butane;
>
> c) a blending unit, at the tank farm, downstream of and in fluid connection with the tank of *gasoline* and the tank of butane;
>
> d) a dispensing unit downstream of and in fluid connection with the blending unit; and
>
> e) a rack, wherein the dispensing unit is located at the rack and is adapted to dispense *gasoline* to *gasoline* transport vehicles.

('302 patent, col. 13:12-23 (emphasis added))

> 1. A system for blending butane with a *gasoline* stream having a *gasoline* flow rate, comprising:
>
> an injection device injecting the butane into the *gasoline* stream at a butane flow rate;

> a volatility measurement device in communication with the
> *gasoline* stream, the volatility measurement device configured to
> output data representative of a volatility measurement; and
>
> a processor in connection with the injection device and the
> volatility measurement device, the processor configured to:
>
> receive the volatility measurement, receive a target volatility value;
>
> determine an adjustment to the butane flow rate based on the
> volatility measurement and the target volatility value; and
>
> output a signal representative of the adjustment to the injection
> device.

('548 patent, col. 17:11-28 (emphasis added))

The parties' competing proposed constructions for "gasoline" are set out in the chart below:

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "gasoline" | "various types of refined petroleum that are used as fuel" | "a type of petroleum-based liquid" |

(D.I. 171 at 9) The crux of the parties' dispute with respect to this term is whether "gasoline" should be construed to encompass both "liquid streams [of gasoline] in [a] refinery" as well as "liquid streams [of gasoline] downstream of that refinery[,]" or whether it should be construed to encompass only the final, finished gasoline product ready for consumption (which, according to Sunoco, would not include liquid streams in a refinery). (*Id.* at 11; *see also* D.I. 315 ("Tr.") at 14) Defendants assert that the plain and ordinary meaning of "gasoline," as supported by the intrinsic record, encompasses both gasoline streams in a refinery and gasoline downstream of the refinery (i.e., "a type of petroleum-based liquid"). (D.I. 171 at 9; D.I. 188 at 2; Tr. at 25-26, 46) Sunoco, meanwhile, argues that the patents expressly define "gasoline" to mean the various

3

types of refined petroleum that are used as fuel (such that gasoline streams in a refinery would be excluded) and that this definition is consistent with the way persons of ordinary skill understand "gasoline." (D.I. 176 at 3; D.I. 191 at 3-4; Tr. at 23)[2]

It is beyond dispute that the general rule of claim construction is that "[t]he words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). There are two exceptions to this rule: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Id.* The standards for finding lexicography and disavowal are "exacting." *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015) (internal quotation marks and citation omitted).

In the Court's view, the plain and ordinary meaning of the term "gasoline," as is underscored by the content of the two representative patents (the '302 patent and the '548 patent), can refer to gasoline streams that are found, *inter alia*, in a refinery. (*See* D.I. 188 at 2; Tr. at 15-17) This is evident in various portions of the patent specifications.

For example, in the "Background of the Invention" section of the '302 patent specification, the patentee explained that:

---

[2] In instituting *inter partes* review proceedings as to the '948 and '548 patents, the United States Patent and Trademark Office's Patent Trial and Appeal Board ("PTAB") adopted Defendants' proposed construction of "gasoline." (D.I. 277, ex. A at 8-15; D.I. 307, ex. A) The Court notes, however, that the PTAB has done so while stressing that: (1) it is applying the "broadest reasonable interpretation" standard for claim construction (i.e., not the *Phillips* standard that applies here), (D.I. 307, ex. A at 6 n.4); (2) certain disclosures of the '948 and '548 patents are consistent with Sunoco's view, (*id.* at 10-11), and (3) its construction of the term is only "preliminary" at this stage, (*id.* at 11).

4

> Butane has historically been blended with gasoline at several
> points in the gasoline distribution chain. The first opportunity to
> blend butane with *gasoline is at the refinery*, before pipelines
> transport gasoline to tank farms. Refineries often add butane at the
> trunk line in response to changes in Reid vapor pressure demand.
> This process is imprecise, however, because the blended gasoline
> is subsequently mixed in the pipeline with other sources of
> gasoline of varying Reid vapor pressure. Moreover, because
> gasoline pipelines serve multiple regions that have variable RVP
> requirements, *the refinery can only modify the gasoline* to the
> lowest maximum RVP allowed by the EPA across the various
> regions served by the pipeline.

