**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SUNOCO PARTNERS MARKETING &<br>TERMINALS L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-1390-LPS-CJB |
| | ) | |
| POWDER SPRINGS LOGISTICS, LLC,<br>and MAGELLAN MIDSTREAM<br>PARTNERS, L.P., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court in this patent infringement case is Defendants Powder Springs

Logistics, LLC ("Powder Springs") and Magellan Midstream Partners, L.P.'s ("Magellan," and

collectively with Powder Springs, "Defendants") motion to dismiss for failure to state a claim

pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (D.I. 138; October 11,

2018 Oral Order) With the Motion, Defendants argue that the patents asserted by Plaintiff

Sunoco Partners Marketing & Terminals L.P. ("Sunoco" or "Plaintiff") are directed to patent-

ineligible subject matter pursuant to 35 U.S.C. § 101 ("Section 101") and that Plaintiff's

allegations of willful infringement fail to meet the *Twombly/Iqbal* pleading standard. The Court

has previously issued a Report and Recommendation addressing the Motion with regard to

Plaintiff's claims of willful infringement. (D.I. 322) This Report and Recommendation will

address the Motion as it relates to the assertion that certain claims of the patents-in-suit are patent

ineligible pursuant to Section 101. For the reasons that follow, the Court recommends that the

Motion be DENIED in that respect.

## I.    BACKGROUND

In this patent case, Plaintiff alleges that Defendants infringe five of Plaintiff's patents.

Those patents are United States Patent Nos. 9,494,948 (the "'948 patent"), 9,606,548 (the "'548

patent"), 9,207,686 (the "'686 patent"), 6,679,302 (the "'302 patent") and 7,032,629 (the "'629 patent") (collectively, "the asserted patents" or "the patents-in-suit"). The patents-in-suit relate to systems and methods for the automated blending of butane and gasoline.

The Court hereby incorporates its summary of the technology at issue and its summary of the patents-in-suit set out in the Court's January 8, 2018 Report and Recommendation, (D.I. 68 at 1-8); further information about these subjects relevant to the pending Motion will be set out in Section III below. Additionally, the Court also incorporates its summary of the procedural background of this matter, which was set out in the Court's August 7, 2019 Report and Recommendation. (D.I. 322 at 2-3)

## II.     STANDARD OF REVIEW

This portion of the instant Rule 12(b)(6) Motion asserts that certain claims of the patents-in-suit are directed to patent-ineligible subject matter. The Court has often set out the relevant legal standards for review of such a motion, including in *Genedics, LLC v. Meta Co.*, Civil Action No. 17-1062-CJB, 2018 WL 3991474, at *2-5 (D. Del. Aug. 21, 2018). The Court hereby incorporates by reference its discussion in *Genedics* of these legal standards and will follow those standards herein. To the extent consideration of this portion of Defendants' Motion necessitates discussion of other, related legal principles, the Court will set out those principles in Section III below.

## III.     DISCUSSION

The five patents-in-suit share two specifications. The '629 patent and the '302 patent (the "generation-1 patents") share a specification and the '948 patent, '548 patent, and '686 patent (the

"generation-2 patents") also share a specification.[1] The generation-2 specification explicitly incorporates the generation-1 specification by reference. ('686 patent, col. 1:7-18)

In assessing the eligibility of the challenged claims of the patents, the Court will first discuss which of these claims will be addressed herein as representative. Thereafter, it will analyze the relevant claims under the test for patent eligibility set out in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

### A. Representative Claims at Issue

In their opening briefs, Defendants put at issue the eligibility of certain claims of the generation-1 patents (claims 17-33 of the '629 patent and claims 18-35 of the '302 patent)[2] and all of the claims of the generation-2 patents. (D.I. 139 at 1-2) In doing so, Defendants made arguments as to why each of these claims are patent ineligible. (*See generally* D.I. 29; D.I. 139) That said, Defendants tended to focus their eligibility arguments as to all claims on a few purportedly representative claims: claim 17 of the '629 patent, claims 18, 23 and 27 of the '302 patent, claim 1 of the '548 patent, claim 7 of the '948 patent and claim 1 of the '686 patent. (D.I. 29 at 4-6; D.I. 139 at 5-11)

In its answering briefs, with regard to the generation-1 patents, Plaintiff did not explain why the above-referenced, assertedly-representative claims were, in fact, not representative. (*See, e.g.*, D.I. 145 at 5) Nor did Plaintiff, in pushing back on Defendants' arguments, specifically address the content of any other challenged claim of the generation-1 patents. Thus,

---

[1]     As a result, the Court will herein make reference only to the '629 patent specification and the '686 patent specification unless otherwise noted.

[2]     Defendants are not challenging the eligibility of claims 1-16 of the '629 patent and claims 1-17 and 36-41 of the '302 patent.

the Court can treat claim 17 of the '629 patent, and claims 18, 23, and 27 of the '302 patent, as

representative; it will therefore refer to the content of those claims below in assessing the

arguments for and against the eligibility of the generation-1 patent claims. *See Berkheimer v. HP*

*Inc.*, 881 F.3d 1360, 1365-66 (Fed. Cir. 2018) (noting that courts "may treat a claim as

representative . . . if the patentee does not present any meaningful argument for the distinctive

significance of any claim limitations not found in the representative claim or if the parties agree

to treat a claim as representative"); *TMI Sols. LLC v. Bath & Body Works Direct, Inc.*, C.A. No.

17-965-LPS-CJB, 2018 WL 4660370, at *6 (D. Del. Sept. 28, 2018) (same).

 With regard to the generation-2 patents, Plaintiff did make distinct arguments in its

answering briefs regarding eligibility as to claims beyond those called out as representative by

Defendants (e.g., as to claim 7 of the '548 patent, claims 1 and 3 of the '948 patent[3] and claim 7

of the '686 patent). (D.I. 45 at 11; D.I. 145 at 4-5) Thus, normally the Court would be required

to separately assess each of these additional claims in its eligibility analysis. *See Berkheimer*,

881 F.3d at 1365-66. Yet in light of the nature of the decision here, the Court will not need to

address all of these additional claims; instead it will primarily focus on the purportedly-

representative generation-2 patent claims identified by Defendants.

 Below, the Court sets out the text of each of the claims Defendants described as being

representative, as well as claim 7 of the '686 patent, which was also discussed at length at the

second oral argument, (*see, e.g.*, D.I. 197 at 39, 42, 64, 74-75):

**Claim 17 of the '629 patent:**

---

[3] The Court notes that Plaintiff likely intended to cite claims 1 and 7 (not 3) of the
'948 patent and claim 3 (not 7) of the '548 patent; those claims recite the "tangible and concrete
things" that Plaintiff points to. ('948 patent, col. 18:16-25 (claim 7 reciting a "butane reservoir,"
etc.); '548 patent, col. 17:32-33 (claim 3 reciting a "plurality of gasoline streams"))

17. A computer-implemented method for blending a butane stream with a gasoline stream comprising the steps of:

receiving a first measurement indicating a vapor pressure of the gasoline stream;

receiving a second measurement indicating a vapor pressure of the butane stream;

calculating a blend rate at which the butane stream can be blended with a gasoline stream; and

transmitting an instruction to a programmable logic controller for adjusting the butane stream to the calculated blend rate for blending with the gasoline stream and distributing at a rack.

('629 patent, col. 14:38-49)

**Claim 18 of the '302 patent:**

18. A method for optimizing butane purchase decisions for a petroleum products tank farm comprising:

a) in an information processing unit, setting a value for the quantity of butane in a tank at time zero;

b) drawing a butane stream from the tank of butane;

c) blending the butane stream with gasoline for a first interval of time from time zero until time one;

d) monitoring the consumption of butane blended with the gasoline during the first interval of time, and transmitting data regarding the consumption during the first interval of time to the information processing unit; and

e) transforming the consumption data during the first interval of time, and the butane quantity at time zero, to an output of data comprising the butane consumption rate during the first interval of time, and the quantity of butane in the tank at time one.

('302 patent, col. 14:51-67)

**Claim 23 of the '302 patent:**

**23.** A method for simplifying record keeping requirements for butane use at a petroleum products tank farm comprising:

a) drawing a gasoline stream from a tank of gasoline;

b) drawing a butane stream from a tank of butane;

c) blending the butane stream and the gasoline stream to form a blend;

d) monitoring the volatility of the gasoline stream and the butane stream;

e) monitoring the rate at which the butane stream is blended with the gasoline stream;

f) inputting the monitored volatilities and monitored blend rate to an information processing unit; and

g) generating a report that tabulates the monitored volatilities and monitored blend rate, or a summary thereof.

('302 patent, col. 15:31-46)

### Claim 27 of the '302 patent:

**27.** A method for blending butane and gasoline using a processor comprising:

a) receiving a gasoline volatility measurement at the processor;

b) receiving a butane volatility measurement at the processor;

c) receiving a target gasoline volatility value at the processor; and

d) calculating a butane blend rate from the gasoline volatility measurement, the butane volatility measurement, and the target gasoline volatility value.

('302 patent, col. 15:54-65)

### Claim 1 of the '548 patent:

**1.** A system for blending butane with a gasoline stream having a gasoline flow rate, comprising[:]

an injection device injecting the butane into the gasoline stream at a butane flow rate;

a volatility measurement device in communication with the gasoline stream, the volatility measurement device configured to output data representative of a volatility measurement; and

a processor in connection with the injection device and the volatility measurement device, the processor configured to:

receive the volatility measurement; receive a target volatility value;

determine an adjustment to the butane flow rate based on the volatility measurement and the target volatility value; and

output a signal representative of the adjustment to the injection device.

('548 patent, col. 17:11-28)

**Claim 7 of the '948 patent:**

**7.** A system for blending butane with gasoline in a pipe to form a blend of butane and gasoline, wherein the gasoline and the blend of gasoline and butane each have a vapor pressure, comprising:

a) a butane reservoir in fluid connection with said gasoline;

b) an injector valve for discharging butane into said gasoline;

c) a vapor pressure analyzer connected to said pipe, said analyzer configured to determine the vapor pressure of the blend of gasoline and butane, and to transmit said vapor pressure to a processor;

d) a programmable logic controller governing the flow of butane through said injector valve; and

e) a processor programmed to receive the vapor pressure from the analyzer, calculate an amount of butane to inject into the gasoline based on a maximum preprogrammed volatility limit, and provide a control signal to said programmable logic controller according to said maximum preprogrammed volatility limit;

wherein the programmable logic controller is configured to adjust the injector valve to govern the flow of butane through said injector valve into said gasoline based on the signal from the processor.

('948 patent, col. 18:12-35)

**Claim 1 of the '686 patent:**

1. A method for in-line blending of gasoline and a volatility modifying agent comprising:

a) providing a continuously flowing gasoline stream that comprises:

      i) a plurality of batches of different gasoline types;

      ii) a gasoline flow rate that varies over time; and

      iii) a plurality of gasoline vapor pressures;

b) providing an allowable vapor pressure;

c) providing a stream of said agent that comprises an agent vapor pressure;

d) periodically determining said gasoline vapor pressure;

e) periodically determining said gasoline flow rate;

f) calculating a blend ratio based upon said agent vapor pressure, said gasoline vapor pressure, and said allowable vapor pressure; and

g) blending said agent stream and said gasoline stream at a blending unit at said blend ratio to provide a blended gasoline stream having a blended vapor pressure less than or equal to said allowable vapor pressure.

('686 patent, cols. 15:62-16:13)

**Claim 7 of the '686 patent:**

7. A system for in-line blending of gasoline and a volatility

modifying agent comprising:

a) a continuously flowing gasoline stream that comprises:

      i) a plurality of batches of different types of gasoline;

      ii) a gasoline flow rate that varies over time; and

      iii) a plurality of gasoline vapor pressures;

b) an agent stream that comprises an allowable agent vapor pressure;

c) a blending unit for blending said gasoline stream and said agent stream at an actual blend ratio and an actual blend rate to yield a blended gasoline stream;

d) an upstream vapor pressure sensor in sensory communication with said gasoline stream upstream of said blending unit; and

e) one or more information processing units (IPUs) in informational communication with said upstream vapor pressure sensors, logically programmed to calculate a calculated blend ratio and calculated blend rate based upon vapor pressure and volumetric flow rate of said gasoline stream, and for communicating said calculated blend ratio and calculated blend rate to said blending unit;

f) wherein said blending unit periodically accesses said calculated blend ratio and calculated blend rate from said one or more IPUs, and adjusts the actual blend ratio and actual blend rate to coincide with said calculated blend ratio and calculated blend rate.

('686 patent, cols. 16:44-17:3)

## B. *Alice*'s Step One

At step one, Defendants assert that the challenged claims of the patents-in-suit are

directed to abstract ideas of "gathering and processing data" or "gathering and

analyzing/calculating data" or "gathering data" or "data gathering and processing" or "gathering

and processing intangible data." (*See* D.I. 29 at 4-6, 9-12; D.I. 139 at 5-11) (For simplicity's sake below, the Court will refer to the proffered abstract idea generally as "data gathering and processing."). In response, Plaintiff does not contest that "data gathering and processing" is an abstract idea; instead, it argues that the claims, when examined as a whole, are directed to much more than that. (D.I. 145 at 4-10; *see also* D.I. 45 at 16) According to Plaintiff, the claims are directed at least to "butane blending[,]" (D.I. 45 at 8-9), and, more specifically, to "patent-eligible processes and machines for blending butane with gasoline that involve concrete, tangible components[,]" (D.I. 145 at 4). In reply, Defendants argue that even if the claims could be said to be directed to more than just the concept of "data gathering and processing," and instead were "directed to 'butane blending'"—a proposition Defendants label as "incorrect[,]" (D.I. 29 at 10 n.3)— the claims would still fail step one. This is assertedly because: (1) "butane blending was 'known' as of the filing of the patents" and was "a fundamental practice in the petroleum industry"; or (2) butane blending amounts to only the "specific [technological] context of the claims[.]" (*Id.* at 10 n.3 (emphasis omitted); D.I. 56 at 1 n.1, 2-3; D.I. 153 at 1-4 & n.1; *see also* D.I. 139 at 9)

The Court rejects Defendants' argument at step one that the purportedly-representative claims are directed to only the concept of "data gathering and processing." Below, the Court will first set out how the intrinsic record shows that the claims must be described as being directed to something more than this—i.e., why the claims' focus has to at least include reference to the process or mechanics of *blending butane with gasoline*. Next, it will explain why Defendants are wrong as a legal matter when they argue that the Court should ignore the claims' reference to blending butane and gasoline. And lastly, the Court will describe how Defendants' failure to

properly articulate an asserted abstract idea that the claims are directed to is fatal to their Motion, even if there are indicators that at least some of the challenged claims might be patent ineligible.

1. **The Intrinsic Record Does Not Support Defendants' Contention that the Purportedly-Representative Claims are Directed Only to "Data Gathering and Processing."**

In *Alice*'s first step, the "'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on 'whether their *character as a whole* is directed to excluded subject matter.'" *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (quoting *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015) (emphasis added)). That inquiry "cannot simply ask whether the claims *involve* a patent-ineligible concept, because essentially every routinely patent-eligible claim" does so at some level. *Id.* (emphasis in original). Moreover, the Federal Circuit has cautioned district courts not to "describ[e] the claims at such a high level of abstraction" so that the description is "untethered from the language of the claims" in a way that "all but ensures that the exceptions to [Section] 101 swallow the rule." *Id.* at 1337; *see also Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017) ("At step one, it is not enough to merely identify a patent-ineligible concept underlying the claim; [the court] must determine whether that patent-ineligible concept is what the claim is directed to.") (internal quotation marks and citation omitted).

With this step one guidance firmly in mind, when the Court assesses the intrinsic record here, it just seems fundamentally wrong to conclude that the purportedly-representative claims are directed to nothing more than "data gathering and processing." Of course, at some level the claims *involve* that concept. All of the claims-at-issue, in one way or another, make some reference to monitoring/transmitting/receiving certain measurement data and to performing either a subsequent calculation based on that data or to transforming that data. For example,

11

claim 17 of the '629 patent, a generation-1 patent, describes "receiving" measured vapor pressures of the gasoline and butane streams and then "calculating a blend rate[.]" ('629 patent, col. 14:38-49)  Similarly, claim 18 of the '302 patent (the other generation-1 patent) recites "monitoring" butane consumption and then "transforming" that consumption data. ('302 patent, col. 14:51-67)  Likewise, each of the generation-2 patent claims include some reference to this concept, such as in claim 7 of the '686 patent, where an information processing unit "calculate[s]" a blend ratio and rate based certain measurements from a "sensor[.]" ('686 patent, cols. 16:44-17:3)  Yet in light of the intrinsic record, it is hard to credibly assert that the "character as a whole" of the challenged claims is directed *only to* this narrow concept—as opposed to an articulation that includes reference to the mechanics or process of blending butane and gasoline.  If these patents are about anything, they are about that.

In part, this can be seen by reference to the patent specifications.[4]  The specifications are replete with references to how the invention is focused on improvements to the process of blending *butane with gasoline* in particular ways.

The generation-1 patents, after all, are titled "Method and System for Blending Gasoline and Butane at the Point of Distribution[,]" ('629 patent; '302 patent); and the generation-2 patents are titled "Versatile Systems for Continuous In-line Blending of Butane and Petroleum[,]" ('548 patent; '948 patent; '686 patent).  The words "data gathering and processing" are nowhere to be

---

[4]    *Cf. Enfish*, 822 F.3d at 1337 (indicating that it is appropriate to look to a patent's specification to determine whether a claim of the patent is "directed to" a particular concept, and that if a claim contains a particular element that is described by the patent's specification as what the "present invention comprises[,]" this suggests that the claim is directed to that element or concept) (internal quotation marks and citation omitted); *Internet Patents*, 790 F.3d at 1348 (same, and noting that if a concept is described in the patent as being "the innovation over the prior art" or the "the essential, most important aspect" of the patented invention, that suggests that the claim is directed to that concept) (internal quotation marks and citation omitted).

found in those titles. Additionally, every single one of the representative claims of all five patents are to systems or methods for blending butane and gasoline.

Moreover, throughout the remainder of the patent specifications, the patentee otherwise made clear that the blending of these two substances at particular points in the distribution system is at least part of what the claims are all about. (*See, e.g.*, '629 patent at Abstract ("A system and method is provided for blending butane with gasoline . . . ."); *id.*, col. 3:21-22 ("The present invention is a system and method for blending butane with gasoline . . . ."); '686 patent at Abstract ("A system and method are provided for in-line processes of blending butane into gasoline streams . . . ."); *id.*, col. 1:22-25 ("The present invention relates to in-line processes for blending butane into a gasoline stream . . . .")) This is even more clear when one examines the portion of the specifications that describe how the claimed inventions filled certain needs that existed in the art in the relevant timeframes.

For example, the generation-1 patents' specification explains that although instruments had previously been used at a refinery to more accurately assess the volatility of gasoline, "a need exists for precise measurements at the final distribution point, which is the tank farm" and that the "present invention is a system and method for blending butane with gasoline at the tank farm[.]" ('629 patent, cols. 2:59-3:8, 3:21-22) The specification indicates that "blending occurs downstream of the gasoline and butane storage tanks on the tank farm . . . but before the gasoline is actually dispensed to the tanker truck at the rack." (*Id.*, col. 3:23-28) It explains that by "blending gasoline and butane immediately before the gasoline is dispensed to a tanker truck, and by continuously controlling the ratio . . . a number of significant advantages are attained[.]" (*Id.*, cols. 3:51-4:6) And it notes how the invention utilizes an "apparatus for blending" that is under the "continuous control of a process control unit" that varies the blend ratio to achieve a

targeted volatility. (*Id.*, col. 3:28-50) Moreover, the specification also explains that "a need exists for the ability to blend butane with reformulated gasoline more accurately[,]" and that the "data required for the process control unit to properly blend butane and gasoline to prescribed conditions . . . can also be used to generate useful operational data" such as that allowing one to "better . . . predict when butane must next be purchased" or to "generate reports for gasoline sold from a particular tank farm" as required by law. (*Id.*, cols. 3:16-17, 4:7-23)[5] Surely, some of those assertedly key portions of the invention involve collecting measurements, (*see, e.g., id.*, cols. 7:19-8:10), and performing a calculation, (*see, e.g., id.*, cols. 6:34-7:18). But as can be seen above, the patentees' focus was on doing so in the specific context of blending butane and gasoline, and doing so at precise locations in the chain of distribution. (D.I. 197 at 56)

Similarly, the shared specification of the generation-2 patents shows that the focus there is not just on the abstract concept of "data gathering and processing." Instead, the heart of the invention is a versatile butane blending system that is composed of several physical components that allow for in-line blending "at any point along a petroleum pipeline." ('686 patent, col. 1:22-25; *see also id.*, cols. 3:15-6:62 ("Summary of the Invention" section)) The specification explains that the inventors had developed a "tightly controlled butane blending system with surprising versatility"—one that could perform as intended even with "variations in the flow rate of gasoline," differences in the "time of year" in which the gasoline is delivered (which can affect federally-mandated volatility limits), or regional variations in volatility limits. (*Id.*, col. 3:15-28; *see also id.*, col. 6:30-33) Thus, "[f]or the first time, petroleum vendors and distributors

---

[5]     Each of these previously-described aspects of the invention appear to be captured by at least one or more of the purportedly representative claims of the '629 patent and '302 patent.

14

are able to take optimum advantage of the many cost saving and performance benefits that butane blending offers . . . without regard to the location where the blending occurs along the pipeline." (*Id.*, col. 3:23-28) Again, although these systems are able to accomplish all of this in part through data gathering and processing, it is clear from the specifications that the invention is directed to much more than just that.

The Court has also considered the language of the purportedly-representative claims. The claim language also indicates that it is too simplistic to say that the claims are directed solely to "data gathering and processing."

With regard to the generation-1 patents, look for example at claim 17 of the '629 patent. ('629 patent, col. 14:38-49) The preamble begins by noting the claim involves a "computer-implemented method for blending a butane stream with a gasoline stream[,]" (*id.*), not just any "computer implemented method" involving data. The body of the claim requires receiving particular measurements specific to the butane/gasoline blending process (i.e., volatility measurements of the two components to be blended). (*Id.*) And although the claim facially involves "calculating," it is calculating a particular butane "blend rate" based on the measurements of these two components. (*Id.*) Finally, the claim recites "adjusting the butane stream" and "distributing at a rack[,]" which are non-data gathering and processing steps. (*Id.*)

The claims of the generation-2 patents make this point to an even greater degree. Take claim 7 of the '686 patent—a claim that Plaintiff focused on in its briefing and during the second oral argument. The preamble of the claim first explains that it is directed to "[a] system for in-line blending of gasoline and a volatility modifying agent [e.g., butane.]" ('686 patent, col. 16:44-45) Then, the claim particularly describes the first component of this system in detail: a "gasoline stream" that is "continuously flowing[,]" that is made up of "different types of

15

gasoline" having a varying "flow rate[,]" and that has a "plurality of gasoline vapor pressures[.]" (*Id.*, col. 16:46-49) The claim next recites a second component, a volatility-modifying agent stream (e.g., butane). (*Id.*, col. 16:50-51) Then the claim recites a "blending unit[.]"[6] (*Id.*, col. 16:52-54) Further, the claim requires a "vapor pressure sensor" that is "in sensory communication with said gasoline stream" (i.e., an in-line sensor) particularly placed "upstream of said blending unit[.]" (*Id.*, col. 16:55-57) The claim then describes "information processing units" used to calculate the blend ratio and blend rate based on the properties of the gasoline stream, the "information processing units" then communicating this blend ratio and rate to the blending unit which adjusts the blend accordingly. (*Id.*, col. 16:58-65) To be sure, this claim and other challenged claims in the generation-2 patents do involve the gathering and processing of data (here, claim 7 gathers data about the "vapor pressure and volumetric flow rate" of the gasoline stream and uses that data to calculate a "blend ratio" and a "blend rate"). (*Id.*, col. 16:60-65) But the bulk of claim 7 is to a specific, physical, multi-part system that allows for in-line blending of gasoline and butane and adjustments thereto. Clearly the focus of this claim is to much more than merely "data gathering and processing."

---

[6]     The Court has determined that "blending unit" should be construed (as Defendants proposed) as "any conventional apparatus that achieves blending of two or more separate streams into one." (D.I. 321) The Court also recommended that the claim term "gasoline" be given its plain and ordinary meaning; again there, it did not accept Plaintiff's argument as to what was the appropriate construction of the term. (D.I. 332) Thus, although Plaintiff has suggested that adoption of its proposed constructions of "blending unit" and "gasoline" might affect the Section 101 calculus, (D.I. 197 at 67, 80), because the Court has waited to resolve this portion of the Motion until after claim construction, and because it has not adopted Plaintiffs' proposals as to these two terms, claim construction did not play a meaningful role in the Court's eligibility analysis here.

In short, the above evidence strongly indicates that in determining what the purportedly representative claims are "directed to," it would be error to completely ignore any reference to the blending of butane and gasoline and to focus exclusively on "data gathering and processing."

## 2. Defendants' Arguments About Why the Court Should Ignore References to Blending Butane and Gasoline in Articulating What the Claims Are "Directed To" Are Not Persuasive.

Another problem for Defendants at step one is their explanations for why the Court should ignore all references to blending butane and gasoline when formulating the abstract idea-at-issue. In this regard, as was previously noted above, Defendants made two primary arguments. First, Defendants asserted that one need not include these concepts at step one because butane blending was "known" or was a "fundamental practice in the petroleum industry" as of the time of the patents' filing. Second, they argued that references to blending butane and gasoline were of no import at step one because butane blending simply amounts to the specific technological "context" of the claims, nothing more. Both arguments are faulty as a legal matter.

First, the Court disagrees with Defendants' suggestion that the Court should ignore the claims' reference to the blending of butane and gasoline at step one because butane blending was "known" and a "fundamental practice" at the time of the patents' filing. As the Supreme Court of the United States noted in *Diamond v. Diehr*, 450 U.S. 175 (1981), "[i]t is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis." *Diehr*, 450 U.S. at 188; *see also* (D.I. 145 at 7-8). Whether or not the claimed components and their configurations were "known" or "conventional" is not the proper inquiry at step one. Instead, the analysis is to whether the claims *as a whole* are "directed to" an abstract idea (whether known or unknown, conventional or unconventional in the art). *Diehr*, 450 U.S. at 188-89 ("The 'novelty' of any element or steps in a process, or even of the process itself, is of no

17

relevance in determining whether the subject matter of a claim falls within the [Section] 101 categories of possibly patentable subject matter."); *see also Timeplay, Inc. v. Audience Entm't LLC*, CV 15-05202 SJO (JCx), 2015 WL 9695321, at *6 (C.D. Cal. Nov. 10, 2015) (noting that although a "'recitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible,'" Section 101 precedent "do[es] not broadly hold that courts must 'strip away' each claim element that recites hardware containing computing elements . . . when performing step one of the *Alice /Mayo* test.") (emphasis omitted) (quoting *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014)).[7] A claim can be directed to something that is not an abstract idea, yet is "known" and "fundamental" in the art. Or a claim

---

[7]        Indeed, at times, both Defendants' argument against patent eligibility and Plaintiff's argument for it sound much more like obviousness arguments made pursuant to 35 U.S.C. § 103. Often in the briefing, the parties seemed to be speaking less to Section 101-related concerns and more to the question of validity—i.e., arguing whether the patent claims are invalid because they amount to a combination of known elements, or whether the claims are valid in light of the prior art, or about the impact of secondary considerations of non-obviousness. (*See, e.g.*, D.I. 145 at 15-16 (Plaintiff asserting that Defendants have failed to "identify a single piece of prior art that discloses anything similar to Sunoco's claimed invention" and that "secondary considerations" regarding Plaintiff's patented technology are relevant to the eligibility question)) The Court acknowledges that some of the analytical questions regarding Section 101's "conventionality" assessment at step two can seem similar to the questions one would ask in assessing obviousness under Section 103. *See Internet Patents Corp.*, 790 F.3d at 1347. But whether a patent is non-obvious in light of prior art is, in the end, a separate and distinct inquiry from whether it passes muster under Section 101. *See BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (rejecting the district court's step two analysis of the ordered combination of claim limitations, where that analysis "look[ed] similar to an obviousness analysis under [Section] 103, except lacking an explanation of a reason to combine the limitations as claimed" and noting that "[t]he inventive concept inquiry [pertinent to Section 101] requires more than recognizing that each claim element, by itself, was known in the art"); *Iron Gate Sec., Inc. v. Lowe's Cos., Inc.*, 15-cv-8814 (KBF), 2016 WL 4146140, at *13 (S.D.N.Y. Aug. 3, 2016) (rejecting the defendant's argument at step two where the defendant "essentially asks this Court to peek at whether the claimed invention is novel and non-obvious by asking the Court to compare the [asserted] [p]atent to prior art in the field of multimedia data indexing" and noting that the proper question on "this threshold [Section] 101 eligibility challenge . . . is instead whether the claims contain an inventive concept beyond any abstract idea to which they are purportedly directed").

can be directed to an abstract idea, but one that is a novel abstract idea. *See Netflix, Inc. v. Rovi Corp.*, 114 F. Supp. 3d 927, 937 (N.D. Cal. 2015) ("A novel abstract idea is still an abstract idea, and is therefore unpatentable."); *Money Suite Co. v. 21st Century Ins. & Fin. Servs., Inc.*, C.A. No. 13-984-GMS, 2015 WL 436160, at *4 (D. Del. Jan. 27, 2015) ("new ideas may be similarly abstract and invalid under [Section] 101.") (*citing Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714-15 (Fed. Cir. 2014)). Here, Defendants' suggestion that if any portion of the claims is said to be "known" or "fundamental in the industry" then the Court should simply not consider such portions in the step one analysis is incorrect as a matter of law.[8]

Second, the Court also rejects Defendants' suggestion that, in determining the focus of the claims at step one, the Court should ignore all butane blending steps and components set out in the claims because they are merely the "technological environment" of the claims. (D.I. 153 at 4) In support of this argument, Defendants cited prominently to the Federal Circuit's decision in *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016), and asserted that "the [technological] context of the process is irrelevant to the first step under *Alice*" and that "'limiting the claims to the particular technological environment . . . is, without more,

---

[8]     It is worth noting that even in the cases that Defendants cite in support of their argument here, (D.I. 139 at 6 & n.3), the courts did not *exclude* the assertedly "fundamental practice" in question from the articulation of the abstract idea, as Defendants attempt to do here. Instead, the "fundamental practice" was considered at step one and *was found to be* the abstract idea that the claims were directed to. *See, e.g., Alice*, 573 U.S. at 220 (at step one, finding the claims to be directed to the "fundamental economic practice" of "intermediated settlement") (internal quotation marks and citation omitted); *Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1385 (Fed. Cir. 2018) (finding at step one that the claims were directed to the "fundamental activity" of "voting, verifying the vote, and submitting the vote for tabulation"); *Align Tech., Inc. v. 3Shape A/S*, 339 F. Supp. 3d 435, 455 (D. Del. 2018) (finding at step one that the claim was directed to the abstract idea of "describing an orthodontic treatment plan"). In other words, the courts in those cases did *not* say at step one: "What *other than* intermediated settlement/voting/orthodontic treatment plans is recited in the claims?" or "What *other than* such concepts is the focus of the claims?"

insufficient to transform them into patent-eligible applications of the abstract idea at their core.'"
(D.I. 153 at 4 (quoting *Elec. Power*, 830 F.3d at 1354); *see also* D.I. 56 at 3)  Yet the quoted
portion of the analysis from *Electric Power* was from a portion of the Federal Circuit's opinion
where that Court was assessing "stage two of the *Alice* analysis[.]" *Elec. Power*, 830 F.3d at
1354.[9]  Indeed, taken to its extreme, Defendants' analytical method would render nearly any
patent claim involving a computer calculation subject to categorization as being directed to mere
"data manipulation" at step one—once the bulk of the other technological aspects of the claim
are ignored as simply the surrounding "technological context" or "technological environment."
*Cf. Diehr*, 450 U.S. at 187 (regarding a claim for a process for curing synthetic rubber, noting
that "[o]bviously, one does not need a 'computer' to cure natural or synthetic rubber, but if the
computer use incorporated in the process patent significantly lessens the possibility of
'overcuring' or 'undercuring,' [i.e., benefits the process,] the process as a whole does not thereby
become unpatentable subject matter"); *Thales*, 850 F.3d at 1349 ("That a mathematical equation
is required to complete the claimed method and system does not doom the claims to
abstraction.").

For all of these reasons, Defendants' arguments for why their purported abstract idea did
not include reference to the process or mechanics of blending butane and gasoline do not hold
up.

---

[9]        Similarly, in other portions of their briefing, when Defendants cite to other cases
for the proposition that one may not circumvent Section 101 by attempting to limit the use of the
idea to a particular "technological environment," the cases cited were analyzing the relevant
claims at step two of *Alice*'s inquiry. *See Alice*, 134 S.Ct. at 2358 (*cited in* D.I. 29 at 13);
*Ultramercial*, 772 F.3d at 716 (*cited in* D.I. 29 at 13).

### 3. Why Defendants' Failure to Properly Articulate an Abstract Idea that the Claims are Directed to Must Lead to Denial of the Motion as to All of the Claims.

So, at this point, the Court has determined that the purportedly-representative claims simply cannot be (contrary to Defendants' suggestion) described as being directed merely to "data gathering and processing."[10] Does this mean that none of the challenged claims are actually patent ineligible?

To be sure, there are some claims—particularly some of the challenged claims of the generation-1 patents—that seem vulnerable to a Section 101 challenge. Claim 27 of the '302 patent, for example, is probably the best example of such a claim. Each of the four steps of that claim is set out in functional language, and each recites data manipulation steps performed on a generic "processor": "receiving" a gasoline volatility measurement, a butane volatility measurement and a target gasoline volatility measurement at the processor (steps a, b and c) and "calculating" a butane blend rate (step d). ('302 patent, col. 15:54-65) The Court certainly acknowledges that this claim is framed at a dangerously-high level of generality.

---

[10] The Court also notes that, even to the extent that Defendants might otherwise suggest that the claims are directed to "butane blending," that would appear to be an overgeneralization of at least some of the claims-at-issue. For example, some number of the challenged claims are explicit that they are to a particular form of blending butane with gasoline: in-line blending. (*See, e.g.*, '686 patent, cols. 15:62-16:14 (claim 1 reciting "a method for in-line blending"); '948 patent, col. 18:12-35 (claim 7 reciting a "system for blending butane with gasoline in a pipe" and a "vapor pressure analyzer connected to said pipe")) And there is evidence in the relevant patents that this feature of such claims was important to the invention disclosed therein. (*See* '629 patent, col. 2:30-50 (describing and disparaging in-tank butane blending as, among other things, "labor intensive and imprecise"); '686 patent, cols. 1:7-25 (incorporating the '629 patent specification by reference, and emphasizing that the invention is to "in-line processes for blending butane into a gasoline stream")) It is hard to see how such claims would not be directed to, *inter alia*, "in-line butane blending" of some type.

21

It might be that, had Defendants at step one better articulated what the challenged claims were *really* directed to (i.e., to include some reference to blending butane and gasoline), then they might have still been able to explain why that concept amounts to an abstract idea—and why claims like claim 27 are actually directed to such an abstract idea. But Defendants chose to aim for a much broader and much more vague articulation of what the claims were purportedly directed to. *Cf. CoolTVNetwork.com, Inc. v. Facebook, Inc.*, C.A. No. 19-292-LPS-JLH, 2019 WL 4415283, at *11 (D. Del. Sept. 16, 2019) (rejecting defendants' description of the "focus of the [challenged] claim" for being "at too high a level of abstraction[,]" and thus recommending denial of the motion to dismiss, but not excluding the possibility that the challenged claim is "directed to some other abstract idea yet to be articulated").

With that being the case, the Court is uncomfortable attempting to come up with the "right" articulation of what claims like claim 27 are *really* "directed to" on its own, and then trying to determine if that leads to patent ineligibility. Because Defendants brought this Motion, it is their burden to show at step one that the claims they chose to challenge are directed to an abstract idea; they have not sufficiently done that here. *See 3G Licensing, S.A. v. HTC Corp.*, C.A. No. 17-83-LPS, 2019 WL 2904670, at *2 (D. Del. July 5, 2019) ("While it may be possible that claim 1 could be accurately characterized as directed to some abstract idea, all I need to decide today [at the motion to dismiss stage] is that the claim is not directed to the abstract idea articulated by defendant."); *SimpleAir, Inc. v. Google Inc.*, 136 F. Supp. 3d 745, 750 (E.D. Tex. 2015) (finding that the defendants did not meet their burden of showing the asserted patents were directed to an abstract idea at step one after rejecting defendants' characterization of the abstract idea because it "ignore[d] significant claim limitations"); *see also Int'l Bus. Machs. Corp. v. Groupon, Inc.*, 289 F. Supp. 3d 596, 606 (D. Del. 2017) (finding "[t]he Court need not continue

to step 2" after concluding that the claims were not directed to an abstract idea at step one). For that reason as well, the remaining portion of the Motion should not be granted.

## IV.  CONCLUSION

For all of the above reasons, the Court recommends that the District Court DENY the remaining portion of Defendants' Motion as it relates to Section 101, without prejudice to Defendants' ability to raise section 101 issues at the summary judgment stage of the case. *See CoolTVNetwork.com, Inc.*, 2019 WL 4415283, at *11.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated:  September 18, 2019

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE