**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SUNOCO PARTNERS MARKETING & TERMINALS L.P., | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 17-1390-LPS-CJB |
| | ) |
| POWDER SPRINGS LOGISTICS, LLC AND MAGELLAN MIDSTREAM PARTNERS, L.P., | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

**<u>REPORT AND RECOMMENDATION</u>**

In this action filed by Plaintiff Sunoco Partners Marketing & Terminals, L.P. ("Sunoco") against Defendants Powder Springs Logistics, LLC ("PSL" or "Powder Springs") and Magellan Midstream Partners, L.P.'s ("Magellan" and collectively with Powder Springs, "Defendants"), Sunoco alleges infringement of United States Patent Nos. 6,679,302 (the "'302 patent"), 7,032,629 (the "'629 patent"), 9,207,686 (the "'686 patent"), 9,494,948 (the "'948 patent") and 9,606,548 (the "'548 patent" and collectively with the other patents, "the asserted patents"). Presently before the Court is Sunoco's "Motion for Partial Summary Judgment of Patent Infringement[,]" filed pursuant to Federal Rule of Civil Procedure 56 ("the Motion"). (D.I. 372) For the reasons that follow, the Court recommends that Sunoco's Motion be GRANTED-IN-PART and DENIED-IN-PART.

**I.    BACKGROUND**

    **A.    Factual Background**

1

In this case, Sunoco alleges that Defendants' butane blending system, which allows Defendants to inject butane into gasoline product flowing through an interstate pipeline maintained by Colonial Pipeline Company ("Colonial") at the Powder Springs facility, and Defendants' related butane blending activities, infringe claim 30 of the '302 patent, claim 3 of the '686 patent, claims 3 and 7 of the '948 patent, and claims 3 and 8 of the '548 patent. (D.I. 149 at ¶¶ 2, 19-25; D.I. 404, ex. 5 at ¶¶ 52, 67; D.I. 440 at 1) Sunoco further alleges that Magellan's blending systems and butane blending activities at nine other locations infringe claims 3, 16, 17, 23 and 24 of the '302 patent, and claims 18, 22, 31 and 32 of the '629 patent. (D.I. 149 at ¶¶ 26-33; D.I. 404, ex. 5 at ¶¶ 52, 67; D.I. 440 at 1) The asserted patents relate to systems and methods for the blending of butane into gasoline. (*See* D.I. 171 at 1; D.I. 176 at 1)

**B.     Procedural History**

Sunoco filed the instant case on October 4, 2017. (D.I. 1) The case was thereafter referred to the Court to hear and resolve all pretrial matters, up to and including case-dispositive motions. (D.I. 15)

Briefing on the instant Motion was completed on November 1, 2019, (D.I. 411), and the Court held oral argument on the Motion (as well as other summary judgment and *Daubert* motions) on November 13, 2019, (D.I. 441 ("Tr.")). A 7-day trial is set to begin on March 9, 2020. (D.I. 83 at 13)

**II.     STANDARD OF REVIEW**

**A.     Summary Judgment**

A grant of summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 n.10 (1986). If the moving party meets this burden, the nonmovant must then "come forward with specific facts showing that there is a *genuine issue for trial*." *Id.* at 587 (emphasis in original) (internal quotation marks and citation omitted). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). During this process, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Facts that could alter the outcome are "material," and a factual dispute is "genuine" only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If the evidence is merely

colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

## B. Patent Infringement

The patent infringement analysis consists of two steps. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). First, the court must determine the meaning and scope of the patent claims asserted to be infringed. *Id.* Claim construction is generally a question of law, although subsidiary fact finding is sometimes necessary. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38 (2015). Second, the trier of fact must compare the properly construed claims to the allegedly infringing device. *Markman*, 52 F.3d at 976. This second step is a question of fact. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1319 (Fed. Cir. 2012).

"Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device." *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998). If any claim limitation is absent from the accused product, there is no literal infringement as a

4

matter of law. *Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1374 (Fed. Cir. 2009).[1]

The patent owner has the burden of proving infringement, and must do so by a preponderance of

the evidence. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir.

1988). A court may enter judgment of infringement if there is no factual dispute that the accused

device contains every element in an asserted claim. *Revolution Eyewear, Inc. v. Aspex Eyewear,*

*Inc.*, 563 F.3d 1358, 1369-70 (Fed. Cir. 2009).

## III. DISCUSSION

In its Motion, Sunoco seeks summary judgment of literal infringement for three asserted

claims. According to Sunoco, the undisputed facts show that two of Magellan's Accused

Systems (the West Tulsa and Kansas City systems) infringe claim 3 of the '302 patent, and that

all of Defendants' Accused Systems infringe claims 3 and 8 of the '548 patent. (D.I. 373 at 1)

The Court will first take up the parties' arguments with respect to the '302 patent, and will then

turn to the '548 patent.

### A. Infringement of Claim 3 of the '302 Patent

Claim 3 of the '302 patent depends from claim 2, which depends from claim 1.

Therefore, claims 1-3 are recited below:

> **1.** A system for blending gasoline and butane at a tank farm
> comprising:
>
> a) a tank of gasoline;

---

[1]    A product that does not literally infringe a patent claim may still infringe under
the doctrine of equivalents if any differences between the claimed invention and the accused
product are insubstantial. *See VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1322 (Fed. Cir.
2014). However, Sunoco notes that its Motion will not require an analysis of the doctrine of
equivalents because its infringement arguments are based on a literal infringement theory. (D.I.
373 at 4 n.3)

b) a tank of butane;

c) a blending unit, at the tank farm, downstream of and in fluid connection with the tank of gasoline and the tank of butane;

d) a dispensing unit downstream of and in fluid connection with the blending unit; and

e) a rack, wherein the dispensing unit is located at the rack and is adapted to dispense gasoline to gasoline transport vehicles.

('302 patent, col. 13:12-23)

**2.** The system of claim **1** further comprising a process control unit, wherein the process control unit generates a ratio input signal that controls the ratio of butane and gasoline blended by the blending unit.

(*Id.*, col. 13:25-27)

**3.** The system of claim **2** wherein the ratio input signal is derived from a calculation of the ratio of butane and gasoline that will yield a desired vapor pressure.

(*Id.*, col. 13:28-30)

Magellan's West Tulsa and Kansas City Accused Systems (the two systems implicated by this portion of Sunoco's Motion) generally operate as follows: (1) gasoline is drawn from a gasoline tank; (2) butane is drawn from a butane tank; (3) the gasoline and butane are blended together by the blending unit; (4) the blended gasoline is sent to an intermediate tank; and (5) the blended gasoline is dispensed to transport trucks using a dispensing unit at a truck rack. (D.I. 374, ex. 1 at ¶¶ 95-96; *see also id.*, ex. 2 at ¶ 98; *id.*, ex. 4 at 148, 166; D.I. 400 at 9-10)[2]

Accordingly, Sunoco asserts that these systems include all limitations of claim 3 of the '302

---

[2]    There are times when, after the blended gasoline is sent to the intermediate tank, the gasoline is dispensed to other destinations, instead of to trucks at the rack. (D.I. 374, ex. 2 at ¶ 98; D.I. 401, ex. 2 at 141-42)

patent; they have a tank of gasoline, a tank of butane, a blending unit at the tank farm that is downstream of and in fluid connection with the tanks of gasoline and butane, a dispensing unit downstream of and in fluid connection with the blending unit, and a rack to dispense the gasoline. (D.I. 373 at 3-8; D.I. 411 at 4-6; *see also* D.I. 401, ex. 3 at ¶ 142; Tr. at 6)

Magellan, for its part, asserts that genuine issues of material fact exist as to whether the West Tulsa and Kansas City systems meet claim 3's "dispensing unit" and "rack" limitations. (D.I. 400 at 1, 4; Tr. at 39)  Pointing to the tank that sits between the blending unit and the truck rack at these two systems, Magellan asserts that the blending systems at issue "end" there at that tank—and that the subsequent rack (and the dispensing unit located at the rack) is not considered to be a part of Magellan's blending systems.[3]  (D.I. 400 at 7-8; D.I. 402, ex. A at ¶¶ 39, 105, 108; Tr. at 27, 30-31, 40; Defendants' Summary Judgment and Daubert Hearing Presentation, Slide DDX 104)

To this, Sunoco responds that Magellan cannot avoid infringement simply by adding a tank between the blending unit and the truck rack in the two systems at issue.  And even taking into account the added tank, Sunoco asserts that the systems still meet each of the claim elements; that is, the tank's addition does not materially change Magellan's systems such that they no longer satisfy the claim elements.  (D.I. 411 at 5; Tr. at 6-7)

With regard to this dispute, a good legal starting point is the United States Court of Appeals for the Federal Circuit's admonition that "[i]t is fundamental that one cannot avoid

---

[3]    As Magellan's assertion that the Accused Systems do not include a "dispensing unit" (at the "rack") flows from their assertion that the "rack" is not part of the Accused Systems, the Court below will focus on the question of whether the Accused Systems can be said to include a "rack."

infringement merely by adding elements if each element recited in the claims is found in the accused device." *SunTiger, Inc. v. Sci. Research Funding Grp.*, 189 F.3d 1327, 1336 (Fed. Cir. 1999) (internal quotation marks and citations omitted).[4] To hold otherwise "would allow an infringer to avoid infringement merely by adding additional elements to an infringing device." *Id.* However, the Federal Circuit has also emphasized that where the addition of elements changes the structure of an accused device, such that a claim element is no longer present, then the product will not infringe. *Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 970 (Fed. Cir. 2000) (suggesting that if the addition of an element would "eliminate a limitation or inherent feature of the claim[,]" infringement could be avoided); *see also, e.g.*, *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1305 (Fed. Cir. 2012) (finding that the addition of plywood to fabric panels changed the structure of the accused device, such that the device did not have the required "flexible fabric front panel," because the addition of the plywood to the fabric panels removed the flexibility of the fabric).

With that precedent firmly in mind, the key question here as to infringement of claim 3 is "what is the system" that exists at West Tulsa and Kansas City, (Tr. at 35-36)—and can those sites be said to host "system[s] for blending gasoline and butane" that include a "rack"?

---

[4]    *See also, e.g.*, *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1347 (Fed. Cir. 2005) ("The addition of unclaimed elements does not typically defeat infringement when a patent uses an open transitional phrase such as 'comprising.'") (citation omitted); *ICM Controls Corp. v. Honeywell Int'l, Inc.*, 256 F. Supp. 3d 173, 198 (N.D.N.Y. 2017) ("[A]n accused device cannot escape infringement by merely adding features, if it otherwise has adopted the basic features of the patent.") (internal quotation marks and citations omitted); *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 747 F. Supp. 2d 1063, 1108 (W.D. Wis. 2010) ("All Buyers has done is include in its assemblies an additional element on top of those required by the claim language and such an action does not avoid infringement.").

In answering this question, in the Court's view, it is important to note that there can be no ambiguity as to what type of system actually infringes claim 3. On that score, the body of claim 3 tells us *exactly what an infringing system is* (and is not).[5] *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (noting that "[i]nfringement . . . is determined by comparing an accused product . . . with the properly and previously construed claims in suit[,]" as "[i]t is the *claims* that measure the invention") (emphasis in original). The claim explains that if an entity makes or uses/controls (1) a "tank of gasoline" and a "tank of butane" and (2) a "blending unit, at the tank farm" that is "downstream of and in fluid connection with the tank of gasoline and the tank of butane" and (3) a "dispensing unit" that is "downstream of and in fluid connection with the blending unit; and (4) a "rack" wherein the dispensing unit is "located at the rack and is adapted to dispense gasoline to gasoline transport vehicles[,]" then (assuming the other elements of claim 2 and 3 are met, which is not disputed here), that entity made or uses an infringing system. ('302 patent, col. 13:14-23; *see also* Tr. at 54, 59) In other words, because the body of the claim lays out the physical components that an infringing system must have, and describes how those components must be interconnected in order for infringement to occur— then so long as an accused infringer makes or uses/controls such components (that are connected together in the way set out in the claim), that accused infringer is guilty of infringement.

And in this case, the record demonstrates that as a literal, physical matter, the West Tulsa and Kansas City Accused Systems do include a series of interconnected physical components that meet all of the requirements of claim 3, including having a "rack." To be sure, that record

---

[5]     Magellan did not argue that, even if the preamble of claim 3 is limiting, the words "[a] system for blending" in that preamble add any material limitations regarding what constitutes an infringing system beyond what is called out in the body of the claim.

also shows that: (1) the two Accused Systems at issue blend butane and gasoline in a pipeline; (2) the blended gasoline is then distributed into a *tank*; and (3) this tank is an additional element that is not expressly recited by the claim. But it is also not disputed that a *rack* exists onsite at the two Accused Systems. And it is not disputed that from the tank, "the blended gasoline can be sent . . . over the truck rack [located at each of the accused facilities] to the customer." (D.I. 400 at 3; *see also id.* at 10; D.I. 411 at 4)

Indeed, Magellan's non-infringement expert, Michael Nikolaou, Ph.D., acknowledges that the two Accused Systems can have "fluid flowing from the blending system to the rack.[]" (D.I. 374, ex. 4 at 166; *see also id.* at 148) Moreover, Magellan's internal documents support the premise that the rack is a physical part of these interconnected blending systems. (D.I. 413, ex. 13 at MAG-SUN_00077543 (depicting a Magellan chart of 10 locations, which identifies racks as blend lines at the Kansas City and West Tulsa sites, and states that tankage should be managed "to ensure maximum blending opportunity while supporting *rack* and mainline *operations*") (emphasis added); *id.*, ex. 14 at MAG-SUN_00055587 (Magellan Butane Blending Operations Process Safety Management procedure for West Tulsa that describes step 1 as requiring "IDENTIFY line to be blended[,]" and listing several choices, include pipelines and "Loading Rack Gasoline Blending" and "Loading Rack A-Grade Blending"); *see also* D.I. 401, ex. 4 at MAG-SUN_00078741 (Magellan document setting out procedure for "Rack/Tank Release and 3rd Party Custody Transfer Oversight" and stating that if test results are off-specification for a second time, the operator should "shut down the grade *at the rack* or the mainline pump to the 3rd

party and notify Quality Control immediately") (emphasis added))[6] The fact that the two Accused Systems *also* include a tank does not impact the conclusion that the systems include the required components of claim 3.

Magellan's arguments to the contrary—i.e., that in its view, the two Accused Systems "are complete at the tank" (and thus do not include the rack that is onsite at both locations)—are insufficient to raise a genuine dispute of material fact with respect to infringement. (*See* Tr. at 27)

For example, Magellan repeatedly points to testimony of one of the inventors of the '302 patent, Larry Mattingly. Magellan argues that this testimony supports its assertion that blending systems that include a storage tank before the rack are very different from blending systems that do not include such a tank (and that there is therefore a genuine dispute of fact as to whether its systems meet the "rack" limitation). (*Id.* at 27-28, 30, 38; D.I. 400 at 5-6, 8) But nothing about Mr. Mattingly's testimony alters the Court's infringement analysis here. That an inventor distinguished his claimed automated blending system from a manual system that required the operator to "'sample the tank to certify that tank being on'" specification, (D.I. 411 at 2 (quoting D.I. 413, ex. 9 at 151); *see also id.* (citing D.I. 413, ex. 9 at 79-80; D.I. 413, ex. 10 at 428-29, 431-33, 456-57)), does not affect whether the accused systems are constructed in the manner called out in claim 3. Moreover, additional testimony of Mr. Mattingly demonstrates that his

_____

[6]    In attempting to refute Plaintiffs' argument that summary judgment was warranted here, Magellan did not argue in the alternative that, even if the Accused Systems included a "rack," Magellan nevertheless did not infringe because those Accused Systems did not include a dispensing unit downstream of and "in fluid connection" with the blending unit. That is, Court does not understand the parties to be raising any separate claim construction dispute that needs to be resolved regarding the meaning of the term "in fluid connection." (Tr. at 40-41, 60-61; D.I. 400 at 8)

invention could indeed blend to a storage "tank" before the "rack" and then be distributed to a

loading rack.  (D.I. 413, ex. 9 at 101 ("[Y]ou can blend our automated system, our patent system,

you can blend going into the storage tank, and then that can be distributed to a loading rack.");

*id.* at 243-44; *see also* Tr. at 59-60)

In further support of its argument that the two Accused Systems are "complete at the

tank," Magellan points to portions of the record suggesting that because of the "superior quality

control and error correction features of tank blending systems[,]" such systems are

fundamentally different from systems that blend directly into a rack.  (D.I. 400 at 2 (citing D.I.

402, ex. A at ¶ 42); *see also* D.I. 402, ex. A at ¶ 41; Tr. at 27, 31-35, 39)  These record citations

could indeed support the conclusion that a system that includes blending into a tank is superior to

(or different than) a system that does not.  But as Sunoco retorts, Magellan's reasons for *why* it

blends into a tank before the blended gasoline may be sent to the rack (including the alleged

superiority of such a process) cannot serve to alter what the body of claim 3 defines as an

infringing "system."  (D.I. 411 at 3-5)  Put differently, these reasons do not change the fact that

Magellan's two Accused Systems include a series of components, including a rack, that are

interconnected in the manner described in claim 3.  And therefore, the addition of the tank to that

system (and the benefits flowing therefrom) does not allow Magellan to avoid infringement

here.[7]

---

[7]    *See, e.g., Tate Access Floors, Inc.*, 222 F.3d at 970 (rejecting the defendant's
argument that a component of its accused product did not satisfy the claim because that
component had to be painted, as "the addition of paint does not eliminate a limitation or inherent
feature of the claim").

For the foregoing reasons, there is no genuine issue of material fact that the West Tulsa and Kansas City Accused Systems include all of the elements of claim 3 of the '302 patent. Therefore, the Court recommends that summary judgment of infringement be entered with respect to this claim.

### B.     Infringement of Claims 3 and 8 of the '548 Patent

Claim 3 of the '548 patent depends from claim 1, and claim 8 of the '548 patent depends from claim 6.  Therefore, claims 1, 3, 6 and 8 are recited below:

> **1.** A system for blending butane with a gasoline stream having a gasoline flow rate, comprising:
>
> an injection device injecting the butane into the gasoline stream at a butane flow rate;
>
> a volatility measurement device in communication with the gasoline stream, the volatility measurement device configured to output data representative of a volatility measurement; and
>
> a processor in connection with the injection device and the volatility measurement device, the processor configured to:
>
> receive the volatility measurement, receive a target volatility value;
>
> determine an adjustment to the butane flow rate based on the volatility measurement and the target volatility value; and
>
> output a signal representative of the adjustment to the injection device.

('548 patent, col. 17:11-28)

> **3.** The system of claim **1**, further comprising a plurality of gasoline streams each associated with a different type of gasoline, at least one gasoline stream being selectable for blending with the butane.

(*Id.*, col. 17:32-35)

13

> **6.**  A system for blending butane with a gasoline stream having a gasoline flow rate, comprising:
>
> an injection device injecting the butane into the gasoline stream at a butane flow rate;
>
> a volatility measurement device in communication with the gasoline stream, the volatility measurement device configured to output data representative of a volatility measurement; and
>
> a processor in connection with the injection device and the volatility measurement device, the processor configured to:
>
> receive the volatility measurement; receive a target volatility value; and
>
> determine an adjustment to the butane flow rate based on the volatility measurement and the target volatility value; and output a signal representative of the adjustment to the injection device, wherein the volatility measurement device is in communication with the gasoline stream at a location downstream of the injection device.

(*Id.*, cols. 17:40-18:3)

> **8.**  The system of claim **6**, wherein the adjustment includes a blend ratio, and the processor calculates the blend ratio based on the volatility measurement and the target volatility value.

(*Id.*, col. 18:7-10)

Sunoco asserts that there is no genuine dispute that all Accused Systems meet all limitations recited in claims 3 and 8 of the '548 patent. (D.I. 373 at 10)  Defendants, however, contest whether the Accused Systems meet the "processor" limitation of claims 3 and 8. (D.I. 400 at 12-13)[8]  The Court finds that there is a genuine dispute of material fact with respect to this limitation, rendering summary judgment of infringement unwarranted.

---

[8]      Defendants also argue that the Court cannot grant Sunoco's Motion with respect to the '548 patent for two additional reasons. (D.I. 400 at 10-11; Tr. at 43)  First, Defendants

14

As demonstrated by the claim language set out above, the "processor" required by these claims is configured to "receive the volatility measurement; receive a target volatility value; determine an adjustment to the butane flow rate based on the volatility measurement and the target volatility value; and *output a signal representative of the adjustment to the injection device*[.]" ('548 patent, col. 17:19-28, 48-56 (emphasis added)) Sunoco's infringement expert, Dr. Harri K. Kytomaa, opined in his expert report that Defendants' Accused Systems meet the "processor" limitation of claims 3 and 8—again, that they contain a processor that, *inter alia*, outputs a signal representative of the adjustment to the injection device.  In making this case, however, Dr. Kytomaa simply referred back to his analysis regarding infringement of claim 1 of the '948 patent:

> As discussed above with respect to claim 1.5 of the '948 patent, the above-identified accused systems include a processor in connection with the injection device and the volatility measurement device. . . .

> As discussed above with respect to claim 1.5 and claim 1.6 of the '948 patent, the above-identified accused systems include a processor configured to output a signal representative of the adjustment to the injection device.

(D.I. 401, ex. 3 at ¶¶ 822, 826, 828; *see also id.* at ¶¶ 846, 849)

---

note that they have a pending summary judgment motion with respect to the priority date of the '548 patent, (*see* D.I. 382 at 18-23), and that the outcome of that motion (whether it be a grant or denial) precludes summary judgment of infringement of claims 3 and 8 of the '548 patent, (D.I. 400 at 10).  Second, Defendants also moved for summary judgment that the Accused Systems cannot infringe claims 3 and 8 of the '548 patent as a matter of law (because their systems are "feedback" systems and claims 3 and 8 are "feedforward" claims).  (D.I. 400 at 11; D.I. 382 at 13-18)  The Court's discussion here, however, focuses solely on the parties' arguments with respect to Sunoco's Motion; it will address Defendants' motions for summary judgment in subsequent opinion(s).

Yet in contrast to claims 3 and 8 of the '548 patent, claim 1 of the '948 patent discloses a system for blending butane with gasoline that includes both a "processor" *and* another component called a "programmable logic controller" ("PLC"):

> **1.** A system for blending butane with gasoline in a pipe, wherein the gasoline has a vapor pressure, comprising:
>
> a) a butane reservoir in fluid connection with said gasoline;
>
> b) an injector valve for discharging butane into said gasoline;
>
> c) a vapor pressure analyzer connected to said pipe, said analyzer configured to determine the vapor pressure of the gasoline and to transmit said vapor pressure to a processor;
>
> d) *a programmable logic controller governing the flow of butane through said injector valve*;
>
> e) *a processor programmed to receive the vapor pressure from the analyzer, calculate an amount of butane to inject into the gasoline based on seasonal and/or regional data and a maximum preprogrammed volatility limit, and provide a control signal to said programmable logic controller according to said seasonal and/or regional data and maximum preprogrammed volatility limit*;
>
> *wherein the programmable logic controller is configured to adjust the injector valve to govern the flow of butane through said injector valve into said gasoline based on the signal from the processor.*

('948 patent, col. 17:9-32 (emphasis added))  Thus, while in claims 3 and 8 of the '548 patent, it is the "processor" that outputs a signal to the injection device, in claim 1 of the '948 patent, it is the "PLC" (not the "processor") that is configured to "adjust the injector valve to govern the flow of butane through said injector valve." (*See* D.I. 400 at 12; Tr. at 47, 49)

In the infringement analysis in his opening expert report with respect to claim 1 of the '948 patent, Dr. Kytomaa opined as follows with respect to the processor and PLC limitations:

> Based on my review of the documents and testimony in this case, it is my opinion that the above-identified accused systems include a processor programmed to receive the vapor pressure from the analyzer, calculate an amount of butane to inject into the gasoline based on seasonal and/or regional data and a maximum preprogrammed volatility limit, and provide a control signal to the programmable logic controller according to the seasonal and/or regional data and maximum preprogrammed volatility limit. . . .
>
> Based on my review of the documents and testimony in this case, it is my opinion that above-identified accused systems include a PLC that is configured to adjust the injector valve to govern the flow of butane through the injector valve into the gasoline based on the signal from the processor.

(D.I. 401, ex. 3 at ¶¶ 765, 779)  Thus, in this analysis, Dr. Kytomaa appears to treat the relevant "PLC" and "processor" as two separate components that work together with each other (as does claim 1 of the '948 patent).  Indeed, in other portions of his opening expert report, Dr. Kytomaa similarly appears to consider the "PLC" and "processor" as two separate things, such as when he describes documents regarding an accused system as "showing butane lines with control valves, *PLCs, processors* and flow meters for injecting butane into gasoline[.]"  (*Id.* at ¶ 770 (emphasis added))

In light of all of the above, it is evident that when Dr. Kytomaa is explaining in his opening expert report why Defendants' Accused Systems read on the "processor" limitations of claims 3 and 8 of the '548 patent, he has to do more than simply (and vaguely) refer back to his infringement analysis for claim 1 of the '948 patent.  At present, when one (at Dr. Kytomaa's direction) *does* look back at his infringement analysis for claim 1 of the '948 patent, one would not understand (without more explanation) why it is that the claims of the '548 patent have a "processor" that outputs a signal to the injection device, since it is the PLC (and not the processor) that is configured to adjust the injector valve in the claims of the '948 patent.  Instead,

after reading Dr. Kytomaa's '948 patent infringement analysis, one would expect that *a PLC*, not a processor, would do that work as to infringement of the '548 patent claims. Yet since the claims of the '548 patent do not reference a PLC, the reader of Dr. Kytomaa's opening report comes away unsure of how it is that the claims-at-issue of the '548 patent are actually infringed in this respect. (*See* D.I. 400 at 12-13; Tr. at 48-50)[9] And this all underscores that there remains a genuine dispute of material fact as to whether the Accused Systems meet the processor requirement. *See, e.g., Insight Tech., Inc. v. Surefire, LLC*, 618 F. Supp. 2d 114, 118 (D.N.H. 2009) (expert's bare statement in his declaration that the accused devices included the required spring-biased mechanism was insufficient to support summary judgment of infringement, as the expert provided no factual basis for his conclusion).

Sunoco responds by asserting that the lack of clarity in Dr. Kytomaa's opinion is irrelevant. They argue that this is so in light of certain deposition testimony of *Defendants' expert*, Dr, Nikolaou, which purportedly establishes that "all limitations are met, and summary judgment [of infringement] is [therefore] appropriate." (D.I. 411 at 7; *see also* D.I. 373 at 10; Tr.

---

[9]    In his reply report, in response to Defendants' expert's assertion that Dr. Kytomaa failed to identify the "processor" in the Accused Systems, Dr. Kytomaa seems to assert that the PLC in the Accused Systems satisfies *both* the processor and PLC limitations. (D.I. 401, ex. 16 at ¶¶ 128, 130, 210, 214, 216) However, this explanation does not appear consistent with Dr. Kytomaa's prior opinions set out in his opening report with respect to these limitations in the '548 patent and the '948 patent. As described above, Dr. Kytomaa's analysis of infringement of the '548 patent claims at issue was sparse and confusing, particularly with regard to the presence of the necessary "processor" in the Accused Systems. In light of the confusion produced by his opening report, his later reply report does not suffice to make it clear that there is no genuine issue of material fact with respect to whether the Accused Systems contain the "processor" required by claims 3 and 8 of the '548 patents. In this way, "[w]hether [Dr. Kytomaa] laid [the infringement analysis] out in a way that [Defendants and the Court] were happy [with] and could understand [] well enough" *is* the issue for summary judgment here. (Tr. at 23; *see also id.* at 24-25)

at 19, 23, 63-64)  Specifically, Dr. Nikolaou answered "[y]es" when asked at his deposition if the "PLCs in the accused systems include a central processing unit or a processor[.]"  (D.I. 374, ex. 4 at 124)  Sunoco converts these few general lines of testimony into an argument that "by saying they have a PLC, [Defendants] have admitted they have the processor that is required by [] these claims. . . . all they have to have is a processor [for these claims, not a processor *and* a separate PLC], and they have it."  (Tr. at 19)

However, the Court agrees with Defendants that this deposition testimony of Dr. Nikolaou is certainly not the equivalent of a clear admission that the Accused Systems have *the processor required by claims 3 and 8 of the '548 patent.*  (*Id.* at 50, 52); *see also Mfg. Resources Int'l, Inc. v. Civiq Smartscapes, LLC*, 397 F. Supp. 3d 560, 572 n.3 (D. Del. 2019) ("While Plaintiff characterizes portions of [defendant's expert's] testimony as an admission that the ribbed heat sink is capable of thermal communication with the plate . . ., I do not believe that Plaintiff has presented affirmative evidence at this stage to warrant a grant of summary judgment.").  Indeed, in his rebuttal expert report regarding non-infringement, Dr. Nikolaou opined that Dr. Kytomaa failed to specifically identify what component of the Accused Systems amounts to the "processor" required by the claims.  (D.I. 402, ex. A at ¶¶ 221-45, 249, 254)

On this record, then, there is a genuine dispute of material fact as to whether the Accused Systems meet the "processor" limitation of claims 3 and 8 of the '548 patent.  Thus, the Court recommends that Sunoco's motion for summary judgment of infringement of these claims be denied.

## IV.    CONCLUSION

For the foregoing reasons, the Court recommends that Sunoco's Motion be GRANTED-IN-PART and DENIED-IN-PART. Specifically, the Court recommends that Sunoco's Motion be GRANTED with respect to claim 3 of the '302 patent and DENIED with respect to claims 3 and 8 of the '548 patent.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections by no later than **January 28, 2020**. Responses to those objections are due no later than **February 10, 2020**. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Because this Report and Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Report and Recommendation. Any such redacted version shall be submitted no later than **January 22, 2020** for review by the Court, along with a motion for redaction that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Report and Recommendation.

Dated:  January 16, 2020

_____
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE