**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SUNOCO PARTNERS MARKETING & TERMINALS L.P., | § § § | |
| | § | Civil Action No. 17-1390-RGA |
| Plaintiff, | § § | |
| | § | JURY TRIAL REQUESTED |
| v. | § § | |
| POWDER SPRINGS LOGISTICS, LLC, AND MAGELLAN MIDSTREAM PARTNERS, L.P., | § § § § | **REDACTED - PUBLIC VERSION** |
| | § | |
| Defendants. | § | |

**PLAINTIFF SUNOCO PARTNERS MARKETING & TERMINALS L.P.'S
OPENING BRIEF IN SUPPORT OF ITS OPPOSED MOTION FOR
PERMANENT INJUNCTION TO PREVENT INFRINGEMENT
BY DEFENDANTS' POWDER SPRINGS SYSTEM**

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ....................................................................................... ii

I.    INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................ 1

II.   NATURE AND STAGE OF PROCEEDINGS ..................................................... 2

III.  LEGAL STANDARD ........................................................................................... 2

IV.  RELEVANT BACKGROUND ............................................................................. 3

      A.    Sunoco would suffer irreparable harm absent a permanent injunction ................. 5

           1.    Defendants' willful infringement at the Powder Springs system irreparably harms Sunoco at its downstream terminals. ........................... 5

           2.    The length of time to trial does not excuse the irreparable harm Defendants intend to cause. ....................................................................... 9

      B.    Monetary damages are inadequate to compensate Sunoco for continued infringement at the Powder Springs system........................................................... 11

      C.    Defendants concede that they will suffer no harm from an injunction................ 13

      D.    A permanent injunction serves the public interest. .............................................. 16

V.    CONCLUSION.................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acumed UC v. Stryker Corp.*,
    551 F.3d 1323 (Fed. Cir. 2008)........................................................................................15

*Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*,
    265 F.3d 1294 (Fed. Cir. 2001)........................................................................................11

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
    809 F.3d 633 (Fed. Cir. 2015)..........................................................................13, 14, 16, 17

*Atlas Powder Co. v. Ireco Chemicals*,
    773 F.2d 1230 (Fed. Cir. 1985)..........................................................................................5

*Broadcom Corp. v. Qualcomm, Inc.*,
    543 F.3d 683 (Fed. Cir. 2008)..........................................................................................15

*Brooktrout, Inc. v. Eicon Networks Corp.*,
    2007 WL 1730112 (E.D. Tex. June 14, 2007)..................................................................13

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
    664 F.3d 922 (Fed. Cir. 2012)............................................................................................8

*Daubert v. Merrell Dow Pharmaceuticals*
    509 U.S. 579 (1993)..........................................................................................................10

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
    717 F.3d 1336 (Fed. Cir. 2013).....................................................................................7, 15

*E.F. Johnson Co. v. Uniden Corp. of Am.*,
    623 F. Supp. 1485 (D. Minn. 1985)..................................................................................15

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)............................................................................................................3

*Evonik Degussa Gmbh v. Materia, Inc.*,
    2017 WL 3434156 (D. Del. Aug. 10, 2017)....................................................................16

*Hybritech Inc. v. Abbott Labs.*,
    849 F.2d 1446 (Fed. Cir. 1988)........................................................................................12

*Muniauction, Inc. v. Thomson Corp.*,
    502 F. Supp. 2d 477 (W.D. Pa. 2007), *rev'd in part, vacated in part*, 532 F.3d
    1318 (Fed. Cir. 2008)....................................................................................................8, 12

*Odetics, Inc. v. Storage Tech. Corp.*,
    14 F. Supp. 2d 785 (E.D. Va. 1998), *aff'd*, 185 F.3d 1259 (Fed. Cir. 1999).........................16

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
    702 F.3d 1351 (Fed. Cir. 2012)..................................................................................5

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011)...............................................................................3, 5

*Sanofi–Synthelabo v. Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2006)................................................................................16

*U.S. v. Marine Shale Processors*,
    81 F.3d 1329 (5th Cir. 1996) ..................................................................................15

*U.S. v. Thoms*,
    684 F.3d 893 (9th Cir. 2012) ..................................................................................10

**Statutes**

35 U.S.C. 154(a)(2)....................................................................................................3

35 U.S.C. 154(b) .......................................................................................................4

35 U.S.C. § 154(a)(1)................................................................................................16

35 U.S.C. § 283.........................................................................................................2

## I.      INTRODUCTION AND SUMMARY OF THE ARGUMENT

After over four years of litigation, a Delaware jury returned a complete verdict in Sunoco's favor, rejecting Defendants' numerous invalidity defenses and finding that Defendants have been willfully infringing Sunoco's patents. While this is a complete vindication for Sunoco, the amount of time it took to achieve, due in no small part to the COVID-19 pandemic, means little life remains on Sunoco's patents. Relevant to this motion, Sunoco's '686 Patent is set to expire on April 5, 2022. These next four months are incredibly important, however, because prime blending season is during the winter months. Defendants' continued infringement at the Powder Springs system in Austell, Georgia threatens to irreparably harm Sunoco, both by competing with Sunoco in a two-player market using Sunoco's patented technology and by depriving Sunoco and its licensees of blending opportunity at their terminals downstream of Powder Springs. There is no real dispute this harm downstream will occur and that it will also be difficult to measure, making money damages inadequate.[1] Sunoco's witnesses disputed whether the Powder Springs blending can be performed manually, but Defendants represented to the Court that ceasing their infringing conduct would not be a hardship, would have the same capture rate, and would cost them very little. Given the public's interest in upholding patent rights and stopping a willful infringer, a permanent injunction preventing Defendants' from infringing the '686 Patent at the Powder Springs system is appropriate.

Notably, Defendants indicated that they plan to oppose such an injunction, not because they will not profit greatly at Sunoco's expense, but rather because they allege that Sunoco was

---

[1]      This future downstream harm that Sunoco seeks to prevent is distinct than the royalty damages awarded to Sunoco for past infringement at the Powder Springs system, as those royalties just represent payment for Defendants' past use of the system itself. The injunction seeks to stop the broader harm that will flow from the Powder Springs system if Defendants are allowed to continue willfully infringing through the winter months at Sunoco's and its customers' terminals.

not "urgent" enough in stopping their willful infringement. In support, Defendants essentially blame Sunoco for the disruptions to the schedule of a traditional jury trial by the global COVID-19 pandemic. However, the right to exclude inherent in the patent system is not premised on time-to-trial, and Sunoco attempted to obtain injunctive relief from the earliest days of this case. Now that a jury has spoken and deemed Defendants willful infringers, Defendants should be enjoined from operating their automatic blending systems at the Powder Springs location until the '686 Patent expires on April 5, 2022.

## II.   NATURE AND STAGE OF PROCEEDINGS

Sunoco filed this suit on October 4, 2017, accusing Defendants of willfully infringing Sunoco's butane blending patents by constructing a system in Atlanta, Georgia to blend gasoline upstream of Sunoco's terminals. D.I. 1. Sunoco amended its Complaint on August 2, 2018, to assert additional patents, including the '686 Patent,[2] and accused systems. D.I. 132. A phased jury trial was held on November 29, 2021. In the first phase, the jury found that Powder Springs system literally infringed claim 3 of the '686 Patent, that the infringement was willful, and that the asserted claim was valid. D.I. 744 at 2–8. The jury found that Magellan's other accused systems literally infringed all other asserted claims, did so willfully, and that those claims were also valid. *Id*. In the second phase, Sunoco was awarded just over $12 million in damages for past infringement, with almost $3 million awarded for past infringement of the Powder Springs system. D.I. 753.

## III.   LEGAL STANDARD

The Court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. An injunction is appropriate if Sunoco shows: "(1) that it has suffered an irreparable

---

[2]      The '686 Patent refers to U.S. Patent No. 9,207,686.

2

injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *Id.*

While permanent injunctions are no longer automatic after *eBay*, "it does not follow that courts should entirely ignore the fundamental nature of patents as property rights granting the owner the right to exclude." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011); *see also eBay*, 547 U.S. at 395 (Roberts, C.J., concurring) (recognizing that the "difficulty of protecting a right to exclude through monetary remedies that allow an infringer to use an invention against the patentee's wishes" meant that "courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases"). "This wisdom is particularly apt in traditional cases, such as this, where the patentee and adjudged infringer both practice the patented technology." *Robert Bosch*, 659 F.3d at 1150.

## IV.    RELEVANT BACKGROUND

Sunoco is the owner of the '686 Patent, titled "Versatile Systems for Continuous In-Line Blending of Butane and Petroleum." D.I. 132-15; PTX 3. The patent issued on December 8, 2015, and claims priority back to a provisional application filed on February 9, 2001. *Id.* Factoring in its patent term extensions and terminal disclaimer, the '686 Patent is set to expire on April 5, 2022.[3] *Id.*

---

[3]    Calculating the patent term for the '686 Patent is somewhat complex. The '686 Patent was filed on April 20, 2012 and claims priority back to a February 8, 2002 utility application. D.I. 132-15 at 1, 2. Accordingly, it would normally expire twenty years from the earliest non-provisional application—February 8, 2022. 35 U.S.C. 154(a)(2). The '686 Patent has an extra 688 dates of life

3

Beginning in March 2017, Defendants began operating the Powder Springs system. PTX 152. That system is a joint venture between Defendants Colonial Pipeline and Magellan. Tr. 132:12–14 (counsel for Defendants); Tr. 498:24–499:14 (Magellan's Huff); Tr. 548:17–19 (Kytomaa); PTX 310; D.I. 280 ¶ 19; D.I. 8-7 ¶ 3. The Powder Springs system is a massive blending system located in Atlanta Junction on the Colonial pipeline, upstream of twenty-five terminals owned by Sunoco or licensees of Sunoco's patents. PTX 705; Tr. 226:14–227:10 (Colella), Tr. 360:3–361:24 (Legge). The system blends butane into gasoline transported along the Colonial pipeline, the blended gasoline then travels in the pipeline to its final destination, including at any of the downstream terminals. D.I. 280, ¶¶ 21–24; D.I. 8-7, ¶ 20. Blending is done to increase the volatility of gasoline and generate profits, as blending creates new volume of gasoline that can then be sold at a gasoline price for the cheaper butane cost. Tr. 166:21–169:12 (Colella); Tr. 269:12–14 (Selvidge, "because it's profitable").

The automatic blending performed at Powder Springs was found to infringe Sunoco's '686 Patent. D.I. 744. That infringement was also found to be willful. *Id.* Absent action by this Court, Defendants intend to continue their infringing blending through the '686 Patent's expiration on

---

due to delays in prosecution. D.I. 132-15 at 1 ("Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 688 days."). However, the '686 Patent was rejected for double patenting in light of U.S. Patent Nos. 7,631,671 (the "'671 Patent") and 8,176,951 (the "'951 Patent"). Ex. 1, '686 Patent Terminal Disclaimer. Sunoco therefore disclaimed any term for the '686 Patent "which would extend beyond the expiration date" of the '671 and '951 Patents. *Id.* at 1, 3. The '686 Patent therefore expires at the earliest expiration date of the '671 or '951 Patents. The '671 Patent was filed on April 20, 2006. It claims priority to a February 8, 2002 utility application and includes a patent term adjustment of 771 days, meaning it expires on March 20, 2024 (771 days after February 8, 2002). Ex. 2, '671 Patent. The '951 Patent claims priority to a February 8, 2022 utility application and includes 56 days of term adjustment, meaning it expires on April 5, 2022. Ex. 3, '951 Patent. While the '951 Patent includes a terminal disclaimer to the '671 Patent, the '671 Patent expires after the '951 Patent so the disclaimer does not reduce the patent term. Ex. 4, '951 Patent Terminal Disclaimer. Accordingly, the '686 Patent expires at the same time as the '951 Patent—April 5, 2022.

April 5, 2022. These next four months are important because they represent a prime blending season due to colder weather. Tr. 313:23–315:7 (Maier) (explaining the blend season); Tr. 525:15–526:3 (Kytomaa) (explaining that there is greater blend opportunity in winter); D.I. 8-3 ¶¶ 9, 10. Sunoco seeks to enforce its statutory right to exclude in order to stop Defendants' infringing blending for this final portion of the blend season during the remaining '686 Patent's term.

## I.   ARGUMENT

### A.   Sunoco would suffer irreparable harm absent a permanent injunction.

#### 1.   Defendants' willful infringement at the Powder Springs system irreparably harms Sunoco at its downstream terminals.

For over four years, Defendants have willfully infringed the '686 Patent by using the Powder Springs system. Worse yet, due to its location on the Colonial pipeline, Defendants' infringement has deprived, and will continue to deprive, twenty-five Sunoco and Sunoco-customer terminals from realizing the full commercial benefits of Sunoco's patented technology. Allowing this infringement to continue for the remaining four months of the '686 Patent's term will irreparably harm Sunoco.

When there is "[d]irect competition in the same market," it "suggest[s] strongly the potential for irreparable harm without enforcement of the right to exclude." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012). This is particularly true when there is a two-player market, which "creates an inference that an infringing sale amounts to a lost sale for the patentee." *Robert Bosch*, 659 F.3d at 1151. That is unquestionably the case here. Tr. 227:1–4 (Colella) (testifying that he was unaware of any other competitor); Tr. 270:9–19 (Selvidge) (only Sunoco and Magellan were involved in Colonial's bid process for Atlanta Junction); Tr. 509:20–23 (Magellan's Huff) ("Q. And you can't identify a company other than Sunoco or Magellan that operates an automated butane blending facility at its terminal? A. Not off

the top of my head."); Tr. 1364:16–1365:3 (Magellan's Lassman) (testifying that other than refineries, Sunoco was the only company he could think of that "Magellan competes against in butane blending"). Allowing Defendants to continue usurping Sunoco's business, even for the four months remaining on the '686 Patent, is irreparable harm. *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1234 (Fed. Cir. 1985) ("The fact that the patent has only one year to run is not a factor in favor of Ireco in the balance of equities. Patent rights do not peter out as the end of the patent term, usually 17 years, is approached.").

Defendants' use of Sunoco's patented technology is also particularly harmful because of the unique nature of the Powder Springs system. Twenty-five of Sunoco or its licensees' terminals are dependent on the Colonial pipeline, at least in part, for their source of gasoline. Tr. 360:3–361:24 (Maier); PTX 705. For fourteen of these terminals—two belonging to Sunoco and twelve belonging to its licensees—the Colonial pipeline is the *only* source. *See* PTX 705. Defendants' Powder Springs system blends directly into the Colonial pipeline itself, meaning that every time the Powder Springs system blends into a gasoline batch destined for any of Sunoco's or its licensees' downstream terminals, those sites receive already blended gasoline and will lose blend opportunity. *See* Tr. 227:11–24 (Colella) (Powder Springs is depriving Sunoco of blend opportunity); Tr. 314:14–22 (Maier) (description of blend opportunity); Tr. 325:16–326:8 (Maier) (upstream systems remove blend opportunity); Tr. 330:5–24 (Maier) (loss of blend opportunity downstream of Powder Springs); Tr. 361:25–362:9 (Legge) (recognition that Powder Springs would remove blend opportunity downstream); *cf.* Tr. 503:21–504:13 (Magellan's Huff) (Magellan included a buy-out provision due to concern of being upstreamed).

In a typical case of infringement, a patentee can at least continue to compete in the open market. That is true for Defendants' infringing terminals and why Sunoco does not seek an

6

injunction to stop those systems. But the Powder Springs system has effectively cut off that opportunity for these fourteen terminals by delivering Sunoco and its licensees pre-blended gasoline. Tr. 227:5–24 (Colella). Sunoco has seen a decrease in blending opportunity since the Powder Springs system came online. Tr. 330:5–24 (Maier). Moreover, Powder Springs blended 2,080,907 million barrels (87,398,094 gallons) of butane in 2018. Tr. 501:14–23 (Magellan's Huff); PTX 152. Without that infringing blending, opportunity would have existed for downstream terminals. *Cf.* Tr. 227:5–24 (Colella); Tr. 361:18–362:9 (Legge). Defendants have thus used Sunoco's own technology against it to effectively steal blending opportunity from Sunoco's downstream terminals. That is irreparable harm. *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) ("Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions.").

This Court has granted permanent injunctions in similar situations. In *Bio-Rad Laboratories Inc., et al. v. 10X Genomics, Inc.*, the Court found that defendant was a direct competitor whose willful infringement caused irreparable harm because "Plaintiffs are being forced to compete with [Defendant's] products that incorporate their own patented inventions." No. 15-cv-152-RGA, Dkt. 568 at 5. Here, Defendants have not just "incorporated" Sunoco's invention into a product, they have used it to effectively cut Sunoco's downstream terminals out of the market by reducing their blend opportunity. Tr. 227:5–24 (Colella); Tr. 330:5–24 (Maier); Tr. 361:18–362:9 (Legge). Likewise, in *E.I. Dupont De Nemours and Company v. Unifrax I LLC* the Court found irreparable harm when the parties were "direct competitors" and the defendant's infringement had led to a "reduction in sales." No. 14-1250-RGA, Dkt. 392 at 3.

In addition to the direct harm to Sunoco's downstream terminals, Defendants' infringement indirectly harms Sunoco by interfering with its licensees. Sunoco's licensees own twelve terminals that are downstream of the Powder Springs system and rely exclusively on the Colonial pipeline for gasoline. PTX 705. Absent Defendants' infringement at the Powder Springs system, these terminals would blend significantly more butane. Tr. 227:5–24 (Colella); Tr. 330:5–24 (Maier); 361:18–352:9 (Legge). Sunoco and its licensees partnered to build these systems and agreed to share the profits. Tr. 195:17–196:12 (Colella) (discussing building the sites); Tr. 205:24–206:5 (Colella) (discussing profit split); Tr. 208:11–211:1 (Colella) (describing the profit sharing between Sunoco and its licensees); *see also* PTX-332–338, 343, 350, 691–692, 877. Key to those agreements is the licensee's trust in Sunoco's technology and that it would be a profitable endeavor for both parties. Tr. 203:22–204:5 (Colella) (discussing Kinder Morgan's respect of Sunoco's patents); Tr. 208:11–211:1 (Colella) (explaining the trust and alignment of the parties). Defendants' infringement jeopardizes that trust and harms the value of those systems. *See* Tr. 325:16-326:8, 330:5-24 (Maier) (explaining concern for upstreaming). Indeed, as Mr. Colella testified, Chevron had a provision inserted into the agreement with Sunoco that, should Chevron's blending system be upstreamed by someone believed to be infringing Sunoco's patents, Sunoco would use all reasonable measures to enforce its patents. Tr. 224:7–226:4 (Colella); PTX 477, 481, 482, 477 571. Defendants' infringement at Powder Springs damages Sunoco's goodwill and constitutes irreparable harm. *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.").

Defendants were well aware of the harm caused by blending directly into the Colonial pipeline upstream of Sunoco and its licensees. Defendants' own contract for the Powder Springs

system includes a provision to preclude Colonial from allowing another system to blend upstream of Powder Springs. PTX 310.28; Tr. 503:14–504:13 (Magellan's Huff). Defendant Magellan thus sought to insulate itself from the exact type of harm it knew it would inflict on Sunoco and all downstream licensees. Furthermore, Defendant's conduct was not unintentional or coincidental. The jury found that this infringing conduct was *willful*, further supporting a finding of irreparable harm. *Muniauction, Inc. v. Thomson Corp.*, 502 F. Supp. 2d 477, 483 (W.D. Pa. 2007), *rev'd in part, vacated in part*, 532 F.3d 1318 (Fed. Cir. 2008) ("The jury's finding that defendants have willfully infringed plaintiff's patent for six years supports our conclusion that plaintiff has suffered irreparable injury to its patent rights, for which there is no adequate remedy at law.").

## 2. The length of time to trial does not excuse the irreparable harm Defendants intend to cause.

Defendants cannot defend their conduct in light of the jury's verdict, so instead, they seek to justify continuing their willful infringement unabated because Sunoco allegedly did not act "urgently" enough while dealing with the repercussions of the COVID pandemic. 12.8.21 Letter (D.I. 758). This is a pretext to continue willful infringement of the '686 Patent. Sunoco's concern for this harm is nothing new.  It sought a preliminary injunction against the Powder Springs system early in this case. D.I. 6. Defendants vigorously opposed that motion, claiming that automatic blending was obvious, that Sunoco would suffer no harm from the system, and that an injunction would force Defendants to stop blending and default on contracts. D.I. 22 at 7–20. There was no mention by the Defendants of the possibility of switching to manual blending.  The first two assertions have since been disproven by the evidence and the jury's verdict, and Defendants themselves walked back the third, claiming at trial—contrary to what they told the Court and the

testimony and testimony of Sunoco's witnesses[4]—switching to manual blending would supposedly be easy, effective, and cheap, requiring (at most) only $70,000 in additional labor costs. Tr. 1390:2–1399:3 (Magellan's Hitz) (at most, one additional part time employee at a rate of $70,000 per year would be required); Tr. 1415:23–1416:25, 1417:15–22, 1428:17–19 (Magellan's Maness). Defendants should now be held to their word—it is time for Defendants' willful infringement to cease and for Sunoco to enjoy the statutory right to exclude others for its remaining time on the '686 Patent.

The remainder of Defendants' letter blames Sunoco for trying to balance the realities of an ongoing deadly pandemic with a desire to vindicate its intellectual property rights. Defendants notably cite no authority for their proposition that a party must abandon every potential legal issue, litigate in a less effective manner, have its counsel violate other courts' deadlines, and put its own witnesses in danger, or else it cannot receive a permanent injunction against a willful infringer. Nothing about Sunoco's decisions in this case contradict the irreparable harm caused by Defendants. Sunoco requested an interlocutory appeal on the Court's *Daubert* ruling because it believed doing so would preserve judicial and party resources. Dkt. 555 at 9. Of course, Sunoco couldn't know at the time that we would still be in a pandemic eighteen months later, which would continue to impact the trial date. Similarly, Sunoco wanted an in-person trial because it believed that credibility would be a key factor and that live testimony is the best for observing a witnesses' demeanor, candor, and responsiveness. *See, e.g.*, *U.S. v. Thoms*, 684 F.3d 893, 903 (9th Cir. 2012) ("[L]ive testimony is the bedrock of the search for truth in our judicial system."). The trial result confirms that Sunoco was right, and the verdict shows whose witnesses the jury thought were

---

[4]     *See* Tr. 226:14–227:10 (Colella) ("to blend into that volume, you would have to use an automated injection system"), Tr. 347:20–348:19 (Legge) (manual blending "wouldn't be feasible").

candid and credible. *Cf.* Tr. 1258:15–1259:6 (Defendants' counsel urging that, "if you believe that we are infringers and willful infringers, you have to accept that we have been lying to you throughout this case"). Unfortunately, the COVID-19 pandemic hampered the ability for a live trial, in particular because Sunoco's corporate representative, Mr. Colella—who attended every day of this trial—is older and in the highest risk category for COVID. That Sunoco would choose to prioritize the health of Mr. Colella and its other witnesses demand a fair presentation of its case live before a jury, does not excuse the irreparable harm caused by Defendants' willful infringement.[5]

Defendants' final effort is to blame Sunoco's counsel for having conflicts and for Defendants' own motion for continuance. 12.8.21 Letter at 2–3 (D.I. 758). Defendants' assertion that counsel must neglect previously set trials to obtain a permanent injunction for willful infringement is facially erroneous. As for the continuance, Defendants concede that was their own request. At that time, Sunoco had no idea that Defendants would now try to take advantage Sunoco's consent to justify their continued willful infringement. That they would make these arguments, rather than defend the merits, is telling. Defendants cannot credibly deny that they are irreparably harming Sunoco by blending upstream of Sunoco's terminals. This factor strongly supports granting a permanent injunction.

### B.  Monetary damages are inadequate to compensate Sunoco for continued infringement at the Powder Springs system.

---

[5]     Defendants also claim that the possibility of a settlement means there cannot be irreparable harm. However, that has no bearing on the irreparable harm analysis because that settlement contained terms other than a cash payment. Indeed, it was the parties' failure to agree on those terms that ultimately caused the settlement to not be completed. Furthermore, Defendants' argument should be rejected because it would disincentivize parties from trying to compromise, which is directly contrary to public policy. *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1308 (Fed. Cir. 2001) ("[W]e are mindful, as was the district court, of the policy in favor of protecting settlement negotiations from being admitted as evidence, thus serving to encourage settlements.").

Defendants have willfully infringed Sunoco's '686 Patent for years in direct violation of Sunoco's statutory right to exclude, thereby taking Sunoco's market share and harming its goodwill with licensees. This alone suggests that monetary damages are insufficient to remedy the harm. *Muniauction*, 502 F. Supp. at 483 (W.D. Pa. 2007) ("The jury's finding that defendants have willfully infringed plaintiff's patent for six years supports our conclusion that plaintiff has suffered irreparable injury to its patent rights, for which there is no adequate remedy at law."); *see also Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1456–57 (Fed. Cir. 1988) ("[B]ecause the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee, whole."); *Bio-Rad Labs.*, No. 15-cv-152-RGA, Dkt. 568 at 6 ("Damages are inadequate to compensate for loss of market share.").

Furthermore, monetary damages are particularly insufficient here because, as Defendants have eagerly pointed out throughout this case, it is very difficult to measure the exact impact of Defendants' infringing activities. *See e.g.*, Tr. 504:14–24 (Magellan's Huff). As discussed above, there is no question that Powder Springs system presents an ever-present threat to Sunoco and its licensees' downstream terminals by reducing blend opportunity. *See* Section V.A.1. Indeed, Defendant Magellan had exactly that concern and included a provision in the Powder Springs contract to disincentivize Colonial from blending upstream:

> Q. What is your understanding of why Section 7.4A was included in the Powder Springs agreement?
>
> A. My best recollection is is that we put in a buyout provision to keep somebody from going upstream of us and blending.
>
> Q. Right. Because if they upstream and blend, they take away the blend margin that you would have; correct?
>
> A. That would be the concern.
>
> Q. So you were concerned that Colonial might work with somebody else to go upstream and take away the blend margin; correct?

12

A. Yes.

Tr. 504:2–13 (Magellan's Huff). While there is no doubt that blending upstream reduces opportunity downstream, the actual effect at Sunoco and its licensees' terminals is difficult to precisely measure because Colonial does not track what batches each terminal receives. Tr. 1349:24–1350:4 (Legge). As Magellan's former engineer Mr. Huff explained, "there's a lot of -- a lot of things in there depending on where the product goes and what's blended and what's not blended and what terminals it gets it actually hits." Tr. 504:20–23. The inability to calculate the exact harm to Sunoco makes monetary remedies inadequate. *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 809 F.3d 633, 645 (Fed. Cir. 2015) (holding that the second factor "weighs in favor of Apple because, as the district court found, the extent of Apple's downstream and network effect losses are very difficult to quantify"); *Brooktrout, Inc. v. Eicon Networks Corp.*, 203-CV-59, 2007 WL 1730112, at *1 (E.D. Tex. June 14, 2007) ("The inability to calculate the plaintiff's future loss with reasonable precision makes legal remedies inadequate in this case. An injunction against future acts of inducement is the proper remedy to prevent future infringement.").

Moreover, Defendants' expert Dr. Maness admitted through prior in-court testimony that a damages model and the hypothetical negotiation of a reasonable royalty would include the downstream losses to Sunoco customers, but the royalty he proposed, and which was used at trial, did not include those customer losses. Tr. 1419:7–10; 1420:3–14 (Magellan's Maness). As such, Defendants admit the royalty rate used at trial cannot and does not account for all the money damages caused by Powder Springs.

### C.   Defendants concede that they will suffer no harm from an injunction.

The balance of hardships factor weighs heavily in favor of granting a permanent injunction because Defendants have represented that they can easily halt their infringement with no adverse consequences, while Sunoco will suffer irreparable harm if Defendants are allowed to continue

13

willfully infringing the '686 Patent and upstreaming Sunoco's terminals. *Apple*, 809 F.3d at 646 ("On this record, it is clear—Samsung will suffer relatively little harm from Apple's injunction, while Apple is deprived of its exclusivity and forced to compete against its own innovation usurped by its largest and fiercest competitor.").

Defendants have stated they are "serious" about defeating the injunction, implying that they would be harmed from halting their infringement and switching to manual blending at the Powder Springs system. 12.8.21 Letter (D.I. 758). That is a very different story than the one they told at trial. At trial, Defendants claimed that they could halt their willful infringement by simply switching their sites to manual blending and called their engineering and construction manager— also their corporate representative—Ivory Hitz, to testify that "[m]anual blending is not that much different from automatic blending or analyzing" so they "don't believe you'd see any difference." Tr. 1395:23–1396:2. Ms. Hitz explained that there were no downsides to switching since Defendants were "already achieving the maximum [blending] amount with the two employees," manual blending would not impact the capture rate, and that there would be no risk of over-blending. Tr. 1392:18–24, 1394:8–10, 1395:9–12. According to Defendants, this change could be done at the Powder Springs location by simply increasing the sampling times, which would cost (at most) $70,000 for additional part-time personnel. Tr. 1397:6–16 (Magellan's Hitz) (moving to once an hour sampling is the only step needed to convert the system and they are already sufficiently staffed to do it); Tr. 1398:24–1399:2 (Magellan's Hitz) ($70,000 would be the "upper bound" for additional labor costs). In fact, Ms. Hitz testified, "I think we're sufficiently staffed," which would obviate the need for any additional costs in converting from automatic to manual blending operations. Tr. 1397:12-16 (Magellan's Hitz).

Sunoco has never agreed with Defendants' claim that they can easily switch to manual blending with no effect on their volumes. Sunoco believes that it and its customers will be able to blend significantly more butane at its downstream terminals if Defendants are enjoined from automatic blending at Powder Springs, hence the importance of this injunction to Sunoco. However, for the balance of hardships analysis Defendants should be held to their representations to this Court and to the jury. Given those claims about the ease of switching to manual blending, they cannot credibly claim that they would suffer any real harm from halting their infringement. Rather, Defendants should simply make the switch that they have maintained is so simple and effective. *Douglas Dynamics*, 717 F.3d at 1345 ("If indeed [defendant] had a non-infringing alternative which it could easily deliver to the market, then the balance of hardships would suggest that Buyers should halt infringement and pursue a lawful course of market conduct."); *Acumed UC v. Stryker Corp.*, 551 F.3d 1323, 1330 (Fed. Cir. 2008) (finding district court did not abuse its discretion by considering the existence of a potential alternative).

Furthermore, any harm—whether it is minimal, or if Defendants now claim it is substantial—should be given little to no weight in the analysis because Defendants are willful infringers. *See Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008) ("[O]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."). Indeed, federal courts often given *no* weight to hardship in such circumstances. *See, e.g.*, *U.S. v. Marine Shale Processors*, 81 F.3d 1329, 1358 n.16 (5th Cir. 1996) (holding that "a court need not balance the hardship when a defendant's conduct has been willful" and listing cases); *E.F. Johnson Co. v. Uniden Corp. of Am.*, 623 F. Supp. 1485, 1504 (D. Minn. 1985) ("A willful infringer which seeks

to profit by copying from others' creative ideas should not be heard to complain that its interests will be disturbed by an injunction.").

For years Sunoco has been forced to directly compete against its own patented technology. Allowing Defendants to continue their willful infringement, especially when they claim they could stop at minimal cost to themselves, would simply be inequitable. The balance of hardships factor therefore weighs strongly in support of a permanent injunction. *Evonik Degussa Gmbh v. Materia, Inc.*, CV 09-636 (NLH/JS), 2017 WL 3434156, at *3 (D. Del. Aug. 10, 2017) ("After eight years of litigation, during which Materia continued to infringe the '528 patent, the Court must now give due weight to Evonik's right to exclude, pursuant to 35 U.S.C. § 154(a)(1), for the remaining two years of the life of the patent. Forcing Evonik to continue competing with its own patented technology would impose a weighty hardship under the circumstances of this case, and would be simply inequitable.").

### D. A permanent injunction serves the public interest.

The public interest is best served by having a strong patent system that protects and encourages innovation. *Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp. 2d 785, 795 (E.D. Va. 1998), *aff'd*, 185 F.3d 1259 (Fed. Cir. 1999) ("The public-interest factor often favors the patentee, given the public's interest in maintaining the integrity of the patent system."). The right to exclude is fundamental to that interest. *Sanofi–Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) ("[T]he encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude."). Given this strong interest, the Federal Circuit has instructed that "the public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions." *Apple*, 809 F.3d at 647.

16

Here, Sunoco practices the patented technology and there are no countervailing factors that would counsel against an injunction. Enjoining Defendants will not deprive customers of butane-blended gasoline. Indeed, the harm from Defendants' conduct is that Sunoco and its licensees are downstream of the Power Springs system and thus directly impacted when such system blends into gasoline destined to any of these terminals. Tr. 227:5–24 (Colella); Tr. 330:5–24 (Maier); Tr. 361:18–362:9 (Legge). If Defendants are enjoined from continued infringement, Sunoco will meet the demand. *Cf.* Tr. 330:5-24 (Maier). Furthermore, an injunction is especially appropriate since Defendants' infringement has been found willful. Allowing Defendants to continue to deliberately infringe the patented technology—knowingly trampling on Sunoco's statutory right to exclude—undermines the very purpose of the patent system. Accordingly, this factor strongly supports granting a permanent injunction. *See Apple*, 809 F.3d at 647 ("We base this conclusion not only on the Patent Act's statutory right to exclude, which derives from the Constitution, but also on the importance of the patent system in encouraging innovation.").

## V.    CONCLUSION

Over four years of willful infringement is enough for one patent. It is time for Defendants to respect Sunoco's intellectual property rights, cease their improper conduct, and allow Sunoco to realize the full, exclusive benefit of its patented technology for the little time the '686 Patent has left. Defendants have admitted that there is a de minimis impact to shifting from its infringing blending to manual operation. Defendants should be permanently enjoined from performing automatic blending at the Powder Springs system.

Dated: December 10, 2021

Respectfully submitted,

*/s/ John C. Phillips, Jr.*
John C. Phillips, Jr. (No. 110)
Megan C. Haney (No. 5016)
PHILLIPS, MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, Delaware 19806
(302) 655-4200
jcp@pmhdelaw.com
mch@pmhdelaw.com

*Attorneys for Plaintiff Sunoco Partners*
*Marketing & Terminals, L.P.*

Of Counsel:
John Keville
Michelle Replogle
Richard McCarty
Michael Krill
WINSTON & STRAWN LLP
800 Capitol St., Suite 2400
Houston, Texas 77002
(713) 651-2600 (phone)
(713) 651-2700 (fax)

18