IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SUNOCO PARTNERS MARKETING &
TERMINALS L.P.

  Plaintiff,

  v.

POWDER SPRINGS LOGISTICS, LLC and
MAGELLAN MIDSTREAM PARTNERS,
L.P.

  Defendants.

C.A. No. 17-1390-RGA



**REDACTED VERSION**

## DEFENDANTS' BRIEF IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION

| | |
|---|---|
| MORRIS, NICHOLS, ARSHT &<br>  TUNNELL LLP<br>Rodger D. Smith II (#3778)<br>1201 North Market Street<br>Wilmington, DE 19801<br>(302) 658-351-9205<br>rsmith@mnat.com<br><br>OF COUNSEL:<br><br>David S. Moreland<br>MEUNIER CARLIN & CURFMAN LLC<br>999 Peachtree St., N.E., Suite 1300<br>Atlanta, GA 30309<br>(404) 645-7700<br>dmoreland@mcciplaw.com;<br>jharbin@mcciplaw.com<br><br>*Attorneys for Defendant*<br>*Powder Springs Logistics, LLC* | FISH & RICHARDSON P.C.<br>Douglas E. McCann (#3852)<br>Martina Tyreus Hufnal (#4771)<br>Nitika Gupta Fiorella (#5898)<br>222 Delaware Ave., 17th Floor<br>Wilmington, DE 19899<br>Telephone: (302) 652-5070<br>dmccann@fr.com; hufnal@fr.com;<br>fiorella@fr.com<br><br><br>Joseph A. Herriges<br>FISH & RICHARDSON P.C.<br>3200 RBC Plaza<br>60 South Sixth Street<br>Minneapolis, MN 55402<br>Telephone: (612) 337-2579<br>herriges@fr.com<br><br>*Attorneys for Defendant*<br>*Magellan Midstream Partners, L.P.* |

Dated:  December 20, 2021

## TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ................................................................................................... 1

II.   SUMMARY OF THE ARGUMENT .................................................................... 3

III.  STATEMENT OF FACTS .................................................................................... 4

      A.    Any Harm To Sunoco Is A Result of Blending, Not The Way Magellan Blends .. 4

      B.    Money Damages are Sufficient for any Infringement at Powder Springs .............. 6

      C.    Defendants Have Ceased Automated Blending of Gasoline at Powder Springs
            And Therefore There Is No Infringement To Enjoin ................................................ 7

IV.   LEGAL STANDARDS ......................................................................................... 9

V.    ARGUMENT ........................................................................................................ 9

      A.    Sunoco Will Not Suffer Irreparable Injury From Future Infringement ................. 9

      B.    Money Damages Have Been And Still Are Sufficient to Compensate Sunoco ... 13

      C.    Although Defendants Have Chosen to Stop Automated Blending, that  Voluntary
            Cessation Does Not Create an Entitlement to a Permanent Injunction Where One
            Did Previously Exist ............................................................................................... 18

VI.   CONCLUSION .................................................................................................... 18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012)................................................................................13

*Am. Standard Inc. v. Pfizer Inc.*,
  722 F. Supp. 86 (D. Del. 1989) (J. Longobardi) ....................................................15

*Apple Inc. v. Samsung Elecs. Co.*,
  809 F.3d 633 (Fed. Cir. 2015)........................................................................9, 10, 11

*Bio-Rad Labs. Inc. et al v. 10X Genomics, Inc.*,
  No. 15-cv-152-RGA, Dkt. 568 ................................................................................11

*Cordis Corp. v. Advanced Cardiovascular Systems, Inc.*,
  1999 WL 805283 (D. Del. Sep. 10, 1999) ..............................................................17

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
  717 F.3d 1336 (Fed. Cir. 2013)...............................................................................11

*E.I. Dupont De Nemours and Company v. Unifrax I LLC*,
  No. 14-1250-RGA, Dkt. 392 ...............................................................................11, 12

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006).....................................................................................................9

*Honeywell Intern., Inc. v. Universal Avionics Systems Corp.*,
  397 F. Supp. 2d 537 (D. Del. 2005)........................................................................18

*INDECS Corp. v. Claim Doc, LLC*,
  No. 16-4421 (KM) (JBC), 2017 WL 1086178 (D.N.J. Mar. 21, 2017)............................16, 17

*Muniauction, Inc. v. Thomson Corp.*,
  502 F. Supp. 2d 477 (W.D. Pa. 2007)....................................................................17

*Parallel Iron LLC v. NetApp, Inc.*,
  84 F. Supp. 3d 352 (D. Del. 2015).........................................................................15

*Polymer Techs., Inc. v. Bridwell*,
  103 F.3d 970 (Fed. Cir. 1996)...................................................................................9

*Presidio Components Inc. v. Am. Tech. Ceramics Corp.*,
  702 F.3d 1351 (Fed. Cir. 2012)...............................................................................11

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
  659 F.3d 1142 (Fed. Cir. 2011)...................................................................................11

*Starter Corp. v. Converse, Inc.*,
  170 F.3d 286 (2d Cir. 1999)........................................................................................15

*Sunoco P'ship Mktg. & Terminals L.P. v. U.S. Venture, Inc.*,
  436 F. Supp. 3d 1099 (N.D. Ill. 2020) .........................................................................2

*XpertUniverse, Inc. v. Cisco Systems, Inc.*,
  2013 WL 6118447 (D. Del. Nov. 20, 2013) ...................................................13, 14

**Other Authorities**

Fed. R. Evid. 408 .............................................................................................................15

I.      **INTRODUCTION**

The patented method of claim 3 of the '686 patent is directed, as Sunoco characterized it throughout trial in this case, to automated blending without human intervention.  The evidence at trial all points to a single conclusion—any blending impact that Sunoco or its customers experience downstream of Powder Springs Logistics ("Powder Springs") stems not from practicing the patented method, but from blending butane into gasoline at Powder Springs, whatever the method.  As a result, Sunoco cannot prove the requisite irreparable harm necessary to obtain the extraordinary relief of a permanent injunction.

Powder Springs is the largest butane blending facility in North America.  And there is no legitimate dispute that Powder Springs is capable of blending using methods other than those required by claim 3, including without full automation.  In fact, Powder Springs (and every Magellan terminal) is able to blend using such non-infringing methods without a meaningful difference in capture rate as compared to fully automated blending.  Thus, while Sunoco relies on the unremarkable fact that blending at Powder Springs could result in some loss in blend opportunity downstream, it offered no evidence that the loss, or any part of it, is attributable to practicing the method of claim 3, as opposed to blending by any other method.  Worse for Sunoco is that Sunoco has repeatedly said that it and its customers can be compensated for upstream blending by money damages.  The facts do not warrant an injunction in this case.

The '686 patent has less than four months of life remaining.  The Court inquired why Defendants do not just "throw[] the automatic to manual switches."  D.I. 759.  Indeed, Defendants have done just that at Powder Springs, which is manned around the clock, and will not require hiring an employee for three months, only to let them go when the patents expire.  As of December 16, 2021, the blending system at Powder Springs now runs in manual, and the PLC code has been altered to remove the blending equation so that it cannot run again in full

1

automated mode until after the '686 patent expires.  Because the blending method at Powder Springs does not infringe the only claim asserted against it at trial, Defendants owe no continuing royalties on that blending.

So why oppose the injunction?  Because, Sunoco is not entitled to one as it cannot show irreparable harm—indeed, Sunoco fails to meet its burden for many of the same reasons it could not show irreparable harm when it sought a preliminary injunction.  But Defendants do not press this issue with the Court for the sake of principle alone.  Instead, Defendants must do so to close the issue.  Defendants informed Sunoco that they ceased using the automated system, giving Sunoco a copy of the new blending procedure and a declaration under oath that it was now in place, and would be until patent expiry.  Instead of agreeing that the permanent injunction issue is now moot, Sunoco responded that it needed an assortment of other irrelevant information, like documentation, such as a "Management of Change," and answers to questions such as "how often are [the operators] expected to review RVPs and make changes."  Ex. 1 at 1.  Sunoco's response shows that the endless litigation that has characterized this case (4 years of litigation over a mere $12 million dollars[1]) is just going to continue.

The best way for Defendants to quiet this part of the litigation is to show the Court what the record more than supports, that Sunoco could not show irreparable harm or the inadequacy of money damages **even if** Defendants were still using the automated system.  As evidenced by sworn testimony, Magellan will continue blending manually at Powder Springs in order to avoid

---

[1] It has been clear for a long time that, if there was infringement, the royalty would be, at most, 2 cents per gallon.  Almost two years ago, this Court struck the damages theories that could lead to large numbers.  D.I. 442 (January 3, 2020).  The same month, the Northern District of Illinois used the 2 cent per gallon rate as support for its decision to award Sunoco $2 million in damages on asserted Mattingly patents.  *Sunoco P'ship Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 436 F. Supp. 3d 1099, 1129-1130 (N.D. Ill. 2020); Tr. at 1368:5-6 (Colella) ("This was a result of the U.S. Ventures case because they in that case, the judge focused on that $0.02.").

paying royalty from blending at its largest system, but, for the reasons stated below, the Court should deny Sunoco's motion.

## II.    SUMMARY OF THE ARGUMENT

1. Sunoco cannot show irreparable harm because it has failed to prove that any harm it may realize at terminals downstream of Powder Springs would be caused by Defendants' use of automated blending.  Instead, the undisputed evidence from trial shows that Sunoco's alleged injury would be caused by *any* blending at Powder Springs, regardless of the method used. Sunoco's failure to satisfy the "causal nexus" test thus makes an injunction inappropriate.

2. Sunoco is also not entitled to an injunction because, to the extent it can show any harm from Defendants' automated blending in particular, it has still failed to demonstrate that money damages are insufficient to address such harm.  In fact, Sunoco indicated the exact opposite to this Court during the preliminary injunction phase, and this Court agreed with Sunoco then: Magistrate Judge Burke concluded that "the record clearly demonstrates that such loss [of blend opportunity] *could* be quantified and compensated accordingly," D.I. 68 at 16 n.4, and, in adopting Judge Burke's Report and Recommendation, Judge Stark noted that "Sunoco's own butane supply license agreements provide that 'equitable financial compensation' is adequate to compensate licensees for blending butane upstream" which Judge Stark said was a "strong suggestion that such harms are compensable by financial payments," D.I. 141 at 4.  Sunoco has not identified any new evidence to warrant a different conclusion now.

3. Defendants have voluntarily stopped automated blending at Powder Springs to avoid paying the on-going royalty, but that does not entitle Sunoco to a permanent injunction.  Sunoco bears the burden to show such entitlement and it is has failed in that proof.  And, because Sunoco refused to withdraw its motion even after being informed of Defendants' actions, the parties require this Court to decide the issue on the merits.

III.    **STATEMENT OF FACTS**

A.    **Any Harm To Sunoco Is A Result of Blending, Not The Way Magellan Blends**

The only evidence presented by Sunoco about harm was conclusory testimony about unspecified impact from the mere fact of upstream blending.  D.I. 764 at 5-9.  No Sunoco witness presented any evidence that any harm to Sunoco was due to automated blending specifically.  In an attempt to imply automated blending is the culprit, Sunoco argues that "[a]bsent Defendants' infringement at the Powder Springs system, these terminals would blend significantly more butane."  D.I. 764 at 8 (citing Tr. 227:5-24 (Colella); Tr. 330:5–24 (Maier); Tr. 361:18-362:9 (Legge)).  Yet Mr. Colella only said Powder Springs "depriv[es] us of blend opportunity."  Tr. 227:5-24.  Mr. Maier said that after Powder Springs started operating, Sunoco saw "some impact" and the facilities "don't blend as much as we had hoped they would."  Tr. 330:5-24.[2]  Neither witness offered evidence as to what the drop is, or what role automated blending plays in any drop.  There is nothing in the record to suggest whether Sunoco or its customers have lost or will lose any blend opportunity because of automation.

In contrast, the record shows that automation is not a meaningful factor in how much Magellan can blend.  To be sure, Powder Springs is a large blending operation; it is the largest butane blending facility in the nation.  Tr. 678:8-16 (Hitz).  Powder Springs has two 90,000 barrel butane spheres that blend into a 42 inch pipeline.  *Id*. at 678:17-22 (Hitz).  Powder Springs is manned 24/7 by operators who focus on blending.  *See id.* at 1397:9-16 (Hitz).  It is true as

---

[2] And the cite Sunoco relies on from Mr. Legge says nothing about what Defendants do at Powder Springs at all; instead, Mr. Legge simply said that Sunoco had discussed needing to "reimburse [its] customers because they were going to be losing blend opportunity."  Tr. 361:18–362:9.

Sunoco says, *see* D.I. 764 at 6, that Sunoco and its licensees have terminals downstream of Powder Springs, and that "Powder Springs system blends directly into the Colonial pipeline itself" and that when it does there could be some lost downstream blend opportunity.  But that is true whether Powder Springs uses automation or not—claim 3 is not directed to the quantity of butane on site for blending, nor to the quantity of the gasoline available for blending.

Powder Springs (and every Magellan terminal) was built with the capability to blend without automation.  Tr. 699:4-7 (Hitz).  Magellan's Manager of Engineering Construction, Ivory Hitz, testified that Magellan terminals Des Moines and Little Rock do not even have the automation equipment, even though Des Moines is the third largest blending terminal in the Magellan system.  *Id*. at 699:13-21.  The Dupont, Kansas City and Tulsa terminals have the equipment; but choose not to use it some of the time, or all of the time.  *Id*. at 699:8-12.

As explained by Ms. Hitz, "manual blending is not that much different from automatic blending or analyzing," and, thus, switching to manual at Powder Springs would not make "any difference."  Tr. at 1395:13-1396:2.  Ms. Hitz's testimony was based on Magellan's real-world experience operating purely manual systems, such as its Des Moines and Little Rock systems, and systems that have automation, but do not always (or ever) use it, such as the Tulsa, Kansas City, and Dupont systems.  *Id.* at 699:8-700:2; 1392:26-1393:16.  That experience showed Magellan that it could achieve the same "very high capture rate, manual or automated."  *Id.* at 1392:26-1393:16.  Thus, the record establishes that the switch to manual blending at Powder Springs will not impact the volume of gasoline blended—and Sunoco, who has the burden, has not contradicted that evidence.  In short, there is no evidence to infer that Magellan's automated blending is the cause of any harm, as opposed to blending upstream generally—which is not infringement and cannot be enjoined.

**B.      Money Damages are Sufficient for any Infringement at Powder Springs**

Independent of whether the harm to Sunoco is based on automated blending or blending

generally, Sunoco has stated that it can compensate its customers for any upstream blending. The

Court will recall that Colonial Pipeline received two bids to build what became Powder

Springs—Magellan and Sunoco.  Mr. Legge testified that if Sunoco had built what became

Powder Springs, Sunoco would have reimbursed its downstream customers.  Tr. 361:18-362:9.

Further, in the preliminary injunction phase of this case, Sunoco's Dan Myers testified by

declaration that "Sunoco has agreements with third party terminals that preclude Sunoco from

blending butane into a pipeline with the patented system upstream of a third party licensee

***without providing equitable financial compensation***."  D.I. 8, Ex. 3 at ¶ 24.  Nonetheless,

Sunoco itself sought to partner with Colonial to operate Powder Springs, *see* D.I. 8, Ex. 13 at ¶

5-6; Tr. 352:3-354:18 (Legge)—which would have caused lost opportunity for Sunoco

customers, whom Sunoco expected to make whole through money.  Based on its "agreements

with third party terminals," Sunoco could not have entered into an agreement with Colonial

unless it in good faith believed that those downstream customers could be made whole through

"equitable financial compensation"—i.e., through money.  D.I. 8, Ex. 3 at ¶ 24.  Mr. Myers'

declaration went on to note that "Sunoco has never granted a license to use the patented

technology in such a manner, i.e., where product blended into the pipeline using the patented

system is the primary source received by other licensed terminals downstream ***without providing***

***compensation to that downstream terminal***"—again recognizing that money damages are

sufficient to address any downstream losses.  *Id.*

As another example, in May of 2015, Magellan purchased a facility in Atlanta, Georgia

known as Perimeter Terminal, which includes a Sunoco butane blending system.  *See* D.I. 26 at ¶

2; Tr. 744:4-15 (Roles).  As part of that purchase, Magellan and Sunoco negotiated an

amendment to the butane supply agreement Sunoco had entered into with the prior owner of Perimeter Terminal. D.I. 26 at ¶¶ 2-5. The amended agreement specifically allowed for Magellan to blend butane "at and adjacent to Colonial Pipeline Company's Atlanta Junction." *Id.* at ¶¶ 6-7 (this is Powder Springs). In return, Magellan and Sunoco agreed that Sunoco would receive a greater share of the butane blending proceeds at Perimeter Terminal—i.e., that money would make Sunoco whole for any loss in downstream blending opportunity. *Id.* at ¶ 8.

It is for many of these same reasons that, at the outset of this case, Magistrate Judge Burke denied Sunoco's request for a preliminary injunction. D.I. 68. The Court found that "Sunoco could not show that a current customer's actual loss of blend opportunity itself could somehow amount to 'irreparable harm' as to that customer or to Sunoco." *Id.* at 16 n.4. Magistrate Judge Burke explained that "the record clearly demonstrates that such loss *could* be quantified and compensated accordingly," as "established by Sunoco's own butane supply license agreements, which preclude Sunoco from blending butane into a pipeline upstream of a third-party licensee without providing that licensee 'equitable financial compensation.'" *Id.* (emphasis in original). Judge Stark subsequently adopted Judge Burke's Report and Recommendation, noting in particular the fact that "Sunoco's own butane supply license agreements provide that 'equitable financial compensation' is adequate to compensate licensees for blending butane upstream" was a "strong suggestion that such harms are compensable by financial payments[.]" D.I. 141 at 4.

### C. Defendants Have Ceased Automated Blending of Gasoline at Powder Springs And Therefore There Is No Infringement To Enjoin

From March 2017 (when Powder Springs began operations) until December 16, 2021, Powder Springs used an automated blending system that operated generally as follows: The online analyzer would sample the gasoline stream downstream of the injection point and measure

the blended stream gasoline Reid Vapor Pressure ("RVP"); that RVP value would be communicated to the programmable logic controller ("PLC"), which would use that value to calculate a blend percentage for the addition of butane; and the PLC would control the butane injection valves to meet and maintain the calculated blend percentage.  *See* Ex. 2 at ¶ 3.

On December 16, 2021, Powder Springs implemented a new manual blending procedure under which the blend percentage equation has been entirely removed from the PLC software so that the PLC is no longer capable of calculating the blend percentage.  *Id.* at ¶¶ 2, 4, 6.  Instead, a human operator receives the RVP values from the downstream online analyzer and manually calculates the blend percentage.  *Id.* at ¶ 4.  The operator then inputs the manually calculated blend percentage into the PLC, which will open or close the valves as necessary to meet and maintain the calculated blend percentage.  *Id.*  While the online analyzer will still be used to sample and measure the RVP of the gasoline stream downstream of the injection point, these RVP measurements will only be used for compliance purposes (to report gasoline RVPs to regulatory agencies) and by the operator to manually calculate the blend percentage.  *Id.* at ¶ 5.  This change in Powder Spring's blending procedures eliminates any potential infringement of Sunoco's '686 patent.[3] On December 17, 2021, Defendants informed Sunoco by e-mail of the changes to Powder Springs's blending operation, and provided Sunoco a copy of the executed Declaration from Ivory Hitz, which is Exhibit 2 to this brief.  *See* Ex. 1 at 2; Ex. 2.  Defendants further explained that these changes obviate the need for a permanent injunction and thus

---

[3] In relevant part, claim 3 of the '686 patent requires "a first information processing unit (IPU) on which said calculating is performed" where the "said calculating" involves "calculating a blend ratio based upon said agent vapor pressure, said gasoline vapor pressure, and said allowable vapor pressure."  PTX-3 at claim 3.  With Powder Springs's December 16, 2021 modifications, no calculation of the blend ratio is done by a processing unit—it is instead done manually, by a human.  Ex. 2 at ¶ 4.

8

requested that Sunoco withdraw its motion. *Id.* Sunoco did not dispute that the new procedure would not infringe, but Sunoco still refused to withdraw its motion. Ex. 1 at 1.

## IV.   LEGAL STANDARDS

A patentee seeking a permanent injunction must satisfy a four-factor test: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between [Sunoco] and [Defendants], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). When a movant fails to satisfy either factor 1 (irreparable injury) or factor 2 (adequacy of money damages), the injunction should be denied and the "trial court need not make findings concerning the third and fourth factors." *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 973-74 (Fed. Cir. 1996).

## V.   ARGUMENT

### A.   Sunoco Will Not Suffer Irreparable Injury From Future Infringement

#### 1.   Use of the '686 Method Does Not Cause Sunoco's Alleged Injury

It is Sunoco's burden to prove not only that it has suffered an irreparable injury but also that the alleged injury is actually caused by the infringement. *See Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 639 (Fed. Cir. 2015) ("To satisfy the first eBay factor, the patentee must show that it is irreparably harmed by the infringement. This requires proof that a 'causal nexus relates the alleged harm to the alleged infringement.'"). This "causal nexus requirement ensures that an injunction is only entered against a defendant on account of a harm resulting from the defendant's wrongful conduct, not some other reason." *Id.* at 640.

Sunoco has not, and cannot, meet its burden of satisfying the "causal nexus" requirement, because the undisputed evidence from trial shows that Sunoco's alleged injury—any loss of

downstream blend opportunity—would not be caused by the automated blending but, rather, by the mere fact that Defendants blend at Powder Springs *at all*—regardless of the method used. This is well-demonstrated by Sunoco's own description of the alleged harm. As Sunoco put it: "Defendants' Powder Springs system blends directly into the Colonial pipeline itself, meaning that every time the Powder Springs system blends into a gasoline batch destined for any of Sunoco's or its licensee's downstream terminals, those sites receive already blended gasoline and will lose blend opportunity." D.I. 764 at 6. But all of that is true regardless of the blending method used and will continue to be true despite Defendants having temporarily ceased automated blending at Powder Springs.

Specifically, whether Defendants use automatic or manual blending, it will still be the case that "Defendants' Powder Springs system blends directly into the Colonial pipeline itself." *Id.* Likewise, whether Defendants use automatic or manual blending, it will still be the case that "every time the Powder Springs system blends into a gasoline batch destined for any of Sunoco's or its licensees' downstream terminals, those sites receive already blended gasoline and will lose blend opportunity." *Id.* Furthermore, Sunoco has not established that any blending impact from Powder Springs is caused by practicing claim 3 as opposed to the simple fact that Powder Springs is the largest butane blending terminal in North America. Tr. at 678:8-22 (Hitz). Thus, Sunoco has not shown that the "harm" alleged has anything to do with use of the '686 patent's automated blending method. Rather, any "harm" arises from the fact that Defendants blend at all, regardless of the method used, and that identical "harm" will continue to exist regardless of any injunction. Accordingly, Sunoco has failed meet its burden of satisfying the "causal nexus" requirement because the alleged harm is not "a harm resulting from [Defendants'] wrongful

conduct"—i.e., automatic blending—but, resulting from "some other reason"—i.e., blending at all, regardless of method. *Apple*, 809 F.3d at 640.

In its brief, Sunoco sidesteps this issue. Without evidence, Sunoco concludes that it does not "agree[] with Defendants' claim that they can easily switch to manual blending with no effect on their volumes," and that "Sunoco believes that it and its customers will be able to blend significantly more butane at its downstream terminals if Defendants are enjoined from automatic blending at Powder Springs." D.I. 764 at 15. But Sunoco's disagreement and Sunoco's belief are not substitutes for facts and evidence. Neither at trial nor in its brief did Sunoco present any such facts or evidence rebutting Ms. Hitz's testimony or rebutting Magellan's real-world experience with its systems that do not have or do not use automation.

Because it is the mere fact of Defendants' upstream blending—not automated blending—that Sunoco asserts caused the alleged harm, Sunoco's reliance on *Presidio Components Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351 (Fed. Cir. 2012), *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142 (Fed. Cir. 2011), and *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336 (Fed. Cir. 2013) are inapt. As Sunoco's brief concedes, those cases all address irreparable harm where there is a "two-player market" or "direct competit[ion]," such that any sale made by the infringer is a lost sale to the patentee. *See* D.I. 764 at 5, 7. Sunoco and Defendants are not competing for any infringing "sales" at Powder Springs. If Defendants cease using automated blending at Powder Springs (as they, in fact, have done), Sunoco will not take over that blending. Rather, Defendants will continue blending at Powder Springs using a non-infringing manual method. Defendants' reliance on *Bio-Rad Labs. Inc. et al v. 10X Genomics, Inc.*, No. 15-cv-152-RGA, Dkt. 568 at 5, and *E.I. Dupont De Nemours and Company v. Unifrax I LLC*, No. 14-1250-RGA, Dkt. 392 at 3 are similarly misplaced. Again, as Sunoco's brief

acknowledges, both cases address situations where, without an injunction, the patentee would be forced to compete for sales with products incorporating its own invention. *See* D.I. 764 at 7. Here, by contrast, Defendants will be making all "sales" at Powder Springs, regardless of whether automated blending is used. There is no competition for those sales. Thus, Sunoco has not shown—and cannot shown—that it would suffer any harm at all from future use of the '686 method, let alone irreparable harm.

### 2. Sunoco's Litigation Behavior Also Shows a Lack of Irreparable Harm

As described in Defendants' December 8, 2021 letter to this Court, Sunoco's litigation behavior further belies its claim of irreparable harm. In its brief, Sunoco mischaracterizes Defendants as arguing that "a party must abandon every potential legal issue, litigate in a less effective manner, have its counsel violate other court's deadlines, and put its own witnesses in danger, or else it cannot receive a permanent injunction against a willful infringer." D.I. 764 at 10. That is, of course, not Defendants' position. Rather, Defendants position is that, for the last two years, Sunoco has not behaved like a party that believes that even four months of infringement will cause it irreparable harm.

For example, when Sunoco requested a continuance in August of 2020, it confirmed for this Court that although "this is an important case[, t]here is no urgency in it." D.I. 594 at 12-13. And, although this Court told Sunoco that it might take 24 months before it could hold another trial—by which point, Sunoco's patents would have expired—Sunoco confirmed that this is what it wanted to do. *Id.* It is, of course, understandable that a party might choose to continue trial until it could be held in person, rather than have witnesses testify remotely. But, where a party believes that even four months of continued infringement can cause it irreparable harm, one

would expect that party might choose remote testimony over a two year delay.  And one might also expect that party not to assure the Court that the case was "not urgent."

As another example, Sunoco was willing to stay this entire case to take up an interlocutory appeal regarding the Court's *Daubert* decision excluding Dr. Ugone in an attempt to resuscitate its damages case.  D.I. 554.  If the Court had granted that application, the case would have been tried after the patents expire.  Sunoco's willingness to postpone trial until the time to obtain an injunction would have passed shows that this case is not about irreparable harm or an injunction; it is about money.

In sum, Sunoco has not behaved like a party on the brink of unquantifiable and irreparable harm.  Rather, it behaved like a party willing to proceed slowly and carefully so as to maximize its damages case.  The fact that the jury awarded Sunoco only a fraction of the damages it sought does not indicate that the harm to Sunoco is irreparable.  It just indicates that the harm is small.

### B.    Money Damages Have Been And Still Are Sufficient to Compensate Sunoco

The Court should also deny Sunoco's motion because money damages will adequately compensate Sunoco for any harm arising from continued infringement.  *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1339-40 (Fed. Cir. 2012); *XpertUniverse, Inc. v. Cisco Systems, Inc.*, 2013 WL 6118447 at *13 (D. Del. Nov. 20, 2013).  At the outset, the jury's damages verdict provides a baseline for calculating future damages, and Sunoco has not offered any reason why the $0.02 per gallon rate could not be applied going forward.  Instead, Sunoco appears to argue only that the jury's award, based on Dr. Maness's testimony, is incomplete because "the royalty [Dr. Maness] proposed, and which was used at trial, did not include [] customer losses."  D.I. 764 at 13.  But Sunoco does not distinguish between losses from blending generally and losses caused by automated blending specifically.

As described above, only losses caused by infringing automated blending are relevant to the injunction inquiry. Even with respect to any losses caused by automated blending, however, although Sunoco now asserts that "the actual effect [of upstream blending] at Sunoco and its licensees' terminals is difficult to precisely measure," Sunoco's prior statements and behavior confirm that any such downstream harm can be reasonably quantified and compensated. *Id.* Critically, this Court *has already held as much* in the preliminary injunction phase of this case, which should entirely dispose of Sunoco's argument now.

1.    **Sunoco Has Already Acknowledged (and This Court Has Already Found) that Loss of Blend Opportunity Alone is Not Irreparable Harm**

Sunoco has already indicated to this Court that loss of blend opportunity alone is not irreparable harm. Indeed, in the preliminary injunction phase of this case, Sunoco's irreparable harm arguments focused not on these losses, but on the alleged harm Defendants' infringement would cause to Sunoco's relationships with its licensees downstream of Powder Springs. *See e.g.*, D.I. 7 at 14-15 (noting that, while there would be "a significant economic impact from Defendants' actions," "the non-compensable impact of Defendants' [infringement]," i.e. on its customer relationships, "is likely to be far more significant"). Sunoco also provided testimony (through a declaration) from Dan Myers indicating that downstream losses caused by blending upstream (by Sunoco itself or one of its licensees) can be remedied through "equitable financial compensation." D.I. 8, Ex. 3 at ¶ 24.

Magistrate Judge Burke came to the same conclusion, noting that "the record clearly demonstrates that such loss [of blend opportunity] *could* be quantified and compensated accordingly," as "established by Sunoco's own butane supply license agreements." D.I. 68 at 16 n.4. Magistrate Judge Burke further relied on Sunoco's counsel's statements at the evidentiary hearing, where Sunoco's counsel acknowledged that "[t]here would be [a] quantifiable aspect to"

14

how much blending Magellan was doing at Powder Springs, and thus pivoted to emphasizing the lost business opportunities as the non-compensable harm. *Id.* Magistrate Judge Burke's finding (later adopted by Judge Stark) was unequivocal: "Sunoco could not show that a current customer's actual loss of blend opportunity itself could somehow amount to 'irreparable harm' as to that customer or to Sunoco." *Id.*; D.I. 141 at 4.

Sunoco's early arguments and this Court's findings are alone sufficient to show that loss of blend opportunity for Sunoco and its downstream licensees is not irreparable harm.  But there is more.  Sunoco has more recently indicated that money is sufficient to compensate for harm to downstream terminals arising from upstream blending by someone other than Sunoco, such as an upstream licensee.  For example, just months ago, ███████████████████████████████ ███████████████████████████.  D.I. 671, Ex. 1 at 2.  Consistent with the statements in Mr. Myer's sworn declaration described above, Sunoco ██████████████████ ████████████████████████████████ unless Sunoco believed that its downstream licensees could be "provid[ed] equitable financial compensation."  D.I. 8, Ex. 3, ¶ 24.  Thus, at least as of June of this year, Sunoco believed that money was sufficient to compensate for any downstream harm.[4]

---

[4] Evidence of Sunoco's assent to the ██████████ as support for the suitability of money damages does not run afoul of Rule 408's prohibitions.  Indeed, Defendants do not use such evidence to "prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or contradiction," *see* Fed. R. Evid. 408, but instead "for another purpose"—to illustrate that Sunoco was willing to accept monetary terms to remedy any infringement.  *See Parallel Iron LLC v. NetApp, Inc.*, 84 F. Supp. 3d 352, 359 (D. Del. 2015) ("Rule 408 does not provide a blanket protection against any and all use of statements made during settlement negotiations."); *see also Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 294 (2d Cir. 1999) (finding district court did not err in admitting settlement agreement for the purpose of proving applicability of equitable estoppel in trademark infringement case); *Am. Standard Inc. v. Pfizer Inc.*, 722 F. Supp. 86, 136 n.55 (D. Del. 1989) (J. Longobardi) ("Because Plaintiff did not offer the evidence to show infringement liability but instead offered it solely for the purpose of proving commercial success and the requisite nexus between success and the invention of the

As another example, when Magellan purchased Perimeter Terminal in May of 2015, Sunoco and Magellan agreed to renegotiate the butane supply agreement Sunoco had with the prior owner.  Tr. 1420:23-1421:8; D.I. 8 at ¶¶ 2-5.  In particular, Sunoco agreed to amend the agreement to allow Magellan to blend upstream of Perimeter Terminal at Powder Springs, in return for a greater share of the butane blending proceeds at Perimeter Terminal.  Tr. 1420:23-1421:8; D.I. 8 at ¶ 8.  This too confirms that Sunoco believed that downstream harms from upstream blending can be quantified and compensated with money.

### 2. Sunoco's Claims of Loss of Customer Trust are Similarly Unsupported, as is its Reliance on the Jury's Willfulness Finding

Sunoco also revives its argument from the preliminary injunction phase, that "Defendants' infringement indirectly harms Sunoco by interfering with its licensees."  D.I. 764 at 8. Similar to what it argued before, *see* D.I. 7 at 14-15, Sunoco again points to its licensees' terminals downstream of Powder Springs and says that "[a]bsent Defendants' infringement . . . these terminals would blend significantly more butane," D.I. 764 at 8.  Sunoco continues that Defendants' infringement "damages Sunoco's goodwill" and jeopardizes its licensees' "trust in Sunoco's technology."  D.I. 764 at 8.  But Sunoco again ignores that it is simply blending upstream of its licensees that causes any reduced blend opportunity, not specific to automated or infringing blending.  And it is only infringing blending that factors into the injunction analysis.

Further, just as Magistrate Judge Burke found in the early stages of this case (*see, e.g.*, D.I. 68 at 22-23), Sunoco's evidence as to the supposed loss of goodwill and customer relationships is too conclusory to support an injunction.  *See INDECS Corp. v. Claim Doc, LLC*, No. 16-4421 (KM) (JBC), 2017 WL 1086178, at *3 (D.N.J. Mar. 21, 2017) (finding conclusory

---

'123 Patent, the Court concludes the settlement agreement and consent judgment are admissible to show commercial success.").

16

statements of harm to reputation and goodwill, without factual support, are insufficient to show irreparable harm).  All Sunoco cites is testimony from its own witnesses generally describing the "trust" between Sunoco and its licensees, "concern" over upstreaming, and a licensee's requirement that Sunoco enforce its patents against upstreaming infringers.  D.I. 764 at 8. Notably absent from Sunoco's brief is any declaration or testimony from an actual customer saying any of these things, much less testifying as to any actual loss of goodwill or trust that has arisen from Defendants' infringement and that is not compensated with money damages.  Indeed, with respect to ████████ insistence that Sunoco enforce its patents to prevent infringement upstream of ████████ terminals, *id*., Sunoco does not explain why such "enforcement" cannot involve requiring any upstreaming party found to infringe to pay a royalty for use of the patents and then providing ████████ with financial compensation for its reduced blending.  In fact, Sunoco's own actions, including its desire to blend at Atlanta Junction in place of Magellan, and its agreement with Magellan at Perimeter Terminal (described above) indicate that Sunoco contemplated doing just that.

Finally, Sunoco asserts that the jury's finding of willfulness "alone suggests that monetary damages are insufficient to remedy the harm," *id*. at 12, but this is not the law.  As explained in *Cordis Corp. v. Advanced Cardiovascular Systems, Inc.*, 1999 WL 805283, at *8 n.4 (D. Del. Sep. 10, 1999), "the fact that [infringement] was willful is not relevant to the question of irreparable harm.  Indeed, willfulness is specifically deemed compensable by money (treble) damages."  Moreover, even the Western District of Pennsylvania case cited by Sunoco—*Muniauction, Inc. v. Thomson Corp.*, 502 F. Supp. 2d 477 (W.D. Pa. 2007)—found only that willfulness ***supported*** the court's finding of irreparable harm, not that willfulness "***alone***

suggests that money damages are insufficient to remedy the harm," as Sunoco wrongly asserts. D.I. 794 at 8, 12.

Simply put, the harm on which Sunoco's motion is repeatedly premised—that, unless Defendants are enjoined, downstream blending volume will go down—is readily compensable. Sunoco and Magellan have quantified it before.  Should any such harm occur (which it will not, because Defendants have voluntarily ceased automated blending at Powder Springs) that harm could be quantified again.

###   C.   Although Defendants Have Chosen to Stop Automated Blending, that Voluntary Cessation Does Not Create an Entitlement to a Permanent Injunction Where One Did Previously Exist

Despite Defendants informing Sunoco that they have stopped automated blending at Powder Springs, Sunoco has not agreed to withdraw its motion for a permanent injunction because it wants a Court order.  *See* Ex. 1 at 1.  Although some courts have issued an injunction despite a defendant stopping infringement, those cases show only that this voluntary conduct is not a reason to deny an ***otherwise proper*** injunction.  *See, e.g.*, *Honeywell Intern., Inc. v. Universal Avionics Systems Corp.*, 397 F. Supp. 2d 537 (D. Del. 2005).  By the same token, a defendant voluntarily stopping infringement is not a reason to ***grant*** an otherwise ***improper*** injunction.  Sunoco cannot show irreparable harm or the inadequacy of money damages, so an injunction is improper.  The fact that Defendants have voluntarily stopped using automated blending is irrelevant to the propriety of an injunction.

##   VI.   CONCLUSION

For the foregoing reasons, Sunoco's motion for a permanent injunction should be denied.

| MORRIS, NICHOLS, ARSHT & TUNNELL LLP | FISH & RICHARDSON P.C. |
| --- | --- |

By: */s/ Rodger D. Smith II*
    Rodger D. Smith II (#3778)
    1201 North Market Street
    Wilmington, DE 19801
    (302) 658-351-9205
    rsmith@mnat.com

    OF COUNSEL:

    David S. Moreland
    John W. Harbin
    MEUNIER CARLIN & CURFMAN
    LLC
    999 Peachtree St., N.E., Suite 1300
    Atlanta, GA 30309
    (404) 645-7700
    dmoreland@mcciplaw.com;
    jharbin@mcciplaw.com

*Attorneys for Defendant*
*Powder Springs Logistics, LLC*

By: */s/ Nitika Gupta Fiorella*
    Douglas E. McCann (#3852)
    Martina Tyreus Hufnal (#4771)
    Nitika Gupta Fiorella (#5898)
    222 Delaware Ave., 17th Floor
    Wilmington, DE 19899
    Telephone: (302) 652-5070
    dmccann@fr.com; hufnal@fr.com;
    fiorella@fr.com

    Joseph A. Herriges
    FISH & RICHARDSON P.C.
    3200 RBC Plaza
    60 South Sixth Street
    Minneapolis, MN 55402
    Telephone: (612) 337-2579
    herriges@fr.com

*Attorneys for Defendant*
*Magellan Midstream Partners, L.P.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 20, 2021, I electronically filed with the Clerk of the

Court, UNDER SEAL, the foregoing document using CM/ECF, and sent <u>electronic</u> copies of

such filing to the following counsel:

|  |  |
|---|---|
| John C. Phillips, Jr.<br>Megan C. Haney<br>PHILLIPS, GOLDMAN, MCLAUGHLIN &<br>  HALL, P.A.<br>1200 North Broom Street<br>Wilmington, DE  19806<br>jcp@pgmhlaw.com;<br>mch@pgmhlaw.com | John Keville<br>Michelle Replogle<br>Richard McCarty<br>Michael Krill<br>WINSTON & STRAWN LLP<br>1111 Louisiana St., 25th Floor<br>Houston, TX 77002<br>jkeville@winston.com;<br>mreplogle@winston.com;<br>rmccarty@winston.com;<br>mkrill@winston.com |
| Rodger D. Smith II<br>MORRIS, NICHOLS, ARSHT &<br>  TUNNELL LLP<br>1201 North Market Street<br>PO Box 1347<br>Wilmington, DE 19899<br>rsmith@mnat.com | David S. Moreland<br>John W. Harbin<br>MEUNIER CARLIN & CURFMAN<br>LLC<br>999 Peachtree St., N.E., Suite 1300<br>Atlanta, GA 30309<br>dmoreland@mcciplaw.com;<br>jharbin@mcciplaw.com |

_/s/ Nitika Gupta Fiorella_
Nitika Gupta Fiorella(#5898)