IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SUNOCO PARTNERS MARKETING & TERMINALS L.P.<br><br>Plaintiff,<br><br>v.<br><br>POWDER SPRINGS LOGISTICS, LLC and MAGELLAN MIDSTREAM PARTNERS, L.P.<br><br>Defendants. | C.A. No. 17-1390 (RGA)<br><br>██████████████<br><br>**REDACTED VERSION** |

**DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO
SUNOCO PARTNERS MARKETING & TERMINALS L.P.'S
OPENING POST-TRIAL BRIEF**

| | |
|---|---|
| MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>Rodger D. Smith II (#3778)<br>1201 North Market Street<br>Wilmington, DE 19801<br>(302) 658-351-9205<br>rsmith@mnat.com<br><br>OF COUNSEL:<br><br>David S. Moreland<br>John W. Harbin<br>MEUNIER CARLIN & CURFMAN LLC<br>999 Peachtree St., N.E., Suite 1300<br>Atlanta, GA 30309<br>(404) 645-7700<br>dmoreland@mcciplaw.com;<br>jharbin@mcciplaw.com<br><br>*Attorneys for Defendant<br>Powder Springs Logistics, LLC* | FISH & RICHARDSON P.C.<br>Douglas E. McCann (#3852)<br>Martina Tyreus Hufnal (#4771)<br>Nitika Gupta Fiorella (#5898)<br>222 Delaware Ave., 17th Floor<br>Wilmington, DE 19899<br>Telephone: (302) 652-5070<br>dmccann@fr.com; hufnal@fr.com;<br>fiorella@fr.com<br><br>Joseph A. Herriges<br>FISH & RICHARDSON P.C.<br>3200 RBC Plaza<br>60 South Sixth Street<br>Minneapolis, MN 55402<br>Telephone: (612) 337-2579<br>herriges@fr.com<br><br>*Attorneys for Defendant<br>Magellan Midstream Partners, L.P.* |

Dated:  March 18, 2022

## <u>TABLE OF CONTENTS</u>

<u>**Page(s)**</u>

I.  ARGUMENT ................................................................................................................. 2

    A.  This Case Does Not Warrant Enhancing the Jury's Damages Award.................... 2

    B.  Sunoco Is Not Entitled to Pre-Verdict Supplemental Damages .......................... 13

    C.  Sunoco Should Not be Awarded Prejudgment Interest for Delay it Caused ........ 18

II.  CONCLUSION .......................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
   No. 2:10-CV-248, 2011 WL 4899922 (E.D. Va. Oct. 14, 2011), *aff'd*, 694 F.3d 1312 (Fed.
   Cir. 2012) ...................................................................................................................16

*Apple, Inc. v. Samsung Elecs. Co.*,
   67 F. Supp. 3d 1100 (N.D. Cal. 2014), *aff'd*, 816 F.3d 788 (Fed. Cir. 2016), *vacated in part
   on reh'g en banc*, 839 F.3d 1034 (Fed. Cir. 2016) .................................................15

*Dee v. Borough of Dunmore*,
   474 F. App'x 85 (3d Cir. 2012) ....................................................................................14

*Dominion Energy, Inc. v. Alstom Grid, LLC*,
   725 F. App'x 980 (Fed. Cir. 2018) .................................................................................2

*E.I. DuPont de Nemours & Co. v. Unifrax I LLC*,
   No. CV 14-1250-RGA, 2017 WL 4004419 (D. Del. Sept. 12, 2017), *aff'd sub nom. E.I. du
   Pont De Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060 (Fed. Cir. 2019) .........16

*General Motors Corp. v. Devex Corp.*,
   461 U.S. 648 (1983).................................................................................................18, 19

*Greatbatch Ltd. v. AVX Corp.*,
   No. CV 13-723-LPS, 2016 WL 7217625 (D. Del. Dec. 13, 2016)....................................2

*Halo Elecs. v. Pulse Elecs.*,
   579 U.S. 93 (2016)................................................................................................2, 3, 9

*Idenix Pharms. LLC v. Gilead Scis., Inc.*,
   271 F. Supp. 3d 694 (D. Del. 2017)...................................................................................9

*Metso Mins., Inc. v. Powerscreen Int'l Distribution Ltd.*,
   833 F. Supp. 2d 333 (E.D.N.Y. 2011) ....................................................................16, 17, 18

*Meyer Intellectual Props. Ltd. v. Bodum, Inc.*,
   690 F.3d 1354 (Fed. Cir. 2012)........................................................................................2

*Nox Med. Ehf v. Natus Neurology Inc.*,
   No. 1:15-CV-00709-RGA, 2018 WL 6427686 (D. Del. Dec. 7, 2018).....................8, 12, 13

*Oiness v. Walgreen Co.*,
   88 F.3d 1025 (Fed. Cir. 1996)........................................................................................19

*Pierce Mfg., Inc. et al. v. E-One, Inc. et al.*,
  C.A. No. 8-18-cv-617-TPB-TGW, slip op. (M.D. Fla. Feb. 16, 2022) ...................................20

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  C.A. No. 1-04-cv-1371-JJF, 2008 WL 5263903 (D. Del. Dec. 12, 2008)..............................20

*Presidio Components Inc. v. Am. Tech. Ceramics Corp.*,
  No. 08-CV-335-IEG NLS, 2010 WL 3070370 (S.D. Cal. Aug. 5, 2010), *aff'd in part, vacated in part*, 702 F.3d 1351 (Fed. Cir. 2012)............................................................................14, 15

*Read Corp. v. Portec, Inc.*,
  970 F.2d 816 (Fed. Cir. 1992)..................................................................................4, 6, 13

*Roche Diagnostics Corp. v. Meso Scale Diagnostics*,
  LLC, 503 F. Supp. 3d 156 (D. Del. 2020) .............................................................................12

*Sanofi-Aventis v. Apotex Inc.*,
  659 F.3d 1171 (Fed. Cir. 2011)...............................................................................................19

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*,
  No. CV 16-284-LPS, 2019 WL 3240521 (D. Del. July 18, 2019) .................................. *passim*

*Slimfold Mfg. Co. v. Kinkead Indus., Inc.*,
  932 F.2d 1453 (Fed. Cir. 1991).................................................................................................4

*St. Clair Intellectual Property Consultants, Inc. v. Fuji Photo Film Co., Ltd., et al.*,
  674 F. Supp. 2d 555 (D. Del. 2009) (reversed on other grounds) ..........................................20

*State Indus., Inc. v. A.O. Smith Corp.*,
  751 F.2d 1226 (Fed. Cir. 1985).................................................................................................4

*Sunoco Partners Mktg. & Terminals L.P. v. Magellan Midstream Partners L.P.*,
  853 F. App'x 668 (Fed. Cir. 2021) ............................................................................................8

*SynQor, Inc. v. Artesyn Techs., Inc.*,
  709 F.3d 1365 (Fed. Cir. 2013).........................................................................................14, 16

*TransPerfect Glob., Inc. v. MotionPoint Corp.*,
  No. C 10-2590 CW, 2014 WL 6068384 (N.D. Cal. Nov. 13, 2014) .......................................15

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
  939 F.2d 1540 (Fed. Cir. 1991)...............................................................................................20

*Vectura Ltd. v. GlaxoSmithKline LLC*,
  No. CV 16-638-RGA, 2019 WL 4346502 (D. Del. Sept. 12, 2019) .................................11, 13

**Statutes**

35 U.S.C. § 284.........................................................................................................................14, 18

Defendants submit this Court should grant its post-trial motions, which would moot Sunoco's post-trial motion altogether.  But even if some or all of the judgment were to stand, the record shows that Defendants have had a good faith belief that they do not infringe any of Sunoco's patents and that Sunoco's patents are invalid.  Indeed, Sunoco failed to present any evidence of the type of malicious or "pirate-like" behavior required for enhancement.  The parties litigated for over four years on many issues, and in fact this Court invalidated various claims asserted in the litigation, while the Patent Office, through IPRs, invalidated two of the five patents asserted.  Defendants have made persuasive arguments in their post-trial motions that the jury's willfulness finding should be set aside, that all claims asserted are invalid under section 101, and that the verdict as to all but one claim should be set aside on non-infringement grounds.  Thus, enhancement would be inappropriate here.

Sunoco also requests pre-verdict supplemental damages from February 1, 2019 through the jury's verdict.  Assuming the jury verdict stands, there is no basis for such a supplemental award.  At trial, Sunoco had all the data necessary to try to prove damages through October 2021, but it did not present this data to the jury.  Instead, Sunoco relied on data through January 2019 and suggested to the jury that it could award a larger amount than what Sunoco calculated using that data.  The jury considered the parties' arguments and made a lump sum damages award to Sunoco as to both Magellan and PSL; the jury's damages award is all Sunoco is entitled to recover through trial.  Nonetheless, if the Court were inclined to award pre-verdict supplemental damages, it should apply Defendants' calculation method to determine the amount owed by Magellan, which is based on the ***actual*** accused blending volumes, as opposed to Sunoco's estimate of those volumes based on historical averages.

Finally, Sunoco seeks prejudgment interest.  Again assuming the award stands, it is not

1

entitled to recover for the period of delay that it intentionally chose when it insisted on a trial continuance.  This case was set for trial in March 2020 but did not go to trial until November 2021.  The reason for nearly 11 months of that delay was that Sunoco repeatedly asked for postponement (over Defendants' objections), which prejudiced Defendants by both delaying resolution of the case and subjecting Defendants to significant additional attorney fees in preparing for trial multiple times.  Thus, even if the jury's verdict stands, Sunoco should only be awarded $2,293,968 in prejudgment interest, and $11,293 in post-judgment interest.

I.    **ARGUMENT**

A.    **This Case Does Not Warrant Enhancing the Jury's Damages Award**

This Court should reject Sunoco's request for enhanced damages for two reasons.  First, a grant of Defendants' post-trial motions would moot Sunoco's motion for enhanced damages. *See e.g.*, *Dominion Energy, Inc. v. Alstom Grid, LLC*, 725 F. App'x 980, 987 (Fed. Cir. 2018) (vacating willfulness and enhanced damages after granting non-infringement JMOL); *Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1379 (Fed. Cir. 2012) (vacating willfulness finding so also vacating enhanced damages).  Second, Sunoco fails to show that Defendants engaged in the type of egregious, pirate-like conduct necessary for enhancement.

1.    **Sunoco Fails to Show that Defendants Engaged in Any "Egregious" Behavior to Warrant Enhancement**

Enhanced damages "are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior."  *Halo Elecs. v. Pulse Elecs.*, 579 U.S. 93, 103 (2016).  Egregious behavior is that which is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed— characteristic of a pirate."  *Id.* at 103-04.  "A finding of willfulness may be a necessary—but is not a sufficient—condition to permit the Court to exercise its discretion."  *Greatbatch Ltd. v.*

2

*AVX Corp.*, No. CV 13-723-LPS, 2016 WL 7217625, at *6 (D. Del. Dec. 13, 2016).  "[I]n assessing whether enhancement is appropriate, the Court may consider whether there was evidence of egregious conduct (e.g., egregious copying versus less offensive copying) and may also consider how one-sided or relatively balanced the evidence was on a disputed issue." *Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, No. CV 16-284-LPS, 2019 WL 3240521, at *8 (D. Del. July 18, 2019).  Even when a plaintiff establishes egregious conduct, there is no requirement that "enhanced damages must follow." *Halo*, 579 U.S. at 106. Instead, "courts should continue to take into account the particular circumstances of each case." *Id.*

Sunoco's own recitation of the facts show enhancement is improper here.  Nowhere does Sunoco allege the type of wanton behavior characteristic of punitive damages, such as egregious copying of a patented product or system or litigation misconduct.  In fact, the trial evidence and court record show the complete absence of such conduct.  Defendants presented significant evidence showing their subjective and reasonable belief that their blending methods did not infringe—as exemplified by Magellan's rejection of Texon's system in favor of its own internally developed system, and the fact that the PTO ***granted Magellan a patent*** over three of Mattingly's feedforward patents, including two of the three at issue in the litigation.[1]  D.I. 796 at 18-20.  Other evidence showed that when Magellan knew it was using Sunoco's technology, it paid for it—as when Magellan acquired the Perimeter terminal that used a Sunoco blending system.  Trial Tr. 218:11-19.  Magellan even agreed to an amendment to the butane blending contract providing a profit share ***more favorable*** to Sunoco to compensate Sunoco for

---

[1] Notably, all of the facts Sunoco points to in support of its request for enhanced damages (aside from Defendants actual blending at PSL) predate the issuance of the '686 patent, *see* D.I. 798 at 3-8, further confirming that, at a minimum, JMOL of no willful infringement of the '686 patent (the sole patent at-issue against PSL) is appropriate.  D.I. 796 at 2, 18.

Magellan's upstream blending at PSL, a further reflection of good faith. Trial Tr. 218:11-19. These are the actions of conscientious businesspeople, not wanton, bad-faith infringers.

Sunoco's brief provides further support for Defendants' argument. For example, Sunoco says that the "real reason" Magellan modified its feedforward systems to be feedback was to "avoid infringing Sunoco's patents." D.I. 798 at 6. Sunoco goes on to call out two documents, one of which is an email from Mr. Huff where he stated the modification would "eliminate the risk that the butane blending system infringes on non-Magellan held patents"—specifically, Sunoco's patents. *Id.* (brackets and quotation marks omitted). In other words, according to Sunoco, Magellan consciously tried to ***avoid*** infringing Sunoco's patents by modifying its systems, which unquestionably is a sign of a company operating in good faith.[2] The same is true of Mr. Roles' email regarding Texon's proposal for a system at one of Magellan's Southeast terminals. According to Sunoco, Mr. Roles recognized that continuing to engage Texon would be unethical if Magellan had already decided to go with its internally developed system, and so he raised that concern with his colleagues. D.I. 798 at 3-4. That itself exemplifies Magellan's principled business approach. That Magellan continued to investigate whether Texon's rack system would suit its business model better than its internal system was, as the evidence showed, simply a matter of practical due diligence—a far cry from egregious conduct.

Perhaps most telling is Sunoco's reliance on Magellan's prosecution of its own patent. Sunoco acknowledges that Magellan cited the '302, '629, and '671 patents in its application, *see*

---

[2] Indeed, the patent system is designed to ***encourage*** this behavior, where innovators develop alternatives to "a competitor's products, even when they are patented, thus bringing a steady flow of innovations to the marketplace." *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985). Such innovation should not be discouraged by punitive damages. *State Indus.,* 751 F.3d at 1236; *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 828 (Fed. Cir. 1992); *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1459 (Fed. Cir. 1991).

D.I. 798 at 6, which indicates that Magellan was transparent that it knew about these patents, and simply believed it was doing something different.  That much is clear from the specification of Magellan's patent, where Magellan expressly described how its invention was different from the Mattingly '671 patent.  PTX-115 at 2:16-58; Trial Tr. 514:13-24.  While Sunoco stresses the examiner's rejections over Mattingly's patent during prosecution, and Magellan's continued operation of its systems during this time, conveniently absent from Sunoco's story is the punch line: the examiner *granted Magellan a patent over Mattingly's patents*, further confirming for Magellan that its blending system was different and non-infringing.

Nor do any other of Sunoco's arguments present the type of overwhelming evidence necessary to support enhancement.  *See Siemens*, 2019 WL 3240521, at *8–9 (refusing to enhance because no evidence "overwhelmingly" supported enhancement).  Indeed, each of the issues Sunoco raises to lobby for enhancement were "highly disputed" by the parties.  *Id.*  For example, while Sunoco contends that Magellan allegedly feigned concerns about whether the Texon system consistently produced "on spec" product, Defendants put forth substantial evidence showing otherwise.  *See* Trial Tr. 730:21-731:6, 738:21-739:19 (Roles); DTX-185.  Indeed, this evidence was contemporaneous with Magellan's evaluation of the Texon system and demonstrated Texon could not satisfy reasonable requests for confirmation of regulatory compliance.  *Id.*; *see also* D.I. 796 at 19.  Sunoco also questions whether Magellan understood Texon's offering to be only a rack blending system, but the only person to testify with knowledge on this issue was Mr. Roles, who confirmed that, regardless of what else Texon put in its presentations, all they were pitching Magellan was a rack blending system.  And that made sense because the pitch was a blending system at Magellan's Southeastern terminals, which were independent of Magellan's pipeline system, and could only blend to the rack (not on a pipeline).

Trial Tr. 729:23-730:6, 732:24-733:14 (Roles); *see also id.* 546:11-21 (Kytomaa) (describing Magellan's Southeastern Chattanooga and Greensboro terminals as blending into a pipeline that goes to a rack).  Similarly, Sunoco challenges Magellan's reasons for changing its blending systems to feedback, but Magellan brought Mr. Huff to trial to explain those reasons, and presented documentary evidence to confirm Mr. Huff's belief that switching to feedback would be more precise and result in greater profits.  Trial Tr. 888:9-22.  Thus, the facts Sunoco uses to try to support its argument either weigh against enhancement, or, at most, were hotly disputed at trial, making enhancement improper.

### 2. The *Read* Factors Confirm Enhancement is Inappropriate

The *Read* factors confirm that enhancement is improper.  Tellingly, Sunoco takes the factors out of order because one of the tell-tale signs of egregiousness—and the **first *Read* factor**—is simply not present here: copying.  Sunoco did not present a copying case.  While it tries to piece together a case now, the fact remains that it never alleged copying during discovery and its expert did not opine at trial that Defendants copied Sunoco's technology.  Notably, Sunoco did tell the jury about potential copying by a third-party, but nothing about alleged copying by Defendants.  Trial Tr. 1133:15-20; *see also* D.I. 796 at 16 n.6.  That is because the facts do not support any such allegation—even now Sunoco only relies on Magellan's interactions with Texon in 2005 and 2006.  Nowhere does Sunoco cite evidence that Magellan gained *technical knowledge* from those discussions that would provide even the opportunity to copy.  D.I. 798 at 12-13; D.I. 796 at 16.  Further, Magellan presented evidence that it had already developed an internal automated system, and Mr. Roles was simply trying to determine whether it made more economic sense to use Texon's or Magellan's at its independent Southeastern terminals.  Trial Tr. 728:1-741:10 (Roles).  This evidence refutes the notion of copying.

While Sunoco relies on it heavily, the **second factor** does not support Sunoco either. Sunoco is plainly wrong in saying that, "Defendants provided no evidence that they investigated the scope of Sunoco's patents and formed a good-faith belief of non-infringement or invalidity." D.I. 798 at 9. As detailed in Defendants' opening brief for JMOL, that is ***exactly*** what Defendants presented, including evidence that (1) Magellan rejected Texon's systems because they were only offering a rack system that Magellan believed was different from and inferior to its own system, and (2) Magellan told the PTO it believed its feedback systems were different from the feedforward systems in Mattingly's patents, and ultimately convinced the examiner that it was right. D.I. 796 at 15-20. Tellingly, after saying Defendants presented no evidence on this point, Sunoco goes on to try to discredit the evidence Defendants did present. D.I. 789 at 9. That attempt fails too. First, Sunoco casts aside testimony from Mr. Roles on what system Magellan understood Texon was pitching for the Southeastern terminals, but cites no witness testimony or other evidence to demonstrate that Texon was pitching anything other than a rack system to Magellan at the time. *Id.* In fact, the testimony of Sunoco's own inventor ***supports*** Mr. Roles' understanding of Texon's invention: Mattingly described his system as a rack system, not a tank system like Williams, and he said that was a "big difference" between the two.[3] Trial Tr. 421:13-22. Sunoco also faults Magellan for not investigating whether pipeline systems fall within the scope of Texon's patents, but Mattingly testified that he knew Magellan was doing pipeline blending, and yet he never told Magellan that what they were doing infringed on his patents. *Id.* at 411:16-412:21. Second, Sunoco suggests Magellan knew Sunoco's patents were not limited to feedforward through the PTO's rejection of its claims during prosecution of the

---

[3] Sunoco also ignores that even this Court recognized a viable non-infringement argument based on the different between rack and tank blending when it denied Sunoco's motion for summary judgment of infringement of claim 3 of the '302 patent. D.I. 547 at 7.

Huff patent, but that fails to show a lack of good faith belief of non-infringement.  The key is Magellan's ***belief***—and what says belief of non-infringement more than Magellan calling out one of Mattingly's patents as being directed to feedforward control in a patent application and then explaining in detail how its feedback systems are different?  *See* PTX-115 at 2:18-65, 3:41-43. Beyond that, Sunoco again conveniently omits the fact that the examiner ultimately allowed Magellan's patent, affirming that Magellan's belief of non-infringement was in good faith.

Defendants further demonstrated a "consistent course of action regarding the invalidity of patents on Plaintiff's invention," which supports their good faith belief that the patents were invalid.  *Nox Med. Ehf v. Natus Neurology Inc.*, No. 1:15-CV-00709-RGA, 2018 WL 6427686, at *3 (D. Del. Dec. 7, 2018).  At the first opportunity, Defendants moved to dismiss this case because of their belief that the asserted patents claim unpatentable subject matter.  D.I. 27; D.I. 138.  Defendants later moved for summary judgment of invalidity under Section 101 on a subset of claims from the asserted '302 patent, and won.  D.I. 382 at 32-27; D.I. 453 at 8; D.I. 523. Defendants also moved for summary judgment of invalidity of claim 3 of the '302 patent and the claims of '548 and '948 patents based on refinery patents.  D.I. 382 at 23-32.  All the while, Defendants were actively challenging the '548, '948,[4] and '686 patents at the PTAB, and succeeded in getting all of the claims of both the '548 and '948 patents cancelled over the same prior art patents they asserted at trial.  D.I. 524-1; D.I. 524-2; *Sunoco Partners Mktg. & Terminals L.P. v. Magellan Midstream Partners L.P.*, 853 F. App'x 668 (Fed. Cir. 2021).

---

[4] Sunoco initially sued Defendants on the '548 and '948 patents, and later added the '302, '629, and '686 patents.  The '548 and '948 patents were continuations of the '671 patent and issued after the '686 patent.  These patents contained broader claims that covered feedback control, and the PTAB invalidated these claims based on feedback refinery art.  D.I. 524-1 at 52; D.I. 524-2 at 41.  The Federal Circuit affirmed the PTAB's decision.  *Sunoco Partners Mktg. & Terminals L.P. v. Magellan Midstream Partners L.P.*, 853 F. App'x 668 (Fed. Cir. 2021).

Defendants also vigorously challenged all of Sunoco's claims throughout this case based on prior art blending systems. *See, e.g.*, D.I. 22 at 8-12; D.I. 397. At trial, Defendants presented substantial evidence showing that Magellan's predecessor, Williams Pipeline Company, began blending butane with gasoline using its own in-house technology back in the 1990s—long before the asserted patents ever issued. *See* DTX-40; *see also* Trial Tr. 787:13-788:21 (Moyer). Multiple witnesses further testified that the Williams blending operation was very similar to Magellan's current blending operations—the only real difference was incorporating the new-to-market online analyzer developed by Grabner. Trial Tr. 881:6-12, 884:25-881:5 (Howerton), 792:16-793:11 (Moyer). This evidence shows that Defendants had a good faith reason to believe that, if their current systems performed the methods claimed by the asserted patents, then Magellan's own prior blending would invalidate the patents. Beyond that, Magellan bought a rack blending system (the TransMontaigne system) before the patents issued, *see* Trial Tr. 973:22-23, 974:15-975:1 (Mongold), which also shows Magellan had a good faith reason to believe that systems like the ones claimed in the asserted patents existed well before the patents.

Tellingly, at trial Sunoco's focus was solely on whether these blending systems were prior art; Sunoco's expert did not testify at all about how these systems operated, nor did Sunoco challenge Defendants' expert's analysis showing how they rendered the claims obvious, Trial Tr. 1103:9-1106:5, 1113:2-1115:12 (Nikolaou); *see also* 1129:7-1134:8 (Kytomaa), which supports Defendants' good faith and reasonable[5] belief of invalidity based on these systems. On the prior art status, Defendants consistently maintained that the prior blending systems were not abandoned, suppressed, or concealed, and persuaded this Court to deny Sunoco summary

---

[5] After *Halo*, courts can still consider the reasonableness of an accused infringer's defenses "as part of its discretionary enhancement decision." *Idenix Pharms. LLC v. Gilead Scis., Inc.*, 271 F. Supp. 3d 694, 702 (D. Del. 2017).

judgment on this issue, showing their good faith and reasonable belief.  D.I. 477; D.I. 547.

Sunoco relegates the **third factor** of litigation conduct to the end of its analysis, and for good reason.  Defendants won many critical issues in this case, confirming that they acted reasonably in pursuing their defenses.  As just a few examples: Defendants defeated Sunoco's motion for a preliminary injunction at the outset of this case; they then successfully rebuffed Sunoco's attempts to limit the claims to downstream of a refinery based on the term "gasoline" during claim construction; next, they invalidated claims of the '302 patent and convinced this Court that genuine disputes of material fact exist as to infringement of the rack claims and whether TransMontaigne and Williams' blending systems constitute prior art at summary judgment; they also showed this Court that Sunoco's damages expert's analysis was unreliable resulting in his exclusion from trial; and finally they killed the '548 and '948 patents in IPR.  *See* D.I. 141 (denying PI); D.I. 539 at 7-8 (claim construction ruling on "gasoline"); D.I. 523 (holding claims of the '302 unpatentable); D.I. 524-1, D.I. 524-2 (PTAB decisions invalidating '948 and '548 patents); D.I. 547 (denying Sunoco's motions for summary judgment on prior art and infringement of claim 3 of the '302 patent and granting Defendants' *Daubert*).  Defendants' success underscores the reasonableness of their positions.

Sunoco attempts to show otherwise ring hollow.  First, that Magellan did not disclose its own blending systems as prior art during prosecution of the Huff patent (which claims feedback control) is irrelevant to whether Defendants appropriately believed that some of those systems (specifically the Williams' systems with feedforward control) could reasonably constitute prior art to the feedforward patents at trial.  Indeed, as explained above, this Court denied Sunoco summary judgment on this exact issue.  D.I. 477; D.I. 547.  Second, the PTO ultimately granted the Huff patent over Mattingly's '671 patent, so Sunoco's reliance on the examiner's early

rejection is irrelevant.  Third, even this Court said it was "dubious" whether Sunoco proved

Defendants' methods meet the butane vapor pressure limitations, Trial Tr. 1141:11-14, showing

that Defendants steadfast insistence of non-infringement on this basis was (and still is)

reasonable and certainly not in bad faith.

Sunoco's argument on the **fourth factor** (size and financial condition) fares no better.

Sunoco is clearly unhappy with the damages award, but that is a result of its own quixotic pursuit

of a windfall through a legally infirm damages theory.  Defendants' profits are entirely irrelevant

here where Sunoco simply failed to prove it was entitled to the damages it wanted.

As explained with respect to the second and third factors, the **fifth factor** also weighs

against enhancement because this case was very close.  "Just because the jury found for [Sunoco]

on infringement, invalidity, damages, and willfulness . . . does not mean that the evidence could

not have supported a verdict for [Defendants] on each of these questions," as evidenced by the

many successes Defendants had leading up to trial and the strength of their non-infringement and

invalidity presentations at trial.  *Siemens*, 2019 WL 3240521, at *8-9; *Vectura Ltd. v.

GlaxoSmithKline LLC*, No. CV 16-638-RGA, 2019 WL 4346502, at *4 (D. Del. Sept. 12, 2019)

(finding this factor weighed against enhancement where "Defendants presented 'considerable

evidence in support of [their] assertions of noninfringement'" and "also presented an invalidity

defense with prior art references that contain each and every claim element of the asserted

claims").  Nor does the fact that jury took four hours to deliberate help Sunoco, as this Court has

explained that the length of jury deliberation is not a "meaningful metric" in evaluating

enhancement.  *Vectura*, 2019 WL 4346502, at *4 n.3.

Neither the **sixth factor** (duration of misconduct) or the **seventh factor** (remedial

measures) support enhancement either.  Defendants have believed in good faith that their

systems were different since they first became aware of Sunoco's patents.  The '686 patent did not even issue until December 2015, well after Magellan changed its systems to feedback, and after Magellan bid for the Colonial project.  *See Siemens*, 2019 WL 3240521, at *8-9 (noting with respect to factor six that defendant launched its product before the patents-in-suit issued).  Further, even Sunoco admits that one reason Magellan changed its systems from feedforward to feedback was to avoid infringement, demonstrating remedial measures.  *See* D.I. 798 at 10.

Sunoco's only argument in support of the **<u>eighth factor</u>** (motivation to harm) focuses on the fact that Magellan and Sunoco competed for the Colonial bid.  But "ordinary competition driven by a profit motive does not constitute the motivation to harm with which this Read factor is concerned."  *Roche Diagnostics Corp. v. Meso Scale Diagnostics*, LLC, 503 F. Supp. 3d 156, 180 (D. Del. 2020).  The evidence showed Colonial chose Magellan because Magellan was a pipeline blender—it had experience blending on large pipelines and had systems in place to prevent delivery of out-of-spec product.  Trial Tr. 952:13-17, 955:4-13, 956:6-19.  Sunoco, on the other hand, was an unproven entity when it came to large scale pipeline blending.  Trial Tr. 956:6-957:3.  That Colonial chose Magellan over Sunoco was a matter of sound business, not an indication of a motivation to harm.  *Nox Med.*, 2018 WL 6427686, at *4 (finding this factor weighed against enhancement because "Plaintiff did not present persuasive evidence that Defendant acted with a motivation to cause harm other than the harm incidental to direct business competition").  Magellan and Sunoco have not otherwise competed for customers, and Sunoco cites nothing else to suggest Magellan acted out of any motivation to harm Sunoco.

Finally, the **<u>ninth factor</u>** weighs against enhancement because Defendants did not try to conceal anything.  The evidence showed that Mattingly knew back in the late 1990s/early 2000s that Williams purchased a Grabner online analyzer to perform automated blending.  Trial Tr.

400:12-402:16.  Mattingly also testified that he knew Magellan was doing automated blending when he helped with Texon's pitch to Magellan in 2005.  *Id*. at 411:12-412:6.  The evidence also showed Magellan's terminals were publicly accessible, that Mattingly ***sent his own contractor to Magellan's terminal*** to investigate its use of the online analyzer and that his contractor was able to do so and report back, and that Sunoco could and did come onto Magellan's Allen terminal whenever it needed.  *Id*. at 401:9-403:22, 404:14-407:18 (Mattingly); 785:3-786:21 (Moyer); 944:20-946:18, 947:1-17 (Hill). Nor does the fact that Magellan requested its patent application not be published during prosecution show any attempt to conceal its actual blending activities.

All of the *Read* factors weigh against enhancement, and certainly not a single factor overwhelmingly weighs in favor of enhancement.  This Court should thus exercise its discretion to deny Sunoco's motion for enhancement.  *Siemens*, 2019 WL 3240521, at *9 (refusing to enhance where four *Read* factors "favor enhancement" but "none overwhelmingly" and other factors "strongly disfavor enhancement"); *Nox Med.*, 2018 WL 6427686, at *4 (finding three factors weakly supported enhancement which was insufficient to warrant enhancement "even absent any offsetting factors," and further finding "counterbalancing factors" existed which made enhancement even more inappropriate); *Vectura*, 2019 WL 4346502, at *5 (refusing to enhance where plaintiff "d[id] not persuade [the Court] that the facts of this case are egregious").

### B.    Sunoco Is Not Entitled to Pre-Verdict Supplemental Damages

Sunoco had the burden to prove the amount of damages it believes it was owed as a result of Defendants' infringement.  Sunoco chose to try to meet that burden by presenting evidence of Defendants' blend volumes through January 2019 and then asking the jury to consider the time period after January 2019 in assessing damages.  The jury's award thus reflects the total damages it found Sunoco was owed for the entire pre-verdict time period, making any pre-verdict supplemental damages inappropriate.  Even if the jury's verdict could be viewed as only

13

accounting for the time period through January 2019, it was Sunoco's choice to present its damages case in that way.  Sunoco had Defendants' blending volume information through October 2021, just one month before trial, but failed to present it to the jury.  Further, Sunoco's calculation of pre- and post-supplemental damages for Magellan's terminals is flawed, as it uses a historical average of 38% to exclude the unaccused outbound volumes from its damages calculation, when it has the raw data from to which to exclude the ***actual*** outbound volumes.  If the Court awards supplemental damages, it should use these actual volumes, which would result in $6,479,507 in pre-verdict supplemental damages, not the $6,973,084 amount Sunoco seeks.

### 1.     The Jury Considered the Full Damages Period in its Verdict

Awarding compensatory damages is typically the province of the jury.  *See Dee v. Borough of Dunmore*, 474 F. App'x 85, 87 (3d Cir. 2012); *Presidio Components Inc. v. Am. Tech. Ceramics Corp.*, No. 08-CV-335-IEG NLS, 2010 WL 3070370, at *2 (S.D. Cal. Aug. 5, 2010), *aff'd in part, vacated in part*, 702 F.3d 1351 (Fed. Cir. 2012) (finding that awarding pre-verdict supplemental damages would be "an improper invasion of the jury's province to determine actual damages and an inappropriate use of 35 U.S.C. § 284 to enhance inadequate compensatory damages") (quotation marks omitted).  That is why supplemental damages are commonly awarded only for ***post-verdict*** accounting.  *See e.g.*, *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1384 (Fed. Cir. 2013).

Sunoco seeks ***pre-verdict*** supplemental damages here, based on its incorrect assumption that the jury did not account for the entire pre-verdict period.  But, in closing, Sunoco's counsel told the jury that the data he was basing his calculations on ran only through January 2019:

> Then we get to Defendants Powder Springs; that's Plaintiff's Exhibit 152. This, again, just like the prior one, by the way, ***both of these end in January 2019. So that's all the data we have is only up through 2019***. So what I'm giving you in gallons and barrels ends in 2019.  But this document, if we break this out, it turns out to 3.3 million barrels blended at Powder Springs. Taking out what needs to be

taken out, times 42, times $0.02, so that's $2.8 million. ***And that, again, is the floor that you should consider***.

Trial Tr. 1484:20-1485:4.  After hearing Sunoco's argument that it should consider the damages numbers based on the data through January 2019 as "the floor," the jury was then asked:

> What sum of money do you find Plaintiff Sunoco has proven by a preponderance of the evidence would fairly and reasonably compensate it for the infringement by [Magellan's systems and the Powder Springs system]?

D.I. 753 at 2.  The jury's damages award thus reflects the total damages it believed Sunoco had proven that would compensate it for Defendants' infringement—without any caveats or qualifications about the period of time for which it was awarding damages.  *Compare id. with Vectura*, D.I. 321 at 2 (Jury Verdict Form) (clarifying that the damages awarded were through December 31, 2018, which was months before the verdict).  Sunoco could have sought to, but did not, offer a proposed verdict form carving out specific time periods for the award.

This case is even more compelling against an award than others where courts have refused to award pre-verdict supplemental damages.  In those cases, the courts said the plaintiffs could have, but did not, argue to the jury that it should extrapolate the data to award damages to cover the full pre-verdict period.  *See Presidio*, 2010 WL 3070370, at *2 n.1; *TransPerfect Glob., Inc. v. MotionPoint Corp.*, No. C 10-2590 CW, 2014 WL 6068384, at *4 (N.D. Cal. Nov. 13, 2014); *Apple, Inc. v. Samsung Elecs. Co.*, 67 F. Supp. 3d 1100, 1119 (N.D. Cal. 2014), *aff'd*, 816 F.3d 788 (Fed. Cir. 2016), *vacated in part on reh'g en banc*, 839 F.3d 1034 (Fed. Cir. 2016), *and aff'd*, 839 F.3d 1034 (Fed. Cir. 2016).  Here, Sunoco's counsel did suggest to the jury that it could award higher damages than the amount he calculated in closing.  The jury simply chose not to do so, making any pre-verdict supplemental damages award improper.

### 2. Sunoco Had All Relevant Information From Which to Seek Total Damages Through Trial

Even if the jury's award could be viewed as limited to the time period through January

2019, Sunoco would still not be entitled to pre-verdict supplemental damages.  Courts typically award such damages only where the plaintiff was unable to present updated sales information because of "deficiencies in the discovery production."  *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, No. 2:10-CV-248, 2011 WL 4899922, at *4 (E.D. Va. Oct. 14, 2011), *aff'd*, 694 F.3d 1312 (Fed. Cir. 2012).  The cases Sunoco cites reflect this principle.  *See SynQor*, 709 F.3d at 1386 ("The district court found Delta unilaterally made a 'conscious and willful decision to withhold this relevant sales data from production'"); *E.I. DuPont de Nemours & Co. v. Unifrax I LLC*, No. CV 14-1250-RGA, 2017 WL 4004419, at *7 (D. Del. Sept. 12, 2017), *aff'd sub nom. E.I. du Pont De Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060 (Fed. Cir. 2019) ("At the time of trial, Defendant only produced sales information for 3G11 through February 2017"); *Metso Mins., Inc. v. Powerscreen Int'l Distribution Ltd.*, 833 F. Supp. 2d 333, 349 (E.D.N.Y. 2011) (awarding supplemental damages where plaintiffs failed to ask for sales data past October 2007 and Defendants "acted questionably" and failed to disclose sales data).

Here, it is undisputed that before the November 29, 2021 trial date, Sunoco had in its possession all the information necessary to enable it to calculate damages through October 2021.  D.I. 798 at 16.  Indeed, Sunoco included all of Defendants' blending data through October 2021 on its exhibit list before trial—including the very exhibits Dr. Ugone now cites to calculate supplemental damages for Sunoco.  Ex. A at 58, 78, 81 (identifying Defendants' blending data as PTX-648, PTX-867, PTX-897, PTX-898).  Yet Sunoco chose to only present the jury with evidence of Defendants' blending volumes through January 2019.

Sunoco's attempts to blame Defendants for its own failure to present the updated blend volumes fall flat.  First, Sunoco complains that Defendants did not produce updated information until after fact and expert discovery closed.  But that is because the vast majority of the data was

*for the time period after discovery closed* and therefore did not exist at the time. As Sunoco notes, Defendants produced up-to-date blending information through January 2019 before the close of fact discovery. D.I. 798 at 16. Defendants continued to produce updated blending information for Magellan and PSL in April 2020 and May 2021. *Id.*; *see also* D.I. 800, Exs. 2-5. And Defendants again supplemented their production with all available data through October 2021 on November 20, 2021—one week before trial began. D.I. 800, Exs. 1, 6, 7. Virtually none of this information existed at the close of the respective discovery periods (in April 2019 and August 2019), so it was impossible for Defendants to produce it before then. Second, Sunoco faults Defendants for not bringing a corporate finance person to trial who could authenticate the updated blending information. But Sunoco made no attempts to remedy its authentication problem. It never asked Defendants to stipulate to the authenticity or admissibility of the updated data, never sought leave to conduct any supplemental discovery to authenticate the data, and never took any other steps at trial to even try to admit the data.[6]

Simply put, Sunoco's proof problems stem from its own litigation choices. In a typical case, Sunoco's expert would present revised damages figures to the jury with updated data. But Sunoco chose to pursue a legally invalid damages theory, which resulted in this Court excluding Sunoco's damages expert, even after it gave Sunoco an opportunity to submit a legally sufficient report. D.I. 442; D.I. 547. When its expert was excluded, Sunoco never tried any alternative method for admitting the data. This Court should not reward Sunoco now by allowing it to collect damages it could not prove at trial—not through any fault of Defendants, but because

---

[6] Sunoco was aware of the Court's exclusion of its damage's expert over a year prior to the trial, and was specifically aware that Dr. Ugone would not be able to testify about Defendants' blend volumes six months before trial, providing ample time for Sunoco to develop a cognizable manner for presenting evidence to the jury. D.I. 547; D.I. 639.

Sunoco's own purposeful litigation strategies backfired.

### 3.     Sunoco's Supplemental Damages Calculation is Flawed

Finally, Sunoco's supplemental damages calculation is flawed.  To determine supplemental damages for Magellan's terminals, Dr. Ugone multiplied the total butane blended in the relevant time periods by 62% and then applied the $0.02 per gallon royalty.  D.I. 799 at 1-2.  Dr. Ugone arrived at that 62% value by assuming that 38% of the total volumes are unaccused outbound volumes, and subtracting that amount to account for only accused volumes.  *Id.*  But that is not a reliable calculation, because Sunoco's counsel at trial merely established that the ***average*** percentage of outbound volumes to total volumes from 2012-April 2019 was 38% of the total volumes.  Trial Tr. 1433:23-1435:7.  That says nothing about the ***actual*** percentage of outbound volumes to total volumes for the period of time that Sunoco seeks supplemental damages.  Instead, the proper base for supplemental damages (if the Court is inclined to award such damages) should be the ***actual*** accused volumes (inbound and rack volumes) from the relevant time period—information Sunoco has in its possession—which results in $6,479,508 in pre-verdict supplemental damages.  Maness Decl. ¶¶ 2-8, Exs. 1-2, 4-5.

### C.     Sunoco Should Not be Awarded Prejudgment Interest for Delay it Caused

Section 284 does not mandate the award of prejudgment interest whenever infringement is found; rather, "it leaves the court some discretion in awarding prejudgment interest."  *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 656-57 (1983).  The Supreme Court explained that "it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit."  *Id*. at 657.

Here, Sunoco is responsible for a period of prolonged delay that resulted in prejudice to the Defendants by both delaying resolution of the case and subjecting them to significant additional attorney fees in preparing for trial a second time.  After the Court announced its

intention to have all witnesses testify remotely, D.I. 583, on July 10, 2020, Sunoco requested

postponement of the impending trial, scheduled for less than a month away, D.I. 590.

Defendants did not join this request, stating that "[t]he parties are ready, and the case is ready for

trial," further explaining that they had "spent considerable resources preparing for trial…[and]

are prejudiced by not having resolution of this proceeding[.]" D.I. 591 at 1; *see also* D.I. 594 at

20-21.  At the hearing on the issue, the Court confirmed that Sunoco was fully aware of the risk

that a continuance could result in a delay of potentially two years.  D.I. 594 at 12-13.  Sunoco

continued to oppose setting the case for trial.  *See* D.I. 596; D.I. 604; D.I. 613.[7]  Defendants

continued to seek a trial date.  *Id*.  A seven day trial was eventually set to begin on June 14,

2021.  D.I. 619.  Ultimately the parties executed a term sheet memorializing the material terms of

a settlement, and entered a joint stipulation staying the case on June 2, 2021.  *See* D.I. 662.

Sunoco's actions in pursuing a unilateral continuance therefore resulted in a delay of ***nearly

eleven months*** (from its first request for a continuance in July 2020 through June 2021).

The addition of prejudgment interest for this entire time would prejudice Defendants and

reward Sunoco for its fully-informed (and fully-opposed) decision to delay trial.  But

"[p]rejudgment interest has no punitive, but only compensatory, purposes."  *Sanofi-Aventis v.

Apotex Inc.*, 659 F.3d 1171, 1179 (Fed. Cir. 2011) (quoting *Oiness v. Walgreen Co.*, 88 F.3d

1025, 1033 (Fed. Cir. 1996).  Interest merely compensates the patent owner for the use of its

money between the date of injury and the date of judgment.  *Id*.  Thus, prejudgment interest

should not be awarded to Sunoco for the period from its request for postponement (July 10,

2020) through the date the parties jointly stipulated to stay pending settlement (June 2, 2021).

---

[7] Notably, when Sunoco opposed trial dates in November 2020, it was with only a passing
reference to the pandemic.  D.I. 613 at 1-2.

*See Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1546 (Fed. Cir. 1991) (upholding denial of prejudgment interest for period of time when "proceedings were stayed upon the agreement of both parties, but [plaintiff] originally requested the stay").

That the circumstances here arose due to logistical issues related to the COVID pandemic does not change the calculus, as Sunoco requested the continuance when both the Court and the Defendants were ready to proceed with trial. *See Pierce Mfg., Inc. et al. v. E-One, Inc. et al.*, C.A. No. 8-18-cv-617-TPB-TGW, slip op. at *3 (M.D. Fla. Feb. 16, 2022) (finding plaintiffs "not entitled to prejudgment interest for the period of the continuance they requested" due to the COVID-19 pandemic).  Because Defendants bear no responsibility for this eleven month delay, they should not bear the costs of interest on it.[8]  Thus, if this Court does not grant Defendants' post-trial motions, then it should only award Sunoco $2,225,998 in prejudgment interest,[9] which also reduces Sunoco's post-judgment award to $11,223.  Maness Decl. ¶¶ 9-13, Exs. 3.A, 3.B.

## II.    CONCLUSION

For the foregoing reasons, the Court should deny Sunoco's motion for enhanced damages and pre-verdict supplemental damages, and if it upholds the jury's verdict, only award Sunoco $2,225,998 in prejudgment interest, and $11,233 in post-judgment interest.

---

[8] This case is thus different from others where the court awarded full prejudgment interest because both parties bore responsibility for the delay.  *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, C.A. No. 1-04-cv-1371-JJF, 2008 WL 5263903, *1 (D. Del. Dec. 12, 2008); *St. Clair Intellectual Property Consultants, Inc. v. Fuji Photo Film Co., Ltd., et al.*, 674 F. Supp. 2d 555, 560 (D. Del. 2009) (reversed on other grounds). To the extent Sunoco tries to argue that Defendants' request for a continuance to accommodate a seven day trial, see D.I. 622, should start the clock again on prejudgment interest, that is incorrect.  No continuance was entered, and Sunoco itself joined in that request.  *Id.*; *see also* D.I. 624.

[9] This amount does not include any prejudgment interest for the pre-verdict supplemental damages Sunoco seeks because, as discussed above, such damages are not proper here.

| | |
|---|---|
| MORRIS, NICHOLS, ARSHT & TUNNELL LLP | FISH & RICHARDSON P.C. |
| By: */s/ Rodger D. Smith II*<br>  Rodger D. Smith II (#3778)<br>  1201 North Market Street<br>  Wilmington, DE 19801<br>  (302) 658-351-9205<br>  rsmith@mnat.com<br><br>  OF COUNSEL:<br><br>  David S. Moreland<br>  John W. Harbin<br>  MEUNIER CARLIN & CURFMAN LLC<br>  999 Peachtree St., N.E., Suite 1300<br>  Atlanta, GA 30309<br>  (404) 645-7700<br>  dmoreland@mcciplaw.com;<br>  jharbin@mcciplaw.com<br><br>  *Attorneys for Defendant*<br>  *Powder Springs Logistics, LLC* | By: */s/ Nitika Gupta Fiorella*<br>  Douglas E. McCann (#3852)<br>  Martina Tyreus Hufnal (#4771)<br>  Nitika Gupta Fiorella (#5898)<br>  222 Delaware Ave., 17th Floor<br>  Wilmington, DE 19899<br>  Telephone: (302) 652-5070<br>  dmccann@fr.com; hufnal@fr.com;<br>  fiorella@fr.com<br><br>  Joseph A. Herriges<br>  FISH & RICHARDSON P.C.<br>  3200 RBC Plaza<br>  60 South Sixth Street<br>  Minneapolis, MN 55402<br>  Telephone: (612) 337-2579<br>  herriges@fr.com<br><br>  *Attorneys for Defendant*<br>  *Magellan Midstream Partners, L.P.* |

Dated:  March 18, 2022