IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SUNOCO PARTNERS MARKETING & TERMINALS L.P., <br><br> Plaintiff, <br><br> v. <br><br> POWDER SPRINGS LOGISTICS, LLC, and MAGELLAN MIDSTREAM PARTNERS, L.P., <br><br> Defendants. | Civil Action No. 17-1390-RGA |

## MEMORANDUM OPINION

John C. Phillips, Jr., Megan C. Haney, PHILLIPS, MCLAUGHLIN & HALL, P.A., Wilmington, DE; John Keville (argued), Michelle Replogle, Michael Krill, SHEPPARD MULLIN RICHTER & HAMPTON, Houston, TX; Richard McCarty, WINSTON & STRAWN LLP, Houston, TX,

    Attorneys for Plaintiff.

Roger D. Smith II, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; David S. Moreland, John W. Harbin, MEUNIER CARLIN & CURFMAN LLC, Atlanta, GA,

    Attorneys for Defendant Powder Springs Logistics, LLC.

Douglas E. McCann, Martina Tyreus Hufnal, Nitika Gupta Fiorella (argued), FISH & RICHARDSON P.C., Wilmington, DE; Joseph A. Herriges, FISH & RICHARDSON P.C., Minneapolis, MN,

    Attorneys for Defendant Magellan Midstream Partners, L.P.

August 31, 2022

ANDREWS, U.S. DISTRICT JUDGE:

Before me is Defendants' Motion of Invalidity of the Asserted Claims Under 35 U.S.C. Section 101. (D.I. 793). I have reviewed the parties' briefing (D.I. 794, 811, 824), and I heard oral argument on August 3, 2022 (D.I. 849). For the following reasons, this motion is DENIED.

## I. BACKGROUND

On August 2, 2018, Sunoco filed its First Amended Complaint, alleging that Defendants infringed U.S. Patent Nos. 6,679,302 ("the '302 patent"); 7,032,629 ("the '629 patent"); and 9,207,686 ("the '686 patent"). (D.I. 132). A jury trial was held from November 29, 2021 to December 6, 2021 regarding infringement and validity of eight asserted claims. (D.I. 817–822).[1] The issue of § 101 was reserved for post-trial briefing. (D.I. 709 at 13–14). Following a jury verdict finding all asserted claims valid and infringed (D.I. 743), Defendants move under Rule 52(c) for a judgment that all asserted claims are invalid under § 101. (D.I. 793).

## II. LEGAL STANDARD

Section 101 of the Patent Act defines patent-eligible subject matter. It provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court recognizes three categories of subject matter that are not eligible for patents—laws of nature, natural phenomena, and abstract ideas. *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). The purpose of these exceptions is to protect the "basic tools of scientific and

---

[1] I cite to the trial transcript as "Trial Tr." The trial transcript is consecutively numbered.

1

technological work." *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 71 (2012).

In *Alice*, the Supreme Court reaffirmed the framework laid out in *Mayo* "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 573 U.S. at 217. First, the court must determine whether the claims are directed to a patent-ineligible concept. *Id.* If the answer is yes, the court must look to "the elements of each claim both individually and as an ordered combination" to see if there is an "inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* at 217–18 (cleaned up).

"While the ultimate determination of eligibility under § 101 is a question of law, . . . there can be subsidiary fact questions which must be resolved en route to the ultimate legal determination." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).

## III. DISCUSSION

At *Alice* Step One, Defendants argue that all asserted claims are directed to "the abstract ideas of receiving and/or transmitting blending data, calculating a butane blend ratio or blend rate from that data and, in some cases, generating reports from that data with a computer." (D.I. 794 at 9).

"The 'abstract ideas' category embodies 'the longstanding rule that an idea of itself is not patentable.'" *Alice*, 573 U.S. at 218 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)). "The Supreme Court has not established a definitive rule to determine what constitutes an 'abstract idea' sufficient to satisfy the first step of the *Mayo/Alice* inquiry." *Enfish, LLC v.*

*Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016). The Supreme Court has recognized, however, that "fundamental economic practice[s]," *Bilski v. Kappos*, 561 U.S. 593, 611 (2010), "method[s] of organizing human activity," *Alice*, 573 U.S. at 220, and mathematical algorithms, *Benson*, 409 U.S. at 64, are abstract ideas. In navigating the parameters of such categories, courts have generally sought to "compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish*, 822 F.3d at 1334.

In determining whether claims are directed to an abstract idea, the court should look to whether the claims "focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (citing *Enfish*, 822 F.3d at 1336). The Federal Circuit further instructs district courts to "approach[] the Step 1 directed to inquiry by asking what the patent asserts to be the focus of the claimed advance over the prior art. In conducting that inquiry, we must focus on the language of the asserted claims themselves, considered in light of the specification." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020) (cleaned up).

### 1. The '302 and '629 Patents

The '302 and '629 patents disclose methods and systems for blending gasoline and butane at the point of distribution. (*See* PTX 1; PTX 2). The '629 patent is a continuation of the '302 patent, and the patents share a common specification. The asserted claims include claims 3, 16, and 17 of the '302 patent and claims 18, 22, 31, and 32 of the '629 patent.

Claim 3 of the '302 patent—which depends from claims 1 and 2—provides:

1. A system for blending gasoline and butane at a tank farm comprising:
   a) a tank of gasoline;
   b) a tank of butane;

3

c) a blending unit, at the tank farm, downstream of and in fluid connection with the tank of gasoline and the tank of butane;
d) a dispensing unit downstream of and in fluid connection with the blending unit; and
e) a rack, wherein the dispensing unit is located at the rack and is adapted to dispense gasoline to gasoline transport vehicles.

2. The system of claim 1 further comprising a process control unit, wherein the process control unit generates a ratio input signal that controls the ratio of butane and gasoline blended by the blending unit.

3. The system of claim 2 wherein the ratio input signal is derived from a calculation of the ratio of butane and gasoline that will yield a desired vapor pressure.

Claims 16 and 17 of the '302 patent—which depend from claims 12, 13, and 14—provide:

12. A method for blending gasoline and butane at a tank farm comprising:
    a) drawing a gasoline stream from a tank of gasoline;
    b) drawing a butane stream from a tank of butane;
    c) blending the butane and gasoline streams, at the tank farm, to form a blend; and
    d) dispensing the blend to gasoline transport vehicles using a dispensing unit located at a rack.

13. The method of claim 12, further comprising:
    a) determining a blend ratio of butane and gasoline in the butane and gasoline streams that will yield a desired vapor pressure, and
    b) blending the gasoline and butane streams at the blend ratio.

14. The method of claim 13, wherein the blend ratio is determined from a vapor pressure of the gasoline stream and a vapor pressure of the butane stream.

16. The method of claim 14, wherein the step of determining the blend ratio comprises:
    a) setting a predetermined value for the vapor pressure of the blend;
    b) transmitting the predetermined value for the vapor pressure of the blend to a processing unit;
    c) transmitting the gasoline vapor pressure and the butane vapor pressure to the processing unit;
    d) calculating the blend ratio from the gasoline vapor pressure, the butane vapor pressure, and the predetermined value for the vapor pressure of the blend.

17. The method of claim 16, further comprising:
    a) transmitting a signal that corresponds to the vapor pressure of the blend from the processing unit to a programmable logic control; and
    b) adjusting the ratio of butane and gasoline blended in the blending unit with the programmable logic control.

Claims 18 and 22 of the '629 patent—which depend from claim 17—provide:

17. A computer-implemented method for blending a butane stream with a gasoline stream comprising the steps of:
    receiving a first measurement indicating a vapor pressure of the gasoline stream;
    receiving a second measurement indicating a vapor pressure of the butane stream;
    calculating a blend rate at which the butane stream can be blended with a gasoline stream; and
    transmitting an instruction to a programmable logic controller for adjusting the butane stream to the calculated blend rate for blending with the gasoline stream and distributing at a rack.

18. The computer-implemented method of claim 17, wherein the blend rate is based on a predetermined vapor pressure for the blended gasoline and butane.

22. The computer-implemented method of claim 17, further comprising the steps of:
    receiving a third measurement indicating a vapor pressure of the blend of the gasoline stream and the butane stream; and
    generating a report comprising the third measurement.

Claim 31 and 32 of the '629 patent provide:

31. A computer-implemented method for blending a butane stream and a gasoline stream comprising the steps of:
    receiving a first measurement indicating a vapor pressure of the gasoline stream;
    calculating a blend rate at which the butane stream can be blended with the gasoline stream;
    transmitting an instruction to a programmable logic controller for adjusting the butane stream to the calculated blend rate for blending with the gasoline stream and distributing at a rack; and
    receiving a second measurement indicating a vapor pressure of the blended gasoline stream and butane stream.

32. The computer-implemented method of claim 31, further comprising the step of generating a report comprising the second measurement.

Defendants argue that the asserted claims of the '302 and '629 patents are directed to "the abstract idea of gathering and transmitting blend data and using generic computer components to calculate a blend ratio and add butane to gasoline." (D.I. 794 at 9). They argue that the focus of the claims is "using a computer to automate aspects of butane blending that have long been done manually." (*Id.* at 1; D.I. 849 at 59:11–25). Sunoco responds that these claims are

5

instead directed to improved systems and methods for blending butane and gasoline at tank farms. (D.I. 811 at 7).

The common specification describes in the "Background of the Invention" section, "Butane has historically been blended with gasoline at several points in the gasoline distribution chain." (PTX 1 at 1:65–66). Butane is more volatile than gasoline, so it is "commonly added as a RVP[2] modifying agent during colder months" when the vapor pressure of gasoline decreases. (*Id.* at 1:40–49). Butane is "also added to reduce the cost of gasoline, because it is generally less expensive than gasoline bought at the wholesale level." (*Id.* at 1:49–51).

Butane has historically been added to gasoline at tank farms, before the gasoline is dispensed to tanker trucks using a dispensing unit, such as a rack. (*Id.* at 1:65–66, 2:24–33, 2:37–40 (describing that gasoline from the tanks at tank farms is dispensed to tanker trucks), 5:18–20 (identifying a "rack" as a typical dispensing unit)). The patents describe blending at the tank farm, explaining, "When delivery of gasoline is made to a large storage tank, the RVP of the tank is measured, and sufficient butane is added to the tank to attain a desired RVP." (*Id.* at 2:24–27).

Conventional blending methods at tank farms involved blending butane directly from a truck of butane into a gasoline storage tank, which was a "labor intensive and imprecise" process. (*Id.* at 2:23–44; Trial Tr. at 527:8–528:14 (Kytomaa), 251:10–16 (Mattingly), 173:18–174:9 (Colella)). Before blending, an operator would climb to the top of the gasoline tank, take several samples from the tank, measure the RVP of the samples, and determine an amount of butane to add to the tank to attain a desired RVP. (PTX 1 at 2:33–44; Trial Tr. at 527:20–528:8

---

[2] RVP or Reid vapor pressure is the measure of a petroleum product's volatility or ability to combust. (PTX 1 at 1:29–43).

(Kytomaa), 173:18–174:9 (Colella)). The operator would then order trucks of butane, connect the butane trucks to the tank, and offload butane into the tank. (Trial Tr. at 527:20–528:8 (Kytomaa)). The gasoline tank would then be stirred for a considerable amount of time (around twelve hours) to render it homogeneous. (*Id.*; PTX 1 at 2:41–44). The operator would then climb to the top of the tank, retrieve samples from the tank, and measure the RVP of the samples. (Trial Tr. at 527:20–528:8 (Kytomaa)). If the RVP of the gasoline tank was still too low, the operator would order additional butane trucks and repeat the process. (*Id.*). If the RVP was acceptable, the operator would certify the RVP of the tank and allow it to be released. (*Id.*). Because these conventional methods were imprecise, suppliers were unable to maximize the amount of butane blended with gasoline. (PTX 1 at 2:39–47, 2:66–3:11; *see also* Trial Tr. at 528:17–23 (Kytomaa)).

The specification and trial testimony make clear that manual blending was performed prior to this invention. Defendants, however, have failed to show that the claimed invention simply automates this prior manual blending. Defendants have not met their burden to show that the claimed blending steps "have long been done manually." (*See* D.I. 794 at 1).[3] Instead,

---

[3] I granted Sunoco's Motion to Strike the exhibits attached to Defendants' Proposed Findings of Fact. (D.I. 848). These exhibits related to the prior art Kerr-McGee system, which was an invalidating reference in *Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 339 F. Supp. 3d 803, 825–26 (N.D. Ill. 2018), *aff'd in part, vacated in part, rev'd in part on other grounds*, 32 F.4th 1161 (Fed. Cir. 2022). Defendants argue that this Court can still find that the claimed blending steps were conventional activities based on the remaining findings of fact that rely on excerpts of the Kerr-McGee documents from the prosecution history of the '948 patent (which is a continuation of the '686 patent). (D.I. 845 at 2–4, 2 n.1; *see* D.I. 844-8, Ex. 8). These documents, however, do not show that the claimed blending steps were conventional activities. Instead, I find that the record evidence shows that the prior manual blending was performed according to the steps detailed *supra.*

7

I find that claims 3, 16, and 17 of the '302 patent and claims 18, 22, 31, and 32 of the '629 patent are directed to improved systems and methods for blending butane.

Unlike the prior manual blending method, where butane was added directly to the gasoline tank, "The blending occurs downstream of the gasoline and butane storage tanks on the tank farm, after the gasoline and butane are drawn from their storage tanks for dispensing into a tanker truck, but before the gasoline is actually dispensed to the tanker truck at the rack." (PTX 1 at 3:16–21). Further, the invention uses "a blending apparatus" for blending the butane and gasoline streams at varying blend ratios to achieve a desired vapor pressure, and the apparatus is "under the continuous control of a process control unit, which can vary the ratio at which gasoline and butane are blended to attain a desired vapor pressure." (*Id.* at 3:21–31). The claimed invention allows for blending the butane and gasoline streams to form a blend such that the maximum allowable vapor pressure is not exceeded and then dispensing the blend at the rack, without having to stir the tank and certify the vapor pressure of the tank before releasing it to the rack. (*Id.* at 10:33–36, 11:30–42, 11:50–55).

The specification explains that these features are part of the claimed invention's improvement over conventional methods. Specifically, "By blending gasoline and butane immediately before the gasoline is dispensed to a tanker truck, and by continuously controlling the ratio of gasoline and butane blended by the blending apparatus, a number of significant advantages are attained, including," among other things, that "[t]he ratio of butane and[] gasoline blended can be easily varied and controlled" and "operators are able to maximize the amounts of butane that they blend." (*Id.* at 3:44–67; *see also id.* at 10:26–33, 11:39–43, 11:51–60).

The '302 patent claims capture these improved blending methods by reciting a system and a method "for blending gasoline and butane at a tank farm" that includes: (1) "a butane

stream" and "a gasoline stream"; (2) a processing unit to calculate a blend ratio; (3) equipment (e.g., a blending unit downstream of the gasoline tank) for blending the streams at the calculated blend ratio; and (4) dispensing the blend at a truck rack. Additionally, claims 16–17 recite: (5) transmitting the vapor pressure of the gasoline stream to the processing unit; (6) calculating the blend ratio with the processing unit; (7) transmitting the vapor pressure of the blended stream; and (8) adjusting the blend ratio.

The '629 patent claims capture these improved blending methods by reciting "[a] computer-implemented method for blending" that includes: (1) "a butane stream" and "a gasoline stream"; (2) "receiving … a vapor pressure of the gasoline stream"; (3) "calculating a blend rate at which the butane stream can be blended with a gasoline stream"; (4) "transmitting an instruction to a programmable logic controller for adjusting the butane stream to the calculated blend rate for blending with the gasoline stream"; and (5) "distributing at a rack." Further, claims 22, 31, and 32 recite: (6) "receiving a … a vapor pressure of the blended gasoline stream and butane stream."

Defendants rely on the Federal Circuit's decision in *University of Florida Research Foundation, Inc. v. General Electric Co.*, 916 F.3d 1363 (Fed. Cir. 2019) to support their argument. This case, however, is distinguishable. There, the patent claimed a method and system for integrating physiologic treatment data by obtaining treatment data from multiple bedside machines, converting that data to a "machine independent format," and displaying the results on a user interface. *Univ. of Fla. Rsch. Found.*, 916 F.3d at 1366. The Federal Circuit held that the claims were directed to the abstract idea of collecting, analyzing, manipulating, and displaying data. *Id.* at 1368. The Court held that the patent at issue was unpatentable because it simply sought to automate the prior art "'pen and paper methodologies' to conserve human

9

resources and minimize errors" and failed to recite any specific improvement to the way computers operate. *Id.* at 1367. The Federal Circuit further noted, "This is a quintessential 'do it on a computer' patent: it acknowledges that data from bedside machines was previously collected, analyzed, manipulated, and displayed manually, and it simply proposes doing so with a computer." *Id.*

The same is not true here. The '302 and '629 patents do not simply propose taking the previous manual blending systems and replacing the human operator with a computer. The patents claim a specific improvement to the physical blending. Further, the claims in *University of Florida* were solely directed to collecting and displaying data, whereas the claims here are directed to a physical process.

The Federal Circuit's decision in *EcoServices, LLC v. Certified Aviation Services, LLC*, 830 F. App'x 634 (Fed. Cir. 2020) is more analogous to the claims at issue here. There, the Federal Circuit denied the defendant's argument that the claimed "system for washing turbine engines" was "directed to the abstract idea of using a generic computer to automate the conventional washing process traditionally performed by human operators." *EcoServices*, 830 F. App'x at 636, 642. Although the specification made clear that human operators were washing aircraft engines prior to the claimed invention. the claimed invention was not merely directed to using a computer to automate these prior art methods. *Id.* at 643 ("That the claimed system achieves automation of a task previously performed by humans, however, does not mean the claimed system is necessarily directed to an abstract idea.").[4]

---

[4] I note that *EcoServices* is not a precedential opinion, and that the decision on the comparable claims was not unanimous.

The Federal Circuit found that the claims were "directed to a specific combination of a type of washing unit, information detector, and control unit, configured in a certain way to create technical improvements to systems for washing jet engines," and so not directed to an abstract idea. *Id.*; *see also, e.g., CardioNet, LLC v. InfoBionic, Inc*, 955 F.3d 1358, 1368 (Fed. Cir. 2020) (holding that the claims "'focus on a specific means or method that improves' cardiac monitoring technology; they are not 'directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery'" (quoting *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016))), *cert. denied*, 141 S. Ct. 1266 (2021).

Similarly, here, the claims are not simply directed to the automation of the prior manual blending methods in which an operator would measure the RVP of samples from a gasoline tank, add the appropriate amount of butane into the tank, stir the tank, and then measure the RVP of the blend. As shown above, the claims are directed to specific technical systems and methods that "allow[] a distributor to blend more gasoline than would be possible with the prior art." (PTX 1 at 11:53–55).

"[P]rocesses that automate tasks that humans are capable of performing are patent eligible if properly claimed." *McRO*, 837 F.3d at 1313. I believe the '302 and '629 patent claims evince this proper claiming. I therefore find that claims 3, 16, and 17 of the '302 patent and claims 18, 22, 31, and 32 of the '629 patent are not directed to an abstract idea at *Alice* Step One.

### 2. The '686 Patent

The '686 patent is a continuation-in-part of the '629 patent (which is a continuation of the '302 patent). The '686 patent discloses a method for in-line blending of butane and gasoline "at

11

any point along a petroleum pipeline." (PTX 3 at 1:22–25). Claim 3—which depends from claim 1—is the only asserted claim of the '686 patent.

> 1. A method for in-line blending of gasoline and a volatility modifying agent comprising:
>    a) providing a continuously flowing gasoline stream that comprises:
>       i) a plurality of batches of different gasoline types;
>       ii) a gasoline flow rate that varies over time; and
>       iii) a plurality of gasoline vapor pressures;
>    b) providing an allowable vapor pressure;
>    c) providing a stream of said agent that comprises an agent vapor pressure;
>    d) periodically determining said gasoline vapor pressure;
>    e) periodically determining said gasoline flow rate;
>    f) calculating a blend ratio based upon said agent vapor pressure, said gasoline vapor pressure, and said allowable vapor pressure; and
>    g) blending said agent stream and said gasoline stream at a blending unit at said blend ratio to provide a blended gasoline stream having a blended vapor pressure less than or equal to said allowable vapor pressure.
>
> 3. The method of claim 1, further comprising:
>    a) providing a first information processing unit (IPU) on which said calculating is performed;
>    b) providing a second IPU which generates pulses of flow rate data;
>    c) transmitting said flow rate data to said first IPU; and
>    d) calculating a blend rate on said first IPU based upon said flow rate data from said second IPU.

Defendants argue that claim 3 is directed to the "abstract idea of receiving blending data and using a generic computer to make calculations based on those measurements." (D.I. 794 at 18). Defendants reason that the claimed advance is simply the automation of the well-known methods for manual blending along a pipeline. (D.I. 824 at 8; D.I. 849 at 70:24–71:1). Sunoco argues that claim 3 is instead directed to a specific method for pipeline blending. (D.I. 811 at 16–17; D.I. 849 at 99:17–20).

Conventional methods for pipeline blending involved adding butane "to a certain volume of gasoline with a constant volatility." (PTX 1 at 2:11–14). With these methods, it was "difficult to perform blending in the pipeline with any measure of precision" because "[t]he rates

of flow within the pipelines and the Reid vapor pressure of a certain volume of gasoline within the pipeline vary considerably." (*Id.* at 2:14–18; *see also* Trial Tr. at 526:21–527:6 (Kytomaa)). "An additional difficulty is that the pipeline must be physically breached in at least two locations to sample the gasoline, and to add butane to the flow of gasoline." (PTX 1 at 2:18–21).

Defendants have not shown that claim 3 is directed simply to the automation of these prior manual blending methods. Claim 3 is instead directed to a specific method for in-line blending.

The specification describes the claimed invention as "a tightly controlled butane blending system with surprising versatility that can be used to blend butane with petroleum products at practically any point along a petroleum pipeline, regardless of variations in the flow rate of gasoline . . . , the time of year . . . , or the ultimate destination." (PTX 3 at 3:17–23). One embodiment includes "periodically determining" the gasoline flow rate and vapor pressure so that "the blend ratio and blend rate are both periodically recalculated to account for differences within and among batches in gasoline flow rate and gasoline vapor pressure." (*Id.* at 3:52–64; *see also id.* at 14:38–44).

Claim 3 of the '686 patent captures these unconventional methods by reciting "periodically determining said gasoline vapor pressure" and "said gasoline flow rate," "calculating a blend ratio based upon . . . said gasoline vapor pressure[] and said allowable vapor pressure," and "blending" the butane and gasoline streams "at a blending unit at said blend ratio to provide a blended gasoline stream having a blended vapor pressure less than or equal to said allowable vapor pressure." (*Id.* at 15:61–16:13). Further, claim 3 adds a processing unit that "generates pulses of flow rate data" and another processing unit that performs the steps of

13

"calculating a blend ratio" and of "calculating a blend rate . . . based upon said flow rate data." (*Id.* at 16:16–23).

The Federal Circuit's decision in *McRO, Inc. v. Bandai Namco Games America Inc.* is instructive. In *McRO*, the Federal Circuit held that a claim directed to a "method for automatically animating lip synchronization" was not directed to an abstract idea. *McRO*, 837 F.3d at 1307, 1316. The Federal Circuit reasoned that the claim did not "simply use a computer as a tool to automate conventional activity" and instead used a computer "to perform a distinct process to automate a task previously performed by humans." *Id.* at 1314. The Court further noted, "Defendants provided no evidence that the process previously used by animators is the same as the process required by the claims." *Id.* Here, Defendants have similarly failed to provide sufficient evidence that the prior art manual blending process is the same process required by claim 3.[5] Further, just like in *McRO*, the claimed invention here uses a computer "to perform a distinct process to automate a task previously performed by humans." (*See* PTX 3 at 3:17–23).

I therefore find that claim 3 of the '686 patent is not directed to an abstract idea at *Alice* Step One.

---

[5] Most of Defendants' trial evidence of prior manual blending systems related to the Williams and TransMontaigne systems. (*See, e.g.*, Trial Tr. at 786:5–789:1 (Moyer), 881:19–887:16 (Howerton); DTX 40; DTX 649). The jury, however, found that these systems were not prior art. (D.I. 743 at 6). Defendants have not challenged this finding. Thus, this evidence has limited, if any, value, and it certainly does not show that the claimed steps were well-understood and conventional activities as of 2001. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018) ("Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art.").

## IV. CONCLUSION

Because Defendants have failed to show that any of the asserted claims are directed to abstract ideas, Defendants' Motion of Invalidity of the Asserted Claims Under 35 U.S.C. Section 101 (D.I. 793) is **DENIED**.