('302 patent, cols. 1:66-2:10 (emphasis added)) During the *Markman* hearing, Plaintiff's counsel concedes that the patentee's use of the term "gasoline" in this portion of the '302 patent specification was an example of the patentee using the term "more broadly" than the construction proposed here by Plaintiff—i.e., to include reference to the gasoline streams found at a refinery (and thus to substances that would not be included in Plaintiff's construction of the term "gasoline"). (Tr. at 16-17) The specification then goes on to note that butane is sometimes "added to gasoline" at a second point (i.e., "while [the gasoline] is being transported in the pipeline") and at a "third point of blending" (i.e., "at the tank farm"). ('302 patent, col. 2:11-12, 24)

The '548 patent specification further supports the conclusion that the plain and ordinary meaning of "gasoline" is as suggested by Defendants. The '548 patent incorporates by reference the specification of the '302 patent. ('548 patent, col. 1:5-18) And in the "Background of the Invention" section of the '548 patent specification, the patent cites to two prior art patents disclosing exemplary "refinery blending process[es:]"

> 1) "Mayer, U.S. Pat. No. 3,751,644" owned by Sun Oil
> Company, which "describes a system for automatically
> adjusting the amount of butane added to a *gasoline stream
> at a petroleum refinery*, based on continuous measurements

of the Reid vapor pressure of the gasoline downstream from the point of blending." (*Id.*, col. 2:26-33 (emphasis added)); and

2) "Bajek's U.S. Pat. No. 3,999,959, which is owned by Universal Oil Products Company, also discloses a system for blending butane and *gasoline at a petroleum refinery*. The Bajek system blends butane with a low-octane *gasoline* stream and a high-octane *gasoline* stream, and then analyzes the blended *gasoline* to measure characteristics such as Reid vapor pressure and vapor to liquid ratio. Bajek does not disclose monitoring the gasoline upstream of the blending operation, or calculating the blend ratio based upon such upstream monitoring." (*Id.*, col. 2:40-49 (emphasis added))

The '548 patent's description of Bajek is particularly instructive. It must be that when the patent states that Bajek discloses a system for blending "butane" and "*gasoline*[,]" that reference to "gasoline" includes reference to a "gasoline stream" found at a refinery—because those gasoline streams are what is thereafter described as being blended with butane in the Bajek system.[3]

---

[3] Sunoco retorts that these statements in the respective patent specifications are irrelevant because they are found in the "Background of the Invention" section of the patents. (D.I. 191 at 2) The Court does not agree that this is so. Sunoco does not point to any caselaw indicating that statements found in the "Background of the Invention" section of a patent are *irrelevant* to understanding the ordinary meaning of a term in a patent. Of course, if language in the "Background of the Invention" section that describes a term seems like it is in direct conflict with language regarding that term that is found in a section describing the present invention, then there might be reason to credit the latter over the former. But otherwise, or absent some other indication to the contrary, if one is attempting to discern the plain and ordinary meaning of a term used in a patent, it would seem that important clues can be drawn from each instance of that word's use in a patent. *See Techno View IP, Inc. v. Oculus VR, LLC*, Civil Action No. 17-386-VAC-CJB, 2018 WL 4141032, at *3 (D. Del. Aug. 30, 2018) (adopting a construction for "videogame" that drew definitional language both from portions of the "Background of the Invention" section of the patent and from the "Detailed Description of the Invention" section of the patent, where the language from these different sections was not in conflict with each other) (internal quotation marks omitted); *Symantec Corp. v. Veeam Software Corp.*, No. C 12-0700 SI, 2014 WL 212624, at *7 (N.D. Cal. Jan. 17, 2014) (rejecting defendant's argument that a statement in the "Background of the Invention" section of the patent relating to the disputed term was irrelevant because it was describing the prior art and not the invention, where "there is no language in the patent suggesting that the description provided is limited only to the prior art").

Thus, the '302 patent and '548 patent both use the term "gasoline" to refer to substances that necessarily include gasoline streams found at a refinery. And this also makes sense in terms of the typical usage of the words in question. What is a "gasoline stream" after all, but a stream of *gasoline*? This all supports Defendants' position that the ordinary meaning of "gasoline"—as understood in the context of the intrinsic record—includes gasoline at a refinery (e.g., "gasoline streams" utilized at such a refinery). (*See* Defendants' Markman Presentation, Slides DDX 106-09)[4]

Sunoco's leading argument in support of its construction is that the patents "express[ly]" define the term "gasoline" in a manner that excludes "'liquid streams in the refinery[.]'" (D.I. 191 at 1-2; *see also* D.I. 176 at 2-3; Tr. at 56) In support, Sunoco points to the following emphasized portions of the specification of the '302 patent (which are found in the section entitled "Detailed Description of the Exemplary Embodiments"):

> The term "tank farm" is meant to encompass any facility that contains a number of large storage tanks for petroleum products, from which petroleum tanker trucks are filled. Such facilities typically contain multiple storage tanks that separately contain various types and grades of gasoline, including reformulated gasoline as that term is typically used in the gasoline business, and the various grades of reformulated gasoline. The tanks may also contain more specialized petroleum products. *Each of these various types and grades of gasoline and specialized petroleum products, is capable of being blended according to the present invention, and is thus encompassed within the term "gasoline."* . . .
>
> .
>
> The dispensing unit can be any type of unit that is adapted for dispensing petroleum products to conventional receptacles mounted on petroleum tanker trucks. One typical dispensing unit

---

[4] Indeed, some of the claims of the patents-in-suit use the phrase "gasoline stream" in describing the invention, and state that gasoline streams are blended with butane (including at tank farms). How then could "gasoline streams" be something that are not "gasoline" and that exist only at the refinery?

> is called a "rack" and is located on the tank farm. The dispensing unit can comprise several outlet ports to which different transports may be coupled. Generally, a transport driver connects the transport to the dispensing unit and selects the desired grade of gasoline. The selection of gasoline initiates the blending process. In the description that follows, *gasoline can include gasoline, as well as other types of refined petroleum products such as diesel and jet fuel.*

('302 patent, cols. 4:58-5:27 (emphasis added))

In citing to these portions of the specification, Sunoco has not met the "exacting" standard to demonstrate that the patentee therein defined "gasoline" in a way that would alter the plain and ordinary meaning of the term (i.e., to exclude gasoline streams at a refinery that are used to make "finished gasoline"). To act as its own lexicographer, a patentee must "clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning." *Thorner*, 669 F.3d at 1365 (internal quotation marks and citation omitted). Here, the patentee's statements about certain substances that "*are encompassed within* the term" "gasoline" or about what gasoline "*can include*" do not suggest that the meaning of "gasoline" is necessarily limited in the way Plaintiff suggests. In other words: (1) where the patent makes reference to "gasoline" in a manner that refers to gasoline streams existing in the refinery; and (2) then the patent later says that "gasoline" "can include" or "encompass[es]" certain finished gasoline products that exist downstream of the refinery; that simply means that (3) the term "gasoline" is broad enough to refer to all of those substances. If the patentee had a different, more particularized view of what "gasoline" should mean (i.e., one that tracks Plaintiff's proposal here), it could have set this out clearly somewhere in the patent. But it did not do so.[5] Thus, nothing about the portions of the

---

[5] Other portions of the specification indicate that when the patentee wanted to provide an express definition for a term, it knew how to do so. (*See, e.g.*, '302 patent, col. 5:13-

8

specification referenced by Plaintiff changes the ordinary meaning of "gasoline"; it is a refined substance that exists in various forms inside the refinery, where it is made, *and* downstream of the refinery.[6] *Cf. Int'l Biomedical Ltd. v. Gen. Elec. Co.*, CAUSE NO. 1-14-CV-397-LY, 2015 WL 7431408, at *3 (W.D. Tex. Nov. 20, 2015) (rejecting the patentee's argument that a statement in the specification explaining that a base "may include a pedestal and wheels" amounted to lexicography requiring that a base must include a pedestal and wheels) (emphasis omitted); *Adventis Pharms. Inc. v. Impax Labs., Inc.*, No. 02-1322 (GEB), 2011 WL 94188, at *3 (D.N.J. Jan. 11, 2011) (holding that in stating that a "suitable antiadherent includes" certain compounds, the patentee did not act as his own lexicographer and limit the term to only including the thereafter-listed compounds, because the patentee's phraseology did not amount to a "clear definition transition phrase" such as "defined as" or "means" or "refers to" or "is[,]" and where those types of clear definition transition phrases were otherwise used in the specification) (internal quotation marks omitted).[7]

---

15 ("As used herein, the term 'tank farm' *only includes* tank farms that distribute petroleum products to petroleum tanker trucks.") (emphasis added))

[6] Defendants do not dispute that the ordinary meaning of gasoline is a substance that is "refined"—in that it is no longer crude oil. (Tr. at 26, 45 ("I'm not saying gasoline is crude oil. Gasoline is refined from crude oil.")) And it is not in dispute that gasoline is "refined" in the refinery. (*Id.* at 54)

[7] Sunoco contends that regulations promulgated by the Environmental Protection Agency ("EPA"), which are referred to generally in the patents, (*see, e.g.*, '948 patent, cols. 1:59-2:1), underscore that the plain and ordinary meaning of "gasoline" comports with its proposed construction, (D.I. 176 at 4 n.4; D.I. 191 at 3-4; Tr. at 20-21). To that end, the EPA regulations define "gasoline" to mean "any fuel sold in any State[] for use in motor vehicles and motor vehicle engines, and commonly or commercially known or sold as gasoline." 40 C.F.R. § 80.2(c) (2015). But again, no one disputes that "gasoline" as used in the patents-in-suit includes this meaning. (D.I. 307, ex. A at 4) Moreover, as Defendants point out, even these EPA regulations later refer to "gasoline" as something existing inside the refinery, where it is produced. (*See* Defendants' Markman Presentation, Slide DDX-122 (quoting 40 C.F.R. §

Nor has Plaintiff met the "exacting" standard to show that the patentee disavowed the full scope of this claim term (i.e., to exclude gasoline streams at a refinery), either in the specification or during prosecution. The Court has already discussed the content of the patent specifications above. And with regard to the prosecution history, there the patentee did not disavow the full scope of the term "gasoline" either. Indeed, if anything, the prosecution history provides some support for the idea that the ordinary meaning of "gasoline" includes gasoline streams found in a refinery.

During prosecution of the '302 patent, the Examiner originally allowed some claims and rejected other claims as being anticipated by Bajek, the prior art patent previously referenced above. (D.I. 166, ex. G at SUN_MAG_0000173) The claims that were allowed were claims that referenced the simplifying and optimizing of purchasing decisions, as well as claims directed to a feedforward blending system. (Tr. at 37, 66; D.I. 166, ex. G at SUN_MAG_0000173)[8] The Examiner explained that Bajek discloses "a gasoline blending system comprising a source of

---

80(h)); Tr. at 48-49) That is, the EPA regulations define "refinery" to mean "any facility, including but not limited to, a plant, tanker truck, or vessel where *gasoline* or diesel fuel is produced, including any facility at which blendstocks are combined to produce *gasoline* or diesel fuel, or at which blendstock is *added to gasoline* or diesel fuel." 40 C.F.R. § 80(h) (2015) (emphasis added). In the Court's view, then, the definitions found in the EPA regulations do not settle this matter.

[8] According to Defendants, a feedforward blending system is one that: (1) receives a volatility measurement of gas; (2) receives a volatility measurement of butane; (3) makes a calculated prediction of what you need to blend; and (4) then blends butane into gasoline. (*See* Tr. at 67-68, 128-29) For example, the Examiner stated that claim 5 would be allowed if rewritten in independent form; that claim discloses sensors that measure the vapor pressure of gasoline and butane within the blending unit immediately before blending. (D.I. 166, ex. G at SUN_MAG_0000173, SUN_MAG_0000226) Meanwhile, a feedback system (which, according to Defendants, is disclosed in Bajek) consists of: (1) performing the blending; (2) taking the relevant measurements; and (3) adjusting from there. (Tr. at 68, 129; D.I. 28, ex. 5, cols. 8:22-10:33)

10

gasoline ... and a source of Butane[.]" (D.I. 166, ex. G at SUN_MAG_0000173) In response, the patentee amended claims 1, 13, 37 and 41 such that the blending system comprised, *inter alia*, a blending unit "at the tank farm[.]" (*Id.* at SUN_MAG_0000226, 228, 234) And the patentee explained that the independent rejected claims, as amended, "recite blending or a blending unit at a tank farm where gasoline is dispensed with a dispensing unit. Typically, the tank farm is the point of distribution to tanker trucks or other forms of transportation." (*Id.* at SUN_MAG_0000236) The patentee then distinguished Bajek by explaining that Bajek:

> [T]eaches a system for blending *gasoline streams*. However, the technology disclosed in Bajek is limited to *blending gasoline streams as part of the refining process*. . . . The various *gasoline streams the refiner works with are part of the refining process* and are *not the end product that is distributed to retailers*. . . . Accordingly, Bajek is limited to controlling *gasoline pools at the refinery* before entering the pipeline to be transported to the tank farm.
>
> As described in the specification of the present application, blending at the refinery is only the first stage in the delivery process for gasoline. The inventions defined by amended Claims 1, 13, 37, and 41 are directed to controlling the volatility of gasoline at the point of distribution, namely the tank farm. The prior methods of blending butane at the refinery lack the precision provided by the inventions defined by these claims. . . . In contrast to the raw components at the refinery, the tank farm distributes *finished gasoline ready for consumption*.

(*Id.* at SUN_MAG-0000236-37 (emphasis added)) But the Examiner was not persuaded, informing the patentee that the Bajek blending system still anticipated these claims because refineries have tank farms. (*Id.* at SUN_MAG_0000241) In response, the patentee further amended these claims to recite "a rack[.]" (*Id.* at SUN_MAG_0000245, 247, 254, 255) These amended claims were then allowed. (*Id.* at SUN_MAG_0000258)

11

This portion of the prosecution history demonstrates that it was not some special definition of "gasoline"—i.e., one that excluded gasoline streams in a refinery—that resulted in the allowance of the claims. After all, the Examiner referred to Bajek as describing a source of "gasoline" that exists at the refinery. And the patentee referred to Bajek as disclosing a system for blending "gasoline streams" or "gasoline pools," which are streams *of "gasoline"* or pools *of "gasoline."* Rather, it was the addition of the "rack" limitation that made it clear that the claims at issue were limited to a particular location downstream of the refinery. (D.I. 188 at 2; Tr. at 28, 41) This reinforces Defendants' position that the ordinary meaning of "gasoline" is broad enough to encompass gasoline (e.g., gasoline streams) in a refinery, and it certainly does nothing to suggest that during prosecution, Plaintiff did something to disavow the full scope of the ordinary meaning of "gasoline."

The Court certainly acknowledges that in the prosecution history, the patentee was asserting that there are differences between gasoline utilized at a refinery and gasoline found at a tank farm downstream from a refinery.[9] For example, the patentee there explained that the

---

[9] During the *Markman* hearing, Sunoco's arguments with respect to the term "gasoline" emphasized its position that "gasoline" as claimed in the patents is something found "downstream of the refinery." (*See, e.g.*, Tr. at 7-8, 56 ("I think it's [] clear that we defined ['gasoline'] in the patent to say, here we're talking about downstream of the refinery where the crude oil goes in and the gasoline comes out."), 59, 65 (Sunoco's counsel agreeing that it included "refined" in its proposed construction of "gasoline" "to mean downstream from the initial or crude oil refinery")) Thus, understandably, Defendants' responsive arguments at the Markman hearing were focused on demonstrating that, according to the patents, "gasoline" can exist at the refinery. And, as the Court has noted herein, Defendants are surely right about that.

However, upon review of the filings relating to the IPR proceedings, the Court notes that in those proceedings, Sunoco's arguments (or, at least, where Sunoco was placing its emphasis) seemed to shift a bit. That is, there Sunoco asserted that the "key claim construction dispute between the parties" was not "*where* gasoline may be found (*i.e.*, in a refinery)" but instead was whether "the *components* that are blended to make gasoline (*e.g.*, 'gasoline streams' or other component streams)" are "gasoline[.]" (*See, e.g.*, D.I. 293, ex. A at 2-3 (internal quotation marks

12

"various *gasoline streams that the refiner works with* are part of the refining process and are not the *end product* that is distributed to retailers" and that in "contrast to the raw components at the refinery, the tank farm distributes *finished gasoline* ready for consumption." (D.I. 166, ex. G at SUN_MAG_0000236-37 (emphasis added)) But the key point is that in noting all of this, the patentee was *not* indicating that the way it was going to distinguish these two types of substances was by calling one of them "gasoline" and one of them something else that is not "gasoline." If anything, what these prosecution history excerpts show is that the patentee knew that if it was going to make a distinction between the two substances, then some *other words* would need to be used (e.g., when the patentee uses "*finished* gasoline" to refer to gasoline at a downstream tank farm that is ready for consumption or to "gasoline streams *that the refinery works with*" to refer to gasoline found at the refinery that is not "finished gasoline").[10]

---

and citation omitted) (emphasis in original)) The Court notes that it does not have before it the full record that was presented to the PTAB. That said, the Court has also herein set out why the intrinsic record (and the overall record before it) demonstrates that "gasoline" can include "gasoline streams" found in a refinery.

[10] As Plaintiff notes, in the prosecution history and in the patents-in-suit, the patentee repeatedly stated that its invention was meant to relate to the utilization of gasoline downstream of a refinery. That is indicated, for example, in the prosecution history, where the patentee states that "Bajek is limited to controlling gasoline pools at the refinery *before entering the pipeline* to be transported to the tank farm[,]" whereas the present invention encompasses different blending processes. (D.I. 166, ex. G at SUN_MAG_0000236 (emphasis added)) And the '948 patent, for example, includes the statement that "[t]he invention . . . may be practiced at any point on a pipeline *downstream of a refinery.*" ('948 patent, col. 5:1-5 (emphasis added); *see also id.*, col. 11:19-27 ("The invention may be located anywhere *downstream of a refinery.*") (emphasis added)) Other patents-in-suit include similar statements. ('302 patent, title and Abstract; *see also id.*, cols. 2:57-3:2 ("[A] need exists for precise measurements at the final distribution point, which is the tank farm."); *id.*, col. 3:14-16 ("The present invention is a system and method for blending butane with gasoline at the tank farm, immediately before the gasoline is dispensed to a tanker truck."); Tr. at 31 (Defendants' counsel stating that "I certainly agree these inventors are trying to say we are outside of refineries.")) And yet, it is clear that Defendants, in making their invalidity case, are going to assert that some claims of the patents-in-suit (that do not include limitations drawn to a "tank farm" or "rack"), like claim 7 of the '948

13

For all of the above reasons, the Court concludes that Plaintiff's proposed construction for "gasoline" is not appropriate. With the Court having resolved the dispute between the parties (and with Defendants' proposed construction not adding much of use), (D.I. 191 at 3), the Court recommends that "gasoline" be afforded its plain and ordinary meaning and that the term need not be further construed at this time.

## III. CONCLUSION

For the foregoing reasons, the Court recommends that the District Court adopt the following construction:

1. "gasoline" should be afforded its plain and ordinary meaning

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.

---

patent or claim 27 of the '302 patent, may be practiced at a refinery. (D.I. 188 at 3; Tr. at 69-70) The Court understands a part of Plaintiff's counter to this argument to be that such claims: (1) have to be limited to downstream-of-the-refinery blending, in light of what is said in the patents and the prosecution history regarding the intent behind the inventions; and so (2) it must be that, in claims like claim 7 of the '948 patent or claim 27 of the '302 patent, the claims' use of the word "gasoline" is something that helps to convey this point.

It may be that Plaintiff is wrong in its claim that the patented inventions are all limited to blending downstream of a refinery. Or it may be that Plaintiff is right about that, but that (in claims like claim 7 of the '948 patent or claim 27 of the '302 patent), it is the inclusion of words other than "gasoline" that shows that this is so. Or it may be that Plaintiff is right that the claims were meant to all be directed to downstream blending, but the patentee made some mistakes as to certain claims and did not include words that conveyed this clearly. *See Bayer CropSci. AG v. Dow AcroScis. LLC*, 728 F.3d 1324, 1332 (Fed. Cir. 2013) ("[I]t is hardly unknown for a patentee with an invention that could be protected to fail in securing such protection by bad choices in claim drafting.") (citing cases). The Court does not yet know what the correct answer to these questions might be. But what the Court can say, for the reasons set out above, is that, based on the record before it, "gasoline" can refer to gasoline streams used at a refinery. (Tr. at 31)

14

Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: August 29, 2019

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